**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CHARMING CHARLIE HOLDINGS INC., *et al.*,[1] | ) Case No. 19-11534 (___) |
| | ) |
| | ) (Joint Administration Requested) |
| Debtors. | ) |
| | ) |

**DEBTORS' MOTION SEEKING ENTRY OF INTERIM**
**AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO**
**ASSUME THE CONSULTING AGREEMENT, (II) APPROVING PROCEDURES**
**FOR STORE CLOSING SALES, (III) APPROVING THE IMPLEMENTATION**
**OF CUSTOMARY STORE BONUS PROGRAM AND PAYMENTS**
**TO NON-INSIDERS THEREUNDER, AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion:[2]

**Relief Requested**

1.      The Debtors seek entry of interim and final orders, substantially in the forms

attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and "Final

Order"): (a) authorizing the Debtors to assume that certain Letter Agreement Governing

Inventory Disposition dated as of July 3, 2019 (the "Consulting Agreement"), by and between

Charming Charlie LLC and Charming Charlie USA, Inc. (together, the "Merchant") and Hilco

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Charming Charlie Canada LLC (0693); Charming Charlie Holdings Inc. (6139); Charming Charlie International LLC (5887); Charming Charlie LLC (0263); Charming Charlie Manhattan LLC (7408); Charming Charlie USA, Inc. (3973); and Poseidon Partners CMS, Inc. (3302). The location of the Debtors' headquarters is: 6001 Savoy Drive, Ste. 600, Houston, Texas 77036.

[2]     A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Alvaro Bellon, Chief Financial Officer of Charming Charlie Holdings Inc., in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on July 11, 2019 (the "Petition Date"). Capitalized terms used, but not otherwise defined in this motion shall have the meanings ascribed to them in the First Day Declaration.

Merchant Resources, LLC and SB360 Capital Partners, LLC (together, the "Consultant"), a copy of which is annexed as Exhibit 1 to **Exhibit A**, attached hereto; (b) authorizing the Debtors to conduct store-closing sales at approximately 261 stores listed in Exhibit A to the Consulting Agreement (collectively, the "Stores"), in accordance with the terms of the store closing procedures (the "Store Closing Procedures"), annexed as Exhibit 2 to **Exhibit A**, attached hereto, with such sales to be free and clear of all liens, claims, and encumbrances (the "Sales"); (c) approving the proposed dispute resolution procedures described herein to resolve any disputes with governmental units regarding certain applicable nonbankruptcy laws that regulate liquidation and similar-themed sales; (d) approving the implementation of a bonus program (the "Store Bonus Program") and authorizing payments thereunder to certain non-insider employees; and (e) granting related relief.   In addition, the Debtors request that the Court schedule a final hearing within approximately 30 days of the commencement of these chapter 11 cases to consider entry of the Final Order.

### Jurisdiction and Venue

2.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware,* dated February 29, 2012.   The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105, 363, 365, and 554 of the Bankruptcy Code, Bankruptcy Rules 2002, 6003, and 6004, and Local Rule 9013-1(m).

## The Store Closings

5.      Following extensive analysis, the Debtors and their advisors have made the difficult decision to seek authority to close and wind down or conduct other similar themed sales ("Store Closings") for all of the Debtors' brick-and-mortar store locations.  The decision has been made after the implementation of numerous cost-reduction measures and the closure of approximately 100 underperforming stores (for which the Debtors obtained approval in the prior chapter 11 cases).[3]  These efforts simply were not sufficient to stabilize the Debtors' businesses and ensure long-term profitability.  As the Court is aware, the Debtors have also faced significant headwinds given the continued decline of the brick-and-mortar retail industry.  The Debtors also faced a number of additional challenges, all as set forth in greater detail in the First Day Declaration.

6.      After arm's-length and extensive negotiations the Debtors chose to engage the Consultant to:  (a) manage the Store Closings; (b) sell all goods, saleable in the ordinary course, located in the Stores or the Debtors' warehouses, 3PLs, and distribution centers (collectively, the "DCs"), in transit to the Stores or DCs, or on order as of the Sale Commencement Date (as defined in the Consulting Agreement) (collectively, the "Merchandise"), subject to the FF&E Election (as defined in the Consulting Agreement) on a guaranty basis or on a fee basis, owned furnishings, trade fixtures, equipment and improvements to real property that are located in the

---

[3]     *See In re Charming Charlie Holdings Inc.*, No. 14-12906 (CSS) (Bankr. D. Del. Jan. 10, 2018).

Stores, DCs, and corporate offices (collectively, the "FF&E"), and the Additional Consultant Goods (as defined in the Consulting Agreement as "Additional Agent Goods", and together with the FF&E and the Merchandise, the "Store Closure Assets") located in the stores; and (c) otherwise prepare the stores for turnover to the applicable landlords on the terms set forth in the Consulting Agreement.  Based on an evaluation of the circumstances, and the Consultant's experience in conducting store closings on an expedited timeline, the Debtors' management, in consultation with the Debtors' advisors, determined that the Consultant provided the best and most competitive proposal.

7.    Pursuant to the Consulting Agreement, the Debtors commenced the Sales on July 8, 2019, and expect such Sales and Store Closings to be completed and the properties vacated by August 31, 2019.  The Debtors estimate that the proceeds from the Sales will be approximately $30 million.

8.    By this motion, the Debtors seek to assume the Consulting Agreement so that the Consultant may continue in its role as Consultant for the Sales and the Store Closings on a postpetition basis without interruption.  The Debtors have determined, in the exercise of their business judgment, that (a) the continuation of services by the Consultant is necessary for efficient large-scale execution of the Sales and Store Closings and to maximize the value of the assets being sold, and (b) any change in or elimination of the engagement with the Consultant would significantly disrupt the Sale process and impair the value of the remaining Store Closure assets.

9.    Further, the Store Closings are a critical component of the Debtors' ability to maximize value for all stakeholders, and assumption of the Consulting Agreement will allow the Debtors to continue to conduct the Sales and Store Closings in an efficient, controlled manner

that will maximize value for the Debtors' estates.  It will permit the Debtors to continue the Sales

and the Store Closings in a timely manner as contemplated by this motion and will establish fair

and uniform store closing procedures.

## I.    The Consulting Agreement.

10.    Pursuant to the Consulting Agreement, the Consultant will serve as the exclusive

agent to the Debtors in connection with the Sales.   The Debtors believe that assuming the

Consulting Agreement will allow the Debtors to continue to utilize the logistical capabilities,

experience, and resources of the Consultant in performing large-scale liquidations in a format

that allows the Debtors to retain control over the sale process.  A summary of the salient terms of

the Consulting Agreement is set forth below.[4]

| Term | Consulting Agreement |
|---|---|
| **Services Provided by Consultant** | During the Sale Term, Consultant shall, in collaboration with Merchant, (a) provide qualified supervisors (the "<u>Supervisors</u>") engaged by Consultant to oversee the management of the Stores; (b) determine appropriate point-of-sale and external advertising for the Stores, including assisting Merchant in developing in-store signage for use during the soft sale period, in all cases approved in advance by Merchant; (c) determine appropriate discounts of Merchandise, staffing levels for the Stores, approved in advance by Merchant, and appropriate bonus and incentive programs, if any, for the Stores' employees, approved in advance by Merchant; (d) oversee display of Merchandise for the Stores; (e) to the extent that information is available, evaluate sales of Merchandise by category and sales reporting and monitor expenses; (f) maintain the confidentiality of all proprietary or nonpublic information regarding Merchant in accordance with the provisions of the confidentiality agreement signed by the Parties; (g) assist Merchant in connection with managing and controlling loss prevention and employee relations matters; (h) prepare permit or other license applications necessary to conduct the Sale at the Stores for signature by Merchant, the costs and expenses of which shall be paid by Merchant and are in addition to the Expense Budget; (i) participate in weekly calls with representatives of the Merchant, the ABL Agents, and the Second Lien Agent; and (j) provide such other related services deemed necessary or appropriate by Merchant and Agent.<br><br>At the conclusion of the Sale, Consultant shall surrender the premises for each Store to Merchant in broom clean condition with unsold FF&E abandoned in neat and orderly fashion.  At the conclusion of the Sale at each Store, Consultant shall photographically document the condition of each such Store. |

---

[4]    The following summary chart is for the convenience of the Bankruptcy Court and parties in interest.  To the extent there is any conflict between this summary and the Consulting Agreement, the Consulting Agreement shall govern in all respects.  For purposes of the summary chart, capitalized terms used, but not otherwise defined in the motion or in the chart shall have the meanings ascribed to them in the Consulting Agreement.

| Term | Consulting Agreement |
|------|---------------------|
| Term of Sale | For each Store, the Sale commenced on July 8, 2019 (the "<u>Sale Commencement Date</u>") and conclude no later than August 31, 2019 (the "<u>Sale Termination Date</u>"); *provided, however,* that the Merchant and the Consultant may mutually agree in writing to extend or terminate the Sale at any Store prior to the Sale Termination Date; *provided, however,* any extension or early termination of the Sale at any of the Stores shall take into account the costs incurred or to be incurred by Merchant weighed against the benefit achieved, in connection therewith..  The period between the Sale Commencement Date and the Sale Termination Date shall be referred to as the "<u>Sale Term</u>." |
| Expenses of Consultant | Merchant shall be responsible for all expenses of the Sale, including (without limitation) all Store level operating expenses, all costs and expenses related to Merchant's other retail store operations, and Consultant's other reasonable, documented out of pocket expenses. To control expenses of the Sale, Merchant, Consultant, and White Oak Commercial Finance LLC and Second Avenue Capital Partners, LLC,[5] in their capacities as agents (the "<u>ABL Agents</u>") under that certain Credit Agreement dated as of February 28, 2019 (the "<u>ABL Credit Agreement</u>") by and between, among others, Merchant and the ABL Agents, have established an aggregate budget (the "<u>Expense Budget</u>") of certain delineated expenses, including (without limitation) payment of the costs of supervision (including (without limitation) Supervisors' wages, fees, travel, and deferred compensation) and advertising costs.  The Expense Budget for the Sale is attached to the Consulting Agreement as **<u>Exhibit B</u>**. The Expense Budget may only be modified by mutual agreement of the Consultant, Merchant, and the ABL Agents.  The costs of supervision set forth on <u>Exhibits B</u> include, among other things, industry standard deferred compensation.

All accounting matters (including, without limitation, all fees, expenses, or other amounts reimbursable or payable to the Consultant or, with respect to the Additional Goods Fee, Merchant) shall be reconciled on every Wednesday for the prior week and shall be paid within seven (7) days after each such weekly reconciliation. The Parties and the ABL Agents shall complete a final reconciliation and settlement of all amounts payable to the Consultant or, with respect to the Additional Agent Goods Fee, Merchant and contemplated by this Agreement (including, without limitation, Expense Budget items, and fees earned hereunder) no later than forty five (45) days following the Sale Termination Date for the last Store. |
| Compensation for Consultant | In consideration of its services hereunder, Consultant shall earn a fee equal to one and one half percent (1.5%) of the Gross Proceeds of Merchandise sold at the Stores. |
| Merchant's Insurance Obligations | Merchant shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability (to the extent currently provided), comprehensive public liability insurance and auto liability insurance) covering injuries to persons and property in or in connection with the Stores, and shall cause Consultant to be named an additional insured with respect to all such policies.  At Consultant's request, Merchant shall provide Consultant with a certificate or certificates evidencing the insurance coverage required hereunder and that Consultant is an additional insured thereunder.  In addition, Merchant shall maintain throughout the Sale Term, in such amounts as it currently has in effect, workers compensation insurance in compliance with all statutory requirements. |
| Consultant's Insurance | As an expense of the Sale, Consultant shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability/completed operations, contractual liability, comprehensive public liability and auto liability insurance) on an |

---

[5]    SB360 Capital Partners, LLC is an affiliate of Second Avenue Capital, LLC.

| Term | Consulting Agreement |
|---|---|
| **Obligations** | occurrence basis in an amount of at least two million dollars ($2,000,000) and an aggregate basis of at least five million dollars ($5,000,000) covering injuries to persons and property in or in connection with Consultant's provision of services at the Stores. Consultant shall name Merchant as an additional insured and loss payee under such policy, and upon execution of this Agreement provide Merchant with a certificate or certificates evidencing the insurance coverage required hereunder. In addition, Consultant shall maintain throughout the Sale Term, workers compensation insurance compliance with all statutory requirements. Further, should Consultant employ or engage third parties to perform any of Consultant's undertakings with regard to this Agreement, Consultant will ensure that such third parties are covered by Consultant's insurance or maintain all of the same insurance as Consultant is required to maintain pursuant to this paragraph and name Merchant as an additional insured and loss payee under the policy for each such insurance. |
| **Indemnification by Consultant** | Consultant shall indemnify, defend and hold Merchant and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential coinvestors, principals, and affiliates (other than the Consultant or the Consultant Indemnified Parties) (collectively, "Merchant Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to (a) the willful or negligent acts or omissions of Consultant or the Consultant Indemnified Parties (defined below); (b) the breach of any provision of, or the failure to perform any obligation under, this Agreement by Consultant; (c) any liability or other claims made by the Consultant Indemnified Parties or any other person (excluding Merchant Indemnified Parties) against a Merchant Indemnified Party arising out of or related to Consultant's conduct of the Sale, except claims arising from Merchant's negligence, willful misconduct, or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortuous or otherwise actionable treatment of Merchant Indemnified Parties, or Merchant's customers by Consultant or any of the Consultant Indemnified Parties and (e) any claims made by any party engaged by Consultant as an employee, agent, representative or independent contractor arising out of such engagement. |
| **Indemnification by Merchant** | Merchant shall indemnify, defend, and hold Consultant and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential coinvestors, principals, affiliates, and Supervisors (collectively, "Consultant Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to: (a) the willful or negligent acts or omissions of Merchant or the Merchant Indemnified Patties; (b) the material breach of any provision of this Agreement by Merchant; (c) any liability or other claims, including, without limitation, product liability claims, asserted by customers, any Store employees (under a collective bargaining agreement or otherwise), or any other person (excluding Consultant Indemnified Parties) against Consultant or an Consultant Indemnified Party, except claims arising from Consultant's negligence, willful misconduct or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortuous or otherwise actionable treatment of Consultant's Indemnified Parties or Merchant's customers by Merchant or Merchant's Indemnified Patties; (e) Merchant's failure to pay over to the appropriate taxing authority any taxes required to be paid by Merchant during the Sale Term in accordance with applicable law; and (f) Merchant's landlords, leases, or occupancy agreements. |

## II.     The Store Closing Procedures.

11.     The Debtors seek approval of streamlined procedures (*i.e.*, the Store Closing Procedures) to sell the Store Closure Assets, in each case free and clear of liens, claims, and encumbrances.   The Debtors also seek approval of the Store Closing Procedures to provide newspapers and other advertising media in which the Sales may be advertised with comfort that the Debtors are conducting the Sales in compliance with applicable law and with the Bankruptcy Court's approval.   The Debtors seek interim approval of the Store Closing Procedures in light of the need to continue the Sales and Store Closures in an efficient and timely manner.

12.     The Debtors have determined, in the exercise of their business judgment and in consultation with their advisors, that the Store Closing Procedures will provide the best, most efficient, and most organized means of selling the Store Closure Assets to maximize their value to the estates.   As noted above, the Debtors estimate that the Store Closings will take until approximately August 31, 2019.

## III.    Liquidation Sale Laws and Dispute Resolution Procedures.

13.     Certain states in which the Debtors operate stores have, or may have, licensing or other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including, without limitation, federal, state, provincial, and local laws, statutes, rules, regulations, and ordinances (the "Liquidation Sale Laws").   Liquidation Sale Laws may establish licensing, permitting, or bonding requirements, waiting periods, time limits, and bulk sale restrictions and augmentation limitations that would otherwise apply to the Store Closings. Such requirements hamper the Debtors' ability to maximize value in selling their inventory. Subject to the Bankruptcy Court's approval, the Debtors intend to conduct the Store Closings in accordance with the Store Closing Procedures, and to the extent such procedures conflict with the Liquidation Sale Laws, the Store Closing Procedures will control.

14.    To facilitate the orderly resolution of any disputes between the Debtors and any Governmental Units (as defined in section 101(27) of the Bankruptcy Code) arising due to the Store Closing Procedures and the alleged applicability of any Liquidation Sale Laws, the Debtors respectfully request that the Bankruptcy Court authorize the Debtors to implement the following dispute resolution procedures (the "Dispute Resolution Procedures"), on an interim and final basis:

a.    Provided that the Sales are conducted in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing Procedures, and in light of the provisions in the laws of many Governmental Units (as defined in the Bankruptcy Code) that exempt court-ordered sales from their provisions, the Debtors and the Consultant will be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the Sales in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing Procedures without the necessity of further showing compliance with any such Liquidation Sale Laws.

b.    Within five business days after entry of the Interim Order, the Debtors will serve by email, facsimile, or first-class mail, copies of the Interim Order, the proposed Final Order, the Consulting Agreement, and the Store Closing Procedures on the following: (i) the landlords for the Stores; (ii) the Attorney General's office for each state in which the Sales are being held; (iii) the county consumer protection agency or similar agency for each county in which the Sales are being held; (iv) the division of consumer protection for each state in which the Sales are being held; (v) the chief legal counsel for each local jurisdiction in which the Sales are being held (collectively, the "Dispute Notice Parties").

c.    To the extent that there is a dispute arising from or relating to the Sales, the Interim Order, or the proposed Final Order, as applicable, the Consulting Agreement, or the Store Closing Procedures, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), the Bankruptcy Court shall retain exclusive jurisdiction to resolve the Reserved Dispute.    Any time within ten days following entry of the Interim Order any Governmental Unit may assert that a Reserved Dispute exists by sending a notice (the "Dispute Notice") explaining the nature of the dispute to: (i) proposed counsel to the Debtors, Paul Hastings LLP, 71 South Wacker Drive, Suite 4500, Chicago, Illinois 60606, Attn: Matthew Murphy, Nathan Gimpel, and Matthew Smart; (ii) proposed co-counsel to the Debtors, Klehr Harrison Harvey Branzburg LLP, 919 N. Market Street, Suite 1000, Wilmington, Delaware, 19801, Attn: Domenic E.

Pacitti, Michael W. Yurkewicz, and Sally E. Veghte; (iii) the Consultant, (a) Hilco Merchant Resources, LLC, 5 Revere Drive, Suite 206, Northbrook, IL 60062, Attn: Ian Fredericks; and (b) SB360 Capital Partners, LLC, 1010 Northern Boulevard, Suite 340, Great Neck, NY 11021, Attn: Robert Raskin; (iv) counsel for the Consultant, Pepper Hamilton LLP, 1313 Market Street, Suite 5100, Wilmington, DE 19801 Attn: Douglas D. Herrmann and Marcy J. McLaughlin; (v) counsel to the Prepetition ABL Agents and DIP Agents, Choate, Hall & Stewart, LLP, Two International Place, Boston, Massachusetts 02110, Attn: John F. Ventola and Jonathan D. Marshall, and Richards, Layton & Finger, P.A., 920 N. King. St., Wilmington, Delaware 19801, Attn: Mark D. Collins and John H. Knight; and (vi) counsel to the Prepetition Vendor Financing Agent and Prepetition Term Loan Agent, Winston & Strawn LLP, 200 Park Avenue, New York, New York 10166, Attn: Gregory M. Gartland. If the Debtors, the Consultant, and the Governmental Unit are unable to resolve the Reserved Dispute within 15 days after service of the Dispute Notice, the Governmental Unit may file a motion with the Court requesting that the Bankruptcy Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

d.      In the event that a Dispute Resolution Motion is filed, nothing in the Interim Order or the Final Order, as applicable, shall preclude the Debtors, a landlord, the Consultant or any other interested party from asserting (i) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (ii) that neither the terms of the Interim Order or the Final Order, as applicable, nor the conduct of the Debtors or the Consultant pursuant to the Interim Order or the Final Order, as applicable violates such Liquidation Sale Laws.  Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of the Interim Order or the Final Order or to limit or interfere with the Debtors' or the Consultant's ability to conduct or to continue to conduct the Sales pursuant to the Interim Order or the Final Order, absent further order of the Court.  Upon the entry of the Interim Order or the Final Order, as applicable, the Court grants authority for the Debtors and the Consultant to conduct the Sales pursuant to the terms of the Interim Order or the Final Order, as applicable, the Consulting Agreement, and/or the Store Closing Procedures and to take all actions reasonably related thereto or arising in connection therewith.  The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in the Interim Order or the Final Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

e.      If, at any time, a dispute arises between the Debtors and/or the Consultant and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in the Interim Order or

the Final Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (c) and (d) above by serving a notice to the applicable parties and proceeding thereunder in accordance with those paragraphs.  Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo*.

**IV.    Fast Pay Laws.**

15.    Many states in which the Debtors operate have laws and regulations that require the Debtors to pay an employee substantially contemporaneously with his or her termination (the "Fast Pay Laws" and, together with the Liquidation Sale Laws, the "Liquidation Sale Laws").  These laws often require payment to occur immediately or within a period of only a few days from the date such employee is terminated.

16.    The nature of the Store Closings contemplated by this motion will result in a substantial number of employees being terminated at or near the end of the Store Closings.  To be clear, the Debtors intend to pay their terminated employees as expeditiously as possible, under normal payment procedures, and pursuant to applicable Bankruptcy Court order.[6]  However, the Debtors' payroll systems will simply be unable to process the payroll information associated with this large number of terminations in a manner that will be compliant with the Fast Pay Laws.  Under ordinary circumstances, the Debtors' payroll department is able to coordinate delivery of final checks to coincide with an employee's final day of work where required by state law.  This process requires the Debtors' payroll department to calculate individual termination payments, prepare each termination payment check, obtain authorization for each such check, and then prepare each such check for mailing.  Given the number of employees who will likely be terminated in connection with the Store Closings, this process could easily take several days,

---

[6]    The Debtors are seeking such relief pursuant to the *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing, but not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief*, filed contemporaneously herewith.

making compliance with the Fast Pay Laws burdensome to the Debtors' estates, if not impossible. Accordingly, the Debtors request exemption from the Fast Pay Laws.

**V.      Lease Restrictions.**

17.      The Debtors also respectfully request a waiver of any contractual restrictions that could otherwise inhibit or prevent the Debtors from maximizing value for creditors through the Store Closings and Sales. In certain cases, the contemplated Store Closings and Sales may be inconsistent with certain provisions of leases, subleases, or other documents with respect to the premises in which the Debtors operate, including, without limitation, reciprocal easement agreements, agreements containing covenants, conditions, and restrictions (including, without limitation, "go dark" provisions and landlord recapture rights), or other similar documents or provisions. Such restrictions would also hamper the Debtors' ability to maximize value in selling their inventory.

18.      The Debtors also request that no entity, including, without limitation, utilities, landlords, shopping center managers and personnel, creditors, and all persons acting for or on their behalf shall interfere with or otherwise impede the conduct of the Store Closings and Sales, or institute any action against the Debtors in any court (other than this Court) or before any administrative body that in any way directly or indirectly interferes with, obstructs, or otherwise impedes the conduct of the Store Closings and Sales or the advertising and promotion (including through the posting of signs) of the Sales.

**VI.     The Store Bonus Program.**

19.      The Debtors seek authorization to implement the Store Bonus Program and make payments thereunder to Store Bonus Program participants, all of whom are non-insiders, to ensure successful consummation of the Store Closings. Specifically, the Debtors request authority, at their discretion, to provide additional compensation in the form of a one-time fixed

bonus to incentivize store-level employees to complete the Store Closings.  For avoidance of doubt, none of the employees eligible for the Store Bonuses are "insiders" of the Debtors.

20.     The success of the Store Closings depends on store-level employees continuing their ordinary course duties under the supervision of the Consultant and Debtors.  Store employees are necessary to, among other things, service customers, administer in-store sales, and manage cash receipts and bank deposits.  Replacing such employees would be unfeasible under the contemplated timeframe for the Store Closings.  Through the employees' ongoing commitment and performance, the Debtors can ensure that they maximize estate value through their store-closing sales. The Store Bonus Program is a necessary component of the Store Closings and has the support of the Debtors' prepetition secured lenders and equity holders.

## **Basis for Relief**

## I.     **The Court Should Authorize the Assumption of the Consulting Agreement.**

21.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor."  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  *See, e.g*., *In re HQ Glob. Holdings. Inc*., 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject an executory contract is governed by the business judgment standard and it can only be overturned if the decision was a product of bad faith, whim or caprice); *see also In re Market Square Inn. Inc*., 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court").

22.     The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate."

*Wheeling-Pittsburgh Steel Corp, v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.),* 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).  Any more exacting scrutiny would slow the administration of the debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.  *See Richmond Leasing Co. v. Capital Bank,* 762 F.2d 1303, 1311 (5th Cir. 1985).

23.     The assumption of the Consulting Agreement is beneficial to the Debtors' estates, and, therefore, is a reasonable exercise of the Debtors' business judgment.  In consultation with its advisors, the Debtors have determined that the Stores are a burden to their estates, and the Store Closure Assets should be liquidated for the benefit of the Debtors' estates and their creditors.  The Debtors determined that entering into the Consulting Agreement, after engaging in extensive negotiations with the Consultant, will provide the greatest return to the Debtors' estates for the Store Closure Assets.  The Debtors believe that the terms set forth in the Consulting Agreement comprise the best for the conduct of the Store Closings and Sales.

24.     The Consultant has extensive expertise in conducting liquidation sales and can oversee and assist in the management and implementation of the Store Closings and Sales in an efficient and cost effective manner.  Assumption of the Consulting Agreement will enable the Debtors to utilize the skills and resources of the Consultant to effectively and efficiently conduct the Store Closing Sales for the benefit of all stakeholders.  Given the number of stores and the particular issues in administering the Store Closing Sales, as discussed above, it is not certain the Debtors could retain a liquidator able to conduct the process as efficiently and effectively as the Consultant.  If the Consulting Agreement is not approved of, operative and effective on an interim basis, the Store Closings and Sales would lose the benefit of the Consultant's oversight

and might be delayed or suspended entirely, leading to loss of additional liquidity and increased administrative expenses.  Moreover, it is imperative that the Consulting Agreement is approved on an interim basis so that the Debtors and Consultant can immediately begin to advertise the Sales as "Store Closing", "Everything Must Go", "Everything on Sale" "Going out of Business" or similarly themed sale.  Based on the Consultant's experience, the ability to advertise using this language will generate more proceeds for the Debtors and their estates.

**II.      The Debtors Have a Valid Business Justification for the Sales.**

25.      Section 363(b)(1) of the Bankruptcy Code, which governs asset sales outside of a debtor's ordinary course of business, provides that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." When selling assets outside of the ordinary course of business, a debtor must articulate a valid business justification to obtain court approval.  *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citation omitted); *In re Abbotts Dairies, Inc.*, 788 F.2d 143, 147-48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Lionel Corp,* and requiring good faith); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983); *In re Delaware & Hudson Ry, Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the *Abbotts Dairies* decision).  When a debtor demonstrates a valid business justification for a decision, a strong presumption arises "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that the Delaware business judgment rule has "vitality by analogy" in Chapter 11, especially where the debtor is a Delaware corporation (quotations omitted)).

26.     Store closing or liquidation sales are a routine occurrence in chapter 11 cases involving retail debtors.  *See Ames Dept. Stores*, 136 B.R. at 359 (noting that liquidation sales are an important part of "overriding federal policy requiring [a] Debtor to maximize estate assets").  As such, bankruptcy courts in this jurisdiction have approved similar store closing sales.  *See, e.g.*, *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 28, 2019); *In re Charming Charlie Holdings Inc.*, No. 17-12906 (CSS) (Bankr. D. Del. Jan. 10, 2018); *In re Radioshack Corp.*, No. 17–10506 (Bankr. D. Del. Mar. 29, 2017); *In re Coldwater Creek,* Case No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014); *In re Anchor Blue Holding Corp.*, Case No. 11-10110 (PJW) (Bankr. D. Del. Jan. 13. 2011).[7]

27.     Sufficient business justification exists to approve the proposed Sales under section 363(b)(1).  The Debtors, with the assistance of their advisors, have determined that the Sales represent the best alternative to maximize recoveries to the Debtors' estates with respect to the Store Closure Assets and provide the Debtors with much-needed liquidity while optimizing their remaining fleet of Stores.  There are meaningful amounts of Merchandise, in the aggregate, that will be monetized most efficiently and quickly through an orderly process conducted in consultation with an experienced liquidation firm.  Further, delay in commencing the Sales would diminish the recovery tied to monetization of the Store Closure Assets.  The Debtors will realize an immediate benefit in terms of financial liquidity upon the sale of the Store Closure Assets and the termination of operations at the Stores.  Further, uninterrupted and orderly Sales will allow the Debtors to timely reject leases associated with the Stores and, therefore, avoid the accrual of unnecessary administrative expenses for rent and related costs.  Suspension of the

---

[7]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

Sales until entry of the Final Order may cause the Debtors to incur large claims for rent at many of these stores, which the Debtors could be required to pay in full.

### III.    The Debtors Have a Valid Business Justification for the Store Bonus Program.

28.    Under the circumstances of these chapter 11 cases, the implementation of the Bonus Program is a sound exercise of the Debtors' business judgment and is in the best interests of the Debtors' and all their estates' stakeholders.  The Debtors believe the Store Bonuses are necessary to sustain employee morale and facilitate the Store Closings during these chapter 11 cases.  Absent the Store Bonuses, the Debtors are likely to lose key store personnel that are critical to administering final sales of merchandise.

29.    The flight risk of store employees is particularly acute under the circumstances here since the Debtors' stores are located in area with numerous other retail tenants.  Store employees could simply pursue another retail opportunity within the same area if not offered an incentive to stay with the Debtors.  Such departures would jeopardize the Store Closing process by requiring the Debtors to find new employees and train them to conduct the in-store functions necessary for the Store Closing Sales. The Store Bonuses are purposed to mitigate flight risk by incentivizing and rewarding store employees for staying with the Debtors through the Store Closing process.

30.    If the Debtors are not able to keep their store employees and motivate them through the Store Closings, the Debtors will realize less value to the detriment of the Debtors' creditors. The potential loss to the estate if employees are not retained through the Store Closing process far outweighs the cost of the Store Bonus Program, which is reasonable in light of competitive market practices.  The maximum cost of the Store Bonus Program will be less than 1 percent of gross annual payroll for store employees and is similar to the amounts used in other restructuring situations to incentivize employees to continue optimal performance despite

the added stress inherent in the chapter 11 process.  *See, e.g.*, *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 6, 2019) (authorizing store closing bonuses up to l.0% of gross annual payroll for closing stores); *In re Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D. Del. Feb. 7, 2018) (authorizing discretionary bonus payments in an amount no more than 10 percent of payroll for store employees); *In re Golfsmith Int'l Holdings, Inc.*, No. 16-12033 (LSS) (Bankr. D. Del. Oct. 13, 2016) (authorizing store closing bonuses up to l.5% of gross annual payroll for closing stores); *In re Quicksilver, Inc.*, No. 15-11880 (BLS) (Bankr. D. Del. Sept. 10, 2015) (approving store closing bonuses up to 10% of base payroll for all employees working at the closing stores); *In re Radioshack Corp.*, No. 15-10197 (BLS) (Bankr. D. Del. Feb.20, 2015) (same).

31.    The Store Bonus program is comparable to employee incentive plans regularly paid as "expenses of sale" by liquidating agents in other "store closing" and similar-themed sales.  As such, courts have approved incentive payments similar to those contemplated in the Store Bonus Program.  *See*, *e.g.*, *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 28, 2019) (authorizing store closing retention bonus program on a final basis); *In Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D. Del. Feb. 7, 2018) (authorizing store closing retention bonus program on an interim basis); *In re rue21, Inc.*, No. 17-22045 (GLT) Bankr. W.D. Pa. June 12, 2017) (authorizing store closing retention bonus program on a final basis); *In re Goldsmith Int'l Holdings, Inc.*, No. 16-12033 (LSS) Bankr. D. Del. Oct. 13, 2016) (same); *In re Sport Auth. Holdings, Inc.*, No. 16-10527 (MFW) (Bankr. D. Del. May 3, 2016) (same).

32.    Accordingly, the Debtors submit that the relief requested with respect to the Store Bonus Program is a valid exercise of the Debtors' business judgement and the approval of the

Store Bonus Program is appropriate under section 363 of the Bankruptcy Code and is the best interests of the Debtors, their estates, and all parties in interest in these chapter 11 cases.

## IV.   The Court Should Approve the Sale of the Store Closure Assets Free and Clear of all Liens, Encumbrances, and Other Interests under Bankruptcy Code Section 363(f).

33.     The Debtors request approval to sell the Store Closure Assets on a final "as is" basis, free and clear of any and all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code.  A debtor in possession may sell property under sections 363(b) and 363(f) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied: (a) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (b) such entity consents; (c) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (d) such interest is in bona fide dispute; or (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f); *see also Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that since section 363(f) is written in the disjunctive, the court may approve a sale free and clear if any one subsection is met).  Moreover, the Third Circuit has indicated that a debtor possesses broad authority to sell assets free and clear of liens.  *See In re TWA Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).

34.     Although the term "any interest" is not defined in the Bankruptcy Code, the Third Circuit has noted that the trend in modern cases is toward "a broader interpretation which includes other obligations that may flow from ownership of the property."  *Folger Adam Security, Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 258–59 (3d Cir. 2000).  As the Fourth Circuit held in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581–82 (4th Cir. 1996) (cited with approval by the Third Circuit in *Folger Adam)*, the scope of section 363(f) is not limited to

*in rem* interests in a debtor's assets.  Thus, a debtor can sell its assets under section 363(f) "free and clear of successor liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F.3d at 258.

35.     With respect to any other party asserting a lien, claim, or encumbrance against the Store Closure Assets, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f).  In connection with the sale of the Store Closure Assets, the Debtors propose that any liens, claims, and encumbrances asserted against the Store Closure Assets be transferred to and attach to the amounts earned by the Debtors under the Sales with the same force, effect, and priority as such liens currently have on the Store Closure Assets.

## V.     The Court Should Waive Compliance with Liquidation Sale Laws and Approve the Dispute Resolution Procedures.

36.     The Debtors' ability to conduct the Sales in accordance with the Store Closing Procedures and without strict compliance with all Liquidation Sale Laws is critical to the Sales' success.  Although the Debtors intend to comply with state and local health and safety laws and consumer protection laws in conducting the Sales, many Liquidation Sale Laws require special and cumbersome licenses, waiting periods, time limits, and other procedures for store closing, liquidation, or similar sales.  Additionally, compliance with Fast Pay Laws would require the Debtors to pay terminated employees within a time frame that would be detrimental to the conduct of these chapter 11 cases, if not impossible.

37.     To eliminate the time, delay, and expense associated with the administrative procedures necessary to comply with the Liquidation Sale Laws, the Debtors propose the Store Closing Procedures as a way to streamline the administrative burdens on their estates while still adequately protecting the broad and varied interests of both landlords and applicable governmental agencies charged with enforcing any Liquidation Sale Laws that may apply to the

Store Closings. As such, the Debtors believe the Store Closing Procedures mitigate any concerns that their landlords or governmental agencies may raise with respect to the Store Closings and, therefore, the requested relief is in compliance with any applicable Liquidation Sale Laws.

38.     The Debtors submit that there is strong support for granting them the authority to not comply with the Liquidation Sale Laws. *First,* it is generally accepted that many state statutes and regulations provide that, if a liquidation or bankruptcy sale is court-authorized, a company need not comply with the Liquidation Sale Laws. *See, e.g.*, Ark. Code Ann. § 4-74-103 (exempting from the provisions of the chapter sales pursuant to any court order); Fla. Stat. Ann. 559.25(2) (same); Ga. Code Ann. § 10-1-393(b)(24)(C)(iv) (same); 815 ILCS 350/3 (same); La. Rev. Stat. Ann. § 51:43(1) (same); N.Y. Gen. Bus. Law § 584(a) (same); Or. Rev. Stat. Ann. § 646A.100(2)(b) ("'Going out of business sale' does not include a sale conducted by a bankruptcy trustee."); Tex. Bus. & Com. Code Ann. § 17.91(3) (exempting from subchapter sales conducted pursuant to court order). *Second*, pursuant to section 105(a) of the Bankruptcy Code, the Court has the authority to permit the Store Closings to proceed notwithstanding contrary Liquidation Sale Laws as it is essential to the continued operation of the Debtors' business. *Third*, this Court will be able to supervise the Store Closings because the Debtors and their assets are subject to this Court's exclusive jurisdiction. *See* 28 U.S.C. § 1334. As such, creditors and the public interest are adequately protected by notice of this motion and the ongoing jurisdiction and supervision of the Court because the Debtors are only seeking interim relief at the outset of these cases, and parties in interest will be able to raise any further issues at the final hearing.

39.     Further, bankruptcy courts have consistently recognized, with limited exception, that federal bankruptcy law preempts state and local laws that contravene the underlying policies

of the Bankruptcy Code. *See Belculfine v. Aloe (In re Shenango Grp. Inc.)*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code. . . . [A] state statute [] cannot place burdens on [a debtor] where the result would contradict the priorities established by the federal bankruptcy code."), *aff'd*, 112 F.3d 633 (3d Cir. 1997).

40. Courts in some jurisdictions have found that preemption of state law is not appropriate if the laws deal with public health and safety. *See Baker & Drake. Inc. v. Pub. Serv. Comm'n of Nev. (In re Baker & Drake. Inc.)*, 35 F.3d 1348, 1353-54 (9th Cir. 1994) (holding that Bankruptcy Code did not preempt state law prohibiting taxicab leasing that was promulgated in part as public safety measure). However, preemption is appropriate where, as is the case here, the only state laws involved concern economic regulation rather than the protection of public health and safety. *See In re Baker & Drake. Inc.*, 35 F.3d at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety").

41. Under the circumstances of these chapter 11 cases, enforcing the strict requirements of the Liquidation Sale Laws would undermine the fundamental purpose of section 363(b) of the Bankruptcy Code by placing constraints on the Debtors' ability to maximize estate assets for the benefit of creditors. Accordingly, authorizing the Sales without the delays and burdens associated with obtaining various state and local licenses, observing state and local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising and similar items is necessary and appropriate. The Debtors do not seek a general waiver of all state and local law requirements, but only those that apply specifically to retail liquidation sales. Indeed, the requested waiver is narrowly tailored to facilitate the

successful consummation of the Sales.  Moreover, the Debtors will comply with applicable state and local public health and safety laws, and applicable tax, labor, employment, environmental, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising.  Finally, the Dispute Resolution Procedures provide an ordered means for resolving any disputes arising between the Debtors and/or the Consultant and any Governmental Units with respect to the applicability of any Liquidation Sale Laws, and should therefore be approved.

42.    Further, this Court has recognized that the Bankruptcy Code preempts certain state laws and have granted relief similar to that requested herein.  *See, e.g.*, *In re Coldwater Creek*, No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (stating that debtors were authorized to conduct store closing sales under the terms of the order "without the necessity of further showing compliance" with liquidation laws); *In re Boscov's*, No. 08-11637 (KG) (Bankr. D. Del. Aug. 15, 2008) (ordering that "[g]overnmental units shall not fine, assess or otherwise penalize Debtors or Agent (or any of the landlords of the Closing Stores) for conducting or advertising the Sales in a manner inconsistent with Liquidation Sales Laws, provided that the Sales are conducted and advertised in compliance with this Order"); *In re Goody's Family Clothing, Inc.*, No. 08-11133 (CSS) (Bankr. D. Del. June 13, 2008) (ordering that the "Store Closing Sales at the Closing Stores shall be conducted by the Debtors and the Store Closing Agent without the necessity of compliance with any federal, state or local statute or ordinance, lease provision or licensing requirement affecting store closing, 'going out of business', liquidation or auction sales, or affecting advertising, including signs, banners, and posting of signage, other than Safety Laws and General Laws").

43.    Courts in this jurisdiction have also granted similar relief from Fast Pay Laws in other bankruptcy cases under similar circumstances.  *See, e.g.*, *In re Golfsmith Int'l Holdings,*

*Inc.*, No. 16-12033 (Bankr. D. Del. Oct. 13, 2016) (granting relief from federal, state, or local laws including "any fast pay laws" in connection with store closing sales); *In re Vestis Retail Grp, LLC*, No. 16-10971 (LSS) (Bankr. D. Del. May 16, 2016); *In re Hancock Fabrics*, No. 16-10296 (BLS) (Bankr. D. Del. Feb. 25, 2016); *In re Fresh & Easy, LLC*, No. 15-12220 (BLS) (Bankr. D. Del. Nov. 24, 2015); *In re Haggen Holdings, LLC*, No. 15-11874 (KG) (Bankr D. Del. Oct. 15, 2015).

## VI.    The Court Should Waive Compliance with Any Restriction in the Leases.

44.    Certain of the Debtors' leases governing the premises of the stores subject to any Sales may contain provisions purporting to restrict or prohibit the Debtors from conducting store closing, liquidation, or similar sales.  Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to properly administer its reorganization case and maximize the value of its assets under section 363 of the Bankruptcy Code.  *See Ames Dep't Stores*, 136 B.R. at 359 (deciding that enforcement of such lease restrictions would "contravene overriding federal policy requiring debtor to maximize estate assets. . . ."); *In re R. H, Macy and Co., Inc.*, 170 B.R. 69, 73–74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to remain open throughout the lease term, because the debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store); *In re Tobago Bay Trading Co.*, 112 B.R. 463, 467–68 (Bankr. N.D. Ga., 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); *In re Lisbon Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in chapter 11 case where debtor sought to conduct a liquidation sale).

45.     This Court has held that restrictive lease provisions affecting store liquidation sales in chapter 11 cases are unenforceable. *See, e.g.*, *In re Coldwater Creek*, No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (ordering that store closing sales be conducted without the further need for compliance with, among other things, lease provisions); *In re Boscov's*, No. 08¬11637 (KG) (Bankr. D. Del. Aug. 15, 2008) (same); *In re Goody's Family Clothing, Inc.*, No. 08-11133 (CSS) (Bankr. D. Del. June 13, 2008) (same); *In re Linens Holding Co.*, No. 08-10832 (CSS) (Bankr. D. Del. May 30, 2008) (same).

46.     Thus, to the extent that such provisions or restrictions exist in any of the leases of the stores subject to the Store Closings, the Debtors request that the Court authorize the Debtors and or the Consultant to conduct the Sales and Store Closings without reference to any such restrictive provisions or interference by any landlords or other persons affected, directly or indirectly, by the Sales.

## VII.   The Court Should Approve the Abandonment of Certain Property in Connection with Any Liquidation Sales.

47.     After notice and a hearing, a debtor "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. §554(a); *see also Hanover Ins. Co. v. Tyco Indus., Inc.*, 500 F.2d 654, 657 (3d Cir. 1974) (stating that a trustee "may abandon his claim to any asset, including a cause of action, he deems less valuable than the cost of asserting that claim").

48.     The Debtors are seeking to sell all FF&E remaining in the Stores.  However, the Debtors may determine that the costs associated with holding or selling certain property or FF&E exceeds the proceeds that will be realized upon its sale or that such property is not sellable at all. In such event, the property is of inconsequential value and benefit to the estates and/or may be burdensome to retain.

49.     To maximize the value of the Debtors' assets and to minimize the costs to the estates, the Debtors respectfully request authority to abandon, after consultation with the ABL Agents and the Second Lien Agent (as both terms are defined in the Consulting Agreement), any of their remaining FF&E or other property located at any of the Stores without incurring liability to any person or entity in accordance with the terms of the Consulting Agreement.  The Debtors further request that the landlord of each Store with any abandoned FF&E or other property be authorized to dispose of such property without liability to any third parties.

50.     Notwithstanding the foregoing, the Debtors will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personal identifying information (which means information that, alone or in conjunction with other information, identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) in any of the Debtors' hardware, software, computers, or cash registers or similar equipment that are to be sold or abandoned.

## VIII.   The Court Should Find That Any Sale of the Store Closure Assets Does Not Require the Appointment of a Consumer Privacy Ombudsman.

51.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor may not sell or release personally identifiable information about individuals unless such sale or lease is consistent with its policies or upon appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code.  The Debtors will not be selling or releasing personally identifiable information in the course of the Sales.  Therefore, appointment of a consumer privacy ombudsman is unnecessary.

## The Requirements of Bankruptcy Rule 6003 Are Satisfied

52.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P 6003.  For the reasons discussed above, authorizing the Debtors to assume the Consulting Agreement, approving store closing or similar themed sales in accordance with the Store Closing Procedures, and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases smoothly.  Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.  For the reasons discussed herein, the relief requested is necessary in order for the Debtors to operate their business in the ordinary course, preserve the going concern value of the Debtors' operations and, maximize the value of their estates for the benefit of all stakeholders.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## Reservation of Rights

53.     Except with respect to the Consultant and the Consulting Agreement, nothing contained in this motion or any actions taken by the Debtors pursuant to relief granted in the Interim Order and Final Order is intended or should be construed as: (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' or any other party-in-interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' or any other party-in-interest's rights under the Bankruptcy

Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this motion are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

54.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Notice

55.    The Debtors will provide notice of this motion to: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Agents and the Prepetition ABL Agents; (d) counsel to the Prepetition Term Loan Agent and the Prepetition Vender Financing Agent; (e) the United States Attorney's Office for the District of Delaware; (f) the Internal Revenue Service; (g) the United States Securities and Exchange Commission; (h) the state attorneys general for all states in which Sales are held; (i) the Dispute Notice Parties; (j) all of the Debtors' landlords at the locations subject to the Sales, and counsel thereto, if known; (k) all applicable federal, state, and local taxing and regulatory authorities having jurisdiction over the Merchandise and the FF&E; (l) all parties known to the Debtors who hold any liens or

security interest in the Debtors' assets who have filed UCC-1 financing statements against the Debtors, or who, to the Debtors' knowledge, have asserted any liens on any of the Debtors' assets; (m) municipalities in which the Store Closure Assets are located; (n) all applicable state and consumer protection agencies; and (o) any party that requests service pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

56.     No prior request for the relief sought herein has been made to this Court or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, (a) granting the relief requested herein, and (b) granting such other relief as is just and proper.

Dated: July 11, 2019
   Wilmington, Delaware

          /s/  *Domenic E. Pacitti*
          Domenic E. Pacitti (DE Bar No. 3989)
          Michael W. Yurkewicz (DE Bar No. 4165)
          Sally E. Veghte (DE Bar No. 4762)
          **KLEHR HARRISON HARVEY BRANZBURG LLP**
          919 N. Market Street, Suite 1000
          Wilmington, Delaware 19801
          Telephone:  (302) 426-1189
          Facsimile:  (302) 426-9193

          - and -

          Matthew M. Murphy (*pro hac vice* admission pending)
          Nathan S. Gimpel (*pro hac vice* admission pending)
          Matthew Smart (*pro hac vice* admission pending)
          **PAUL HASTINGS LLP**
          71 South Wacker Drive, Suite 4500
          Chicago, Illinois 60606
          Telephone:  (312) 499-6000
          Facsimile:  (312) 499-6100

          Todd M. Schwartz (*pro hac vice* admission pending)
          **PAUL HASTINGS LLP**
          1117 South California Avenue
          Palo Alto, California 94304
          Telephone:  (650) 320-1800
          Facsimile:  (650) 320-1900

          *Proposed Co-Counsel to the Debtors and Debtors in Possession*