## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CHARMING CHARLIE HOLDINGS INC., *et al.*,[1] | ) | Case No. 19-11534 (___) |
| | ) | |
| | ) | (Joint Administration Requested) |
| Debtors. | ) | |
| | ) | |

### DECLARATION OF ALVARO BELLON,
### CHIEF FINANCIAL OFFICER OF CHARMING CHARLIE HOLDINGS INC.,
### IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Alvaro E. Bellon, hereby declare under penalty of perjury:

1.      I am the Senior Vice President and Chief Financial Officer of Charming Charlie Holdings Inc. ("Holdings"), a corporation organized under the laws of Delaware and one of the above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Charming Charlie").

2.      I have served in these roles since approximately March 2019.  From June 2016 to March 2019, I served as Vice President and Controller.  Prior to that, I was the Assistant Controller from December 2014 until June 2016.  Prior to joining Charming Charlie, I spent ten years with Abercrombie & Fitch in various roles.

3.      I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I submit this declaration to assist the Court and parties in interest in understanding the circumstances compelling the commencement of these chapter 11

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Charming Charlie Canada LLC (0693); Charming Charlie Holdings Inc. (6139); Charming Charlie International LLC (5887); Charming Charlie LLC (0263); Charming Charlie Manhattan LLC (7408); Charming Charlie USA, Inc. (3973); and Poseidon Partners CMS, Inc. (3302).  The location of the Debtors' headquarters is:  6001 Savoy Drive, Ste. 600 Houston, Texas 77036.

cases and in support of the Debtors' chapter 11 petitions and certain motions and applications filed today.

4.        Except as otherwise indicated, all facts in this declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge. I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth in this declaration.

## Preliminary Statement

5.        The Debtors commence these chapter 11 cases approximately 14 months after completing a prior restructuring and emerging from chapter 11 with a simplified capital structure, a reduced brick-and-mortar footprint, and a revamped "Back to Basics" business plan.[2] Unfortunately, these efforts have not resulted in long-term sustainability.  The Debtors once again face issues similar to those that precipitated filing the Prior Cases: unsustainable operating expenses, including onerous leases, and constrained liquidity under our loan documents.  This lack of liquidity has resulted in reduced inventory, further exacerbating the Debtors' lack of availability under their asset based loan.  These factors combined with the continued decline of the brick-and-mortar retail industry have made it increasingly difficult for the Debtors to support their cost and capital structure.

---

[2]    On December 11, 2017, the Debtors' predecessors in interest (the "Prior Debtors") commenced chapter 11 cases (the "Prior Cases") in this Court, which were jointly administered under the caption *In re Charming Charlie Holdings Inc.*, No. 17-12906 (CSS).  On December 14, 2018, all of the Prior Cases were closed. *See Order Issuing a Final Decree Closing the Chapter 11 Cases*, No. 17-12906 (CSS) [Docket No. 874] (Bankr. D. Del. 2018).

6.       The Debtors, together with their advisors, pursued multiple additional sources of financing and inventory (*i.e.*, consignment programs) to ease their liquidity crisis. However, on July 10, 2019, it became abundantly clear that those alternative sources were not viable, or not available on the timeline required by the company. After an extensive evaluation, the Debtors and their advisors reached the difficult decision that the best way to maximize value for all stakeholders is to commence an orderly wind-down of Charming Charlie and its non-Debtor affiliates.

7.       On July 3, 2019, the Debtors entered into a Consulting Agreement (as defined below) with the contractual joint venture comprised of Hilco Merchant Resources, LLC ("Hilco") and SB360 Capital Partners (together with Hilco, the "Consultant") to effectuate the closure of the Debtors' stores through going-out-of-business sales (the "Store Closing Sales"). The Store Closing Sales will commence immediately upon Court approval of the procedures set forth in the Consulting Agreement.[3] The Debtors estimate that the Store Closing Sales will last approximately two months, and generate revenue of approximately $30 million.

8.       To finance these chapter 11 cases and the Store Closing Sales, the Debtors have obtained proposed debtor-in-possession financing ("DIP Facility") of $13.0 million to be provided by the prepetition ABL Lenders (as defined below). The Debtors believe that the liquidity provided by the DIP Facility will enable the Debtors to complete the Store Closing Sales in a manner that maximizes recoveries for the Debtors' estates and stakeholders.

---

[3]    *See Debtors' Motion Seeking Entry of Interim and Final Order (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief*, filed concurrently herewith.

9.      To familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in those certain motions and applications filed contemporaneously herewith, I have organized this declaration as follows:

- **Part I** provides a general overview of the Debtors' corporate history and operations;

- **Part II** provides an overview of the Debtors' prepetition capital structure;

- **Part III** describes the circumstances leading to these chapter 11 cases;

- **Part IV** describes the Debtors' proposed debtor-in-possession financing and marketing process; and

- **Part V** sets forth the evidentiary basis for the relief requested in each of the first day pleadings.

**I.      The Charming Charlie Brand.**

10.      Charming Charlie was founded by Charles Chanaratsopon in 2004.  In less than a decade, Charming Charlie grew into a leading specialty retailer focused on colorful fashion jewelry, handbags, apparel, gifts, and beauty products.  By 2013, Charming Charlie had grown into 284 stores in 40 states.  By the fall of 2017, Charming Charlie had over 390 locations spread across the United States, Canada, the Middle East, and the Philippines.

11.      Since its founding, Charming Charlie has been on a colorful and purposeful mission to make fashion fun with a focus on four key elements—color, value, variety, and fun. Charming Charlie has a distinctive color-focused merchandising model in which key products are available in a wide array of colors and store merchandise is organized on a color basis, creating an aesthetically unique experience.  Store locations are stocked with jewelry, handbags, eyewear, scarves, shoes, and thousands of accessories grouped together across a range of colors to fit any occasion.  Charming Charlie's products are competitively priced between more

expensive stores (*e.g.*, Kohl's and Macy's) and stores that cater to a younger market (*e.g.*, Claire's).  Charming Charlie offers unique products that are both in-style and affordable.

### A.    Charming Charlie's Business Operations.

#### 1.    Charming Charlie's Physical and Digital Presence.

12.    ***Brick-and-Mortar Presence***.  Charming Charlie has both a national, operating approximately 261 locations across 38 states nationwide.  Retail stores are located in lifestyle centers, shopping malls, power centers, street level shops, and outlets.  The stores are located in approximately 125 lifestyle centers, 80 shopping malls, 50 power centers, 2 street stores, and 4 outlets.  Currently, Texas, Florida, and California host the most brick-and-mortar locations with approximately 75 locations in total.

13.    ***The E-Commerce Platform***.  In addition to its physical footprint, Charming Charlie maintains a robust online presence.  Customers can seek out the latest style advice, fashion tips, trends, and styles complete with video tutorials on the Charming Charlie website, www.charmingcharlie.com.  Additionally, customers may purchase merchandise via the Debtors' website.  Recognizing that a user-friendly and well-curated online platform is crucial to ensuring a seamless customer experience, Charming Charlie has invested significant time and resources to expand and improve its website to compete with experiences provided by certain of its competitors.

#### 2.    Merchandise and Key Customer Base Overview.

14.    Charming Charlie offers specialty handbags, apparel, fashion jewelry, and beauty products.  Historically, Charming Charlie utilized a sophisticated inventory system to position products according to their color and theme.  Merchandise is offered in as many as 26 different hues and arranged at each store according to the item's color and theme, creating what has been referred to as a "treasure hunt" experience.  Although this approach initially provided Charming

Charlie with a strategic benefit, and engendered significant brand loyalty, it eventually caused Charming Charlie to be saddled with excess merchandise in underperforming color offerings.

15.    Consumers, however, continue to rely on Charming Charlie for trendy and affordable merchandise.  Inventory prices are benchmarked by Charming Charlie's merchants and typically range from $5 to $50, and up to $125, providing Charming Charlie with a competitive advantage over other select specialty retailers and department stores (e.g., Kohl's, Macy's, JC Penney).  For example, many of the handbags sold by the company are similar in style to premium, expensive lifestyle brands, but are offered at a lower price point that is more accessible to the average consumer.

16.    Charming Charlie's inventory price point and demographics cover a wide range, reflective of the variety of products stocked in its stores and the tastes of its customers. Charming Charlie's jewelry selection remains its strongest product offering, historically providing the highest company-wide margins.  Charming Charlie places an emphasis on outfit solutions to provide its customers with complete outfits, including fashion accessions, jewelry, and handbags.  Traditionally, this approach has required offering a wide assortment of tops, dresses, and other apparel pieces in regular and plus-sizes across 26 color varieties.  Essential to the brand is the promise of a wide range of products that are unique, innovative, and reflective the latest trends.  For example, items perfect for gifts and special occasions are widely available, including, bridal gifts, holiday themed merchandise, gifts perfect for pets, and baby showers and reveals.

17.    Charming Charlie's loyal customer base shops regularly in its stores and is an advocate for the brand.  The customer base generally consists of women of all ages and spending preferences, with women aged 35 to 55 composing Charming Charlie's core customer base.

These core consumers shop at Charming Charlie approximately three times per year and represent approximately 38% of its customer base.

### B. Critical Components of the Debtors' Cost Structure.

#### 1. Supply Chain.

18.     The Debtors maintain an integrated supply chain aimed at ensuring the uninterrupted flow of fresh merchandise to their brick-and-mortar locations. Generally, the Debtors contract with various domestic vendors to design and source the merchandise from foreign manufacturers, located predominantly in the People's Republic of China, India, and Vietnam. In limited circumstances, the Debtors contract with foreign manufacturers directly. Depending on the nature of the Debtors' arrangement with a given vendor or manufacturer, the Debtors ship the merchandise to a warehouse located in Houston, Texas, that serves as the Debtors' distribution center.

#### 2. Employee Compensation and Benefits.

19.     The Debtors employ approximately 3,342 employees, including approximately 856 full-time employees and approximately 2,486 part-time employees (collectively, the "Employees"). In light of the Debtors' planned store closings and related reductions in force,[4] the Debtors anticipate that their monthly gross Employee Compensation, including wages, salaries, and related compensation, will range from approximately $200,000 to approximately $4.5 million during the pendency of these chapter 11 cases. The Debtors offer their Employees the ability to participate in a number of insurance and benefits programs, including, among other programs, medical and dental plans, life insurance, accidental death and

---

[4]     The Debtors planned store closing are discussed in more detail in *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief,* filed contemporaneously herewith.

dismemberment insurance, disability benefits, workers' compensation, retirement plans, non-insider incentive programs, paid time off, severance, director compensation, and other employee benefit plans.

### 3.    Real Estate Obligations.

20.    The Debtors lease all of their store locations.  In 2018, the Debtors' aggregate occupancy costs was approximately $47.4 million.  The Debtors lease two spaces in Houston, Texas, consisting of (a) their corporate headquarters, a building owned by Sierra Assets Group, LLC, and (b) their distribution center, a building owned by GLP US Management, LLC.

## II.    The Debtors' Prepetition Corporate and Capital Structure.

21.    A chart depicting the Debtors' current corporate is attached hereto as **Exhibit B**. Holdings and each of its U.S.-incorporated subsidiaries that are obligors (either as a borrower or guarantor) under the ABL Facility and the Term Loan Facility are Debtors in these chapter 11 cases.

22.    As of the Petition Date, the Debtors' capital structure consists of outstanding funded-debt obligations in the aggregate amount of approximately $81.8 million, including the Prepetition ABL Facility, the Prepetition Term Loan Facility, and the Prepetition Vendor Facility.[5]  The following table summarizes the Debtors' outstanding funded-debt obligations as of the Petition Date:

---

[5]    Charming Charlie LLC is also a party to certain lease agreements (collectively, the "Capital Leases") whereby it leases company vehicles and office equipment, including printers (collectively, the "Leased Assets") utilized in the ordinary course of business.  Under the Capital Leases, Charming Charlie LLC is indebted in the aggregate amount of approximately $95,000.  The Capital Leases mature in 2020, and are secured by a first-priority lien on the Leased Assets.

| Funded Debt | Maturity | Interest Rates | | Total Amount Outstanding |
|---|---|---|---|---|
| **Prepetition ABL Facility** | February 2022 | Libor + 6.5% | | $9.5 million |
| | | Prime Rate + 5.5% | | |
| **Prepetition Term Loan Facility** | April 2023 | Term A Loans: Libor + 10.00% Term B Loans: Libor + 1.00% + PIK interest of 9.00% | | $62.3 million (including PIK interest) |
| | | Term A Loans: Base Rate + 9.00% Term B Loans: Base Rate + 0.00% + PIK interest of 9.00% | | |
| **Prepetition Vendor Facility** | May 2020 | 20.0% | | $10.0 million |
| **TOTAL** | | | | $81.8 million |

### A.    The Prepetition ABL Revolving Credit Facility.

23.    Charming Charlie LLC and Charming Charlie USA, Inc. ("CC USA") are parties to that certain Credit Agreement, dated as of February 28, 2019, (as amended, the "Prepetition ABL Facility") by and among Charming Charlie Holdings Inc. ("Holdings"), as holdings, Charming Charlie LLC and CC USA, as borrowers, the guarantors party thereto,[6] Second Avenue Capital, LLC ("Second Avenue"), as co-collateral agent and lender, and White Oak Commercial Finance, LLC ("White Oak" and together with Second Avenue, the "Prepetition ABL Lenders") as co-collateral agent, lender, and administrative agent (White Oak and together with Second Avenue, the "Prepetition ABL Agents").  The Prepetition ABL Facility provides for

---

[6]    The guarantors under the Prepetition ABL Facility are Holdings, Poseidon Partners CMS, Inc. ("Poseidon"), Charming Charlie Manhattan LLC ("CC Manhattan"), Charming Charlie International LLC, ("CC International"), and Charming Charlie Canada LLC ("CC Canada").

a $35.0 million senior secured revolving credit facility (subject to a borrowing base composed primarily of inventory and credit card receivables) with a maturity date of February 28, 2022.

24.    The Prepetition ABL Facility provides for loans bearing interest at 3-month LIBOR *plus* an applicable margin of 6.5%. Interest is paid monthly in arrears.  Obligations under the Prepetition ABL Facility are secured by a first priority lien on all of the assets of the borrowers and the guarantors.  Each Debtor has guaranteed all obligations under the Prepetition ABL Facility.

25.    Additionally, the Debtors have entered into deposit account control agreements in favor of the Prepetition ABL Agents with respect to their bank accounts.  Thus, substantially all of the Debtors' cash (the "Cash Collateral") is subject to a perfected first priority security interest in favor of the Prepetition ABL Agents.  Under the Prepetition ABL Facility, the Debtors must remit substantially all cash receipts on a daily basis to a non-Debtor account maintained by the Prepetition ABL Agents (the "Agent Account").  Accordingly, each day, any excess cash is swept to the Agent Account and applied to prepay loans in accordance with the Prepetition ABL Facility.  As of the Petition Date, there is approximately $9.5 million of outstanding principal and approximately $4.0 million of availability under the Prepetition ABL Facility.

**B.      The Prepetition Term Loan Facility.**

26.    Charming Charlie LLC is party to that certain Amended and Restated Term Loan and Guarantee Agreement, dated as of April 28, 2018 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "Prepetition Term Loan Facility"), among Holdings, Charming Charlie LLC, as borrower, certain of the Debtors as guarantor parties thereto,[7] the lenders from time to time

---

[7]    The guarantors under the Term Loan Facility are Holdings, Poseidon, CC Manhattan, CC International, CC Canada, and CC USA.

parties thereto (the "Prepetition Term Loan Lenders"), and Wilmington Trust, National Association, as administrative agent (in such capacity, the "Prepetition Term Loan Agent"). The Term Loan Facility provides for a loan in an original principal amount of $55 million, with a maturity date of April 24, 2023. CC USA, in addition to certain Debtors, has guaranteed all obligations under the Term Loan Facility. Obligations under the Term Loan Facility are secured by a second priority lien on all assets of the Debtors.

27. The Term Loan Facility provides for Tranche A Term Loans and Tranche B Term Loans. Tranche A Term Loans that are LIBOR loans bear interest (per annum) at LIBOR (with a 1.00% floor) *plus* a 10.00% margin. Tranche B Term Loans that are LIBOR loans bear interest (per annum) at LIBOR (with a 1.00% floor) *plus* a 1.00% margin *plus* PIK interest of 9.00%. Tranche A Term Loans that are Base Rate loans bear interest (per annum) at the Base Rate (equal to the higher of (a) the applicable prime lending rate, (b) 0.50% above the overnight federal funds rate, or (c) 1.00% above LIBOR, subject to a 2.00% floor) plus a 9.00% margin. Tranche B Term Loans that are Base Rate loans bear interest (per annum) at the Base Rate (equal to the higher of (a) the applicable prime lending rate, (b) 0.50% above the overnight federal funds rate, or (c) 1.00% above LIBOR, subject to a 2.00% floor) *plus* a 0.00% margin *plus* PIK interest of 9.00%.

28. As of the Petition Date, approximately $60.7 million in aggregate principal amount remained outstanding under the Term Loan Facility, and approximately $1.6 in PIK Interest accrued to balance, for a total outstanding balance of approximately $62.3 million.

**C.    The Vendor Credit Agreement.**

29. Charming Charlie LLC is party to that certain Vendor Payment Financing Credit and Guarantee Agreement, dated as of April 24, 2018 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the

Petition Date, the "Prepetition Vendor Facility"), among Holdings, Charming Charlie LLC, as borrower, certain of the Debtors as guarantor parties thereto,[8] the lenders from time to time parties thereto (the "Prepetition Vendor Loan Lenders"), and Wilmington Trust, National Association, as administrative agent (in such capacity, the "Prepetition Vendor Program Loan Agent"). The Prepetition Vendor Facility provides for a term loan in an original principal amount up to $10 million, with a maturity date of May 15, 2020. Each of the Debtors have guaranteed all obligations under the Prepetition Vendor Facility. Obligations under the Prepetition Vendor Facility are secured by a second priority lien on all assets of the Debtors.

30.    The Prepetition Vendor Facility bears interest at a rate of 20.0% percent per annum. As of the Petition Date, approximately $10.0 million in aggregate principal amount remained outstanding under the Vendor Facility.

**D.    The Intercreditor Agreement.**

31.    The relative lien priorities between (i) the Prepetition ABL Facility and (ii) the Prepetition Vendor Facility and the Prepetition Term Loan Facility are set forth in that certain Subordination and Intercreditor Agreement, dated as of February 28, 2019, (as amended, the "Intercreditor Agreement"), by and among the ABL Agent and Wilmington Trust, National Association, in its capacities as Prepetition Vendor Program Loan Agent and Prepetition Term Loan Agent. In addition to lien priorities, the Intercreditor Agreement governs the respective rights, interests, obligations, and positions of (a)(i) the Prepetition ABL Agents and (ii) the Prepetition Vendor Program Loan Agent and the Prepetition Term Loan Agent and (b)(i) the Prepetition ABL Lenders and (ii) the Vendor Facility Lenders and the Term Lenders. The DIP Facility preserves the priority scheme set forth in the Intercreditor Agreement.

---

[8]    The guarantors under the Prepetition Term Loan Facility are Holdings, Poseidon, CC Manhattan, CC International, CC Canada, and CC USA.

E.      **Common and Preferred Equity Interests.**

32.     As of the Petition Date, the following firms directly or indirectly hold 100 percent of the common equity interests of Holdings.

- THL Credit ("THL");
- Apollo Management ("Apollo");
- Medley Capital;
- Cion Investment Management;
- Russell Investments;
- Stichting Blue Sky;
- Redding Ridge Asset Management;
- Congruent Investment Partners;
- FLP Investments Ltd.;
- LCM Asset Management; and
- Stone Tower Capital.

III.    **Events Leading to these Chapter 11 Cases.**

33.     Multiple macroeconomic and microeconomic factors lead to the Debtors' commencing these chapter 11 cases.  The macroeconomic factors, include inclement weather disrupting the shopping experience in the first quarter of 2019, the implementation of the new tax laws that reduced consumer spending, and the general downturn in the retail industry, which has led to a decrease in consumer traffic and related sales and the marked shift away from brick-and-mortar retail to online channels.  Microeconomic factors also contributed, including, for example, constricted access to credit, excess, unprofitable inventory, and unfavorable trade and real estate lease terms.  Together, these factors have strained the Debtors' liquidity.  Indeed, as of the Petition Date, the Debtors have $6,000 in cash on hand.

A.     **The Prior Chapter 11 Cases.**

34.     I understand that beginning in 2015, the Prior Debtors experienced a decline driven primarily by: (a) an overly broad vendor base, (b) an disproportionately large physical footprint, (c) certain operational missteps, and (d) a challenging retail market conditions.  These factors tightened the Prior Debtors' liquidity and complicated their relationship with their vendors.  Industry-wide declines in sales and traffic exacerbated these factors.  Ultimately, the Prior Debtors' were left with insufficient liquidity to responsibly run the business.  To address these challenges, the Prior Debtors took steps to evaluate and implement cost-reduction initiatives, including filing the Prior Cases.

35.     The Prior Cases accomplished four main objectives: (a) eliminated approximately 45 percent of the prepetition funded debt; (b) created approximately $85 million in post-emergence working capital; (c) closed and liquidated approximately 100 underperforming brick and mortar stores; and (d) initiated the "Back to Basics" operational overhaul.

B.     **Challenges Subsequent to the Effective Date.**

36.     Upon emergence from the Prior Cases, the Debtors sought to capitalize on their deleveraged balance sheet with additional cost-reduction measures, including refinancing the revolving exit financing to increase liquidity, reworking their eCommerce offerings to bring the platform into profitability, and tailoring their store offerings to their customers desires to increase revenue.  Notwithstanding these measures, the Debtors continued to face challenges that make it impossible for Charming Charlie to continue as a going concern.

1.     **Challenging Operating Environment.**

37.     The Debtors, along with many other apparel and retail companies continue to face a challenging commercial environment brought on by increased competition and the shift away from shopping at brick-and-mortar stores.   Given the Debtors' substantial brick-and-mortar

presence and the expenses associated therewith, the Debtors' business is heavily dependent on physical consumer traffic, and resulting sales conversion, to meet sales and profitability targets. The continuing decline of physical consumer traffic, which has plagued the retail industry as a whole, contributed to the Debtors falling short of their sale targets and depressed profitability performance.

38.     The Debtors' efforts to right-size their brick and mortar footprint in the Prior Cases where hampered by landlord negotiations.  For example, to receive favorable lease concessions, some landlords required the Prior Debtors to keep certain underperforming stores open.  The Debtors were unable to close approximately 50 underperforming stores as a result of such negotiations.

39.     The difficult retail environment has been further negatively impacted by numerous events in 2019, including inclement weather in the first quarter of 2019, reduced consumer spending declined due to decreased tax returns, and increased trade tariffs:

(a)     The first quarter of 2019 saw number of severe weather events, including numerous severe thunderstorms and record low temperatures.  These weather events decreased retail foot traffic, which has already been trending downward in recent years.  These weather events resulted in approximately $1.1 million in decreased revenue or an approximately 25% decrease compared to 2017.

(b)     In 2019, many consumers saw a decreased federal tax return following the implementation of the new tax law.  The decreased tax returns resulted in decreased consumer spending in the Spring.  This hit the Debtors particularly hard because the reduced consumer spending roughly coincided with Mother's Day, which has historically been one of the Debtors most profitable holidays behind Christmas and Valentine's Day.

(c)     Import and export tariffs on American goods have increased in 2019.  Many of Charming Charlie's suppliers are located in Asia, particularly China.  The increased tariffs have reduced Charming Charlie's already slim margins.

### 2.    Operational Missteps.

40.    Certain operational missteps contributed to the Debtors' needing to file these chapter 11 cases.    Before the Prior Cases, the Prior Debtors substantially reduced their workforce.    Although these reductions conserved liquidity, they resulted in severely understaffed stores.    Some stores were left with a single associate for numerous hours.    Minimal staffing limited the Debtors' ability to convert consumer traffic into sales.    In a retail environment plagued by depressed conversion rates, the Debtors could ill afford to miss these opportunities. Moreover, the Debtors' workforce was subject to regular poaching from competitors.    In at least one instance, competitors would come into Charming Charlie stores to recruit the Debtors employees, offering higher wages.    These workforce losses left the stores further understaffed.

### 3.    Supply Chain and Borrowing Base Challenges.

41.    Upon emergence from the Prior Cases, the Debtors were saddled with undesirable merchandise, unfavorable trade terms, and an undercapitalized balance sheet.    As is typical in the apparel industry, inventory levels form a substantial portion of the prior and current ABL Facility borrowing base.    Thus, to resolve their liquidity crisis, the Prior Debtors hastily increased their inventory to expand their borrowing base.    In so doing, the Prior Debtors received merchandise that was either off brand or not of the quality their customers had come to expect. As a result, the merchandise sat stagnate on the Debtors' shelves, resulting in extreme mark downs and lower margins.

42.    The Debtors' efforts to restock their shelves with more desirable merchandise were strained by onerous trade terms.    In the weeks and month before the Prior Debtors filed the Prior Cases, many of their vendors sough payment assurances through unfavorable trade terms, including deposits, cash on delivery or short payment terms.    Upon emergence, the company expected that they would be able to quickly return to pre-filing trade terms.    In reality, it took the

Debtors approximately six months longer than expected to return to favorable trade terms. During this time, the Debtors liquidity was constrained forcing the company to put off other operational initiatives.

43.    In addition, the Debtors emerged from the Prior Cases undercapitalized. During the Prior Cases, the Debtors significantly reduced their funded debt obligations. Although the de-levered balance sheet was necessary for the Debtors' long-term sustainability, the Debtors emerged from chapter 11 without access to sufficient liquidity. For example, in late 2018, the lenders under the Debtors' prior asset based revolving credit facility tightened credit limits right before the holiday season. The tightened credit resulted in the Debtors having to delay certain merchandise, costing the Debtors approximately $2.1 million in lost sales during the holiday season.

### C.    Efforts to Address Liquidity Challenges.

44.    To address the liquidity issues associated with their lenders, the Debtors began exploring a potential refinancing transaction. In February 2019, the Debtors entered into the current ABL Facility with the ABL Lenders. The refinancing transaction initially provided the Debtors access to more liquidity, but as time passed, the Debtors faced the same liquidity challenges they experienced before due to increased reserves and borrowing base calculations under the ABL Facility.

### D.    Exploration of Strategic Alternative.

45.    Notwithstanding the measures discussed above, Charming Charlie was unable to return to profitability under its current business model. The Debtors' brick and mortar business suffered from same store sales declines and reduced store productivity. As a result, in February 2019, the company engaged Clear Thinking Group LLC ("CTG"), a financial and restructuring advisory firm to perform a review of Charming Charlie's go forward business plan and explore

strategic alternatives. CTG worked alongside Paul Hastings LLP ("Paul Hastings") to develop a restructuring strategy for Charming Charlie's business.

46.     The Debtors and their advisors analyzed Charming Charlie's capital structure and potential alternatives, including (a) refinancing the Prepetition ABL Lenders, (b) entering into agreements to keep inventory flowing (*i.e.*, consignment agreements), and (c) reducing the store footprint to various levels depending on store profitability. At the same time, Charming Charlie has been managing liquidity by making only payments to the merchandise vendors and suppliers that are essential to the Charming Charlie's operations. To that end, Charming Charlie and its advisors have been diligently meeting with vendors and suppliers to work through supply chain issues while limiting disruption to the greatest extent possible. Unfortunately, on July 10, 2019, it became clear that there were no viable options to remain as a going concern.

**IV.    Store Closing Sales and the Proposed DIP Financing.**

**A.    Store Closing Sales.**

47.     After an extensive review of their businesses and strategic alternatives, the Debtors made the difficult decision to proceed with liquidation, closing all stores and winding down their business. Accordingly, the Debtors and their advisors decided to engage the Consultant to assist in these efforts. Not only is the Consultant comprised of industry leaders, but Hilco has extensive experience with Charming Charlie because Hilco worked with the Prior Debtors on their store closing sales during the Prior Cases.

48.     On July 3, 2019, the Debtors and the Consultant entered into that certain Agency Agreement, attached to the Store Closing Motion, which will govern the Consultant's engagement (the "Consulting Agreement"). Maura Russell of Montgomery McCracken Walker & Rhoads LLP, a liquidation consultant, CTG, Paul Hastings, and I were involved in the negotiations with the Consultant regarding the terms and conditions of the Consulting

Agreement.  I believe that they were conducted in good faith and at arm's length, and the terms of the Consulting Agreement are reasonable.  The Consulting Agreement will enable the Debtors to use the logistical capabilities, experience, skills, and resources of the Consultant to conduct the Store Closing Sales effectively and efficiently.  I believe that implementing the store closing procedures and conducting the Store Closing Sales in the manner proposed in the Store Closing Motion will provide the best and most efficient means for the Debtors to maximize the value of the Debtors' inventory and other store assets.

49.    I also believe that it is in the best interests of the Debtors' estates to assume the Consulting Agreement and formally implement the Store Closing Sales.  Prior to the Petition Date, the Debtors commenced "soft sales" as the stores prepared for the potential launch of the Store Closing Sales.  Any delay in consummating the Store Closing Sales would diminish the recovery tied to the monetization of such assets for a number of reasons.  Among other things, many of the Debtors' stores fail to generate sufficient positive cash flow to support the required costs of systems, design, sourcing, merchandising, and other corporate costs.  With the Store Closing Sales, however, these stores (and indeed all the Debtors' stores) will experience increased sales and cash inflows, which will supplement the Debtors' liquidity.  And, the swift and orderly implementation of the Store Closing Sales will allow the Debtors to timely reject the applicable store leases and avoid the accrual of unnecessary administrative expenses for rent payments.  In sum, any delay in running the Store Closing Sales could deteriorate the Debtors' asset value and thus creditor recoveries in these chapter 11 cases.

**B.    The Proposed DIP Financing.**

50.    One of the primary reasons the Debtors' filed these chapter 11 cases is a liquidity crisis.  In the weeks leading up to the Petition Date, it became clear to the Debtors that their liquidity position was not sustainable and would require a chapter 11 filing supported by access

to both Cash Collateral and postpetition financing to provide sufficient liquidity to operate the Debtors' business during these chapter 11 cases. In short, the Debtors lack sufficient funds to continue their operations in the ordinary course. Without increased availability of funds, the Debtors will be unable to continue to operate their businesses, conduct the Store Closing Sales, and implement an orderly wind-down process.

51.    Accordingly, the Debtors' advisors began discussing possible debtor-in-possession financing with the Debtors' Prepetition ABL Lenders while soliciting indications of interest from alternate third parties. These discussions focused on the Debtors' need for funding through the consummation of the Store Closing Sales. Although the discussions with the third parties resulted in several indications of interest and a term sheet, the Debtors did not receive a proposal that was better both in terms of economics as well as the ability to implement. The Prepetition ABL Lenders will provide approximately $13.0 million in postpetition financing and the use of Cash Collateral.

52.    The Debtors have a need for immediate access the DIP Facility and Cash Collateral. The Debtors lack sufficient funds to operate their businesses and continue paying their debts as they come due. As of the Petition Date, the Debtors' total cash balance is approximately $6,000, and they do not have readily available sources of additional financing. Thus, the immediate access to the DIP Facility and Cash Collateral is essential. Without immediate access, the Debtors will be unable to continue to operate their businesses, including paying employee wages, and would likely be forced to liquidate, causing immediate and irreparable harm to value of the Debtors' estate. The Debtors believe that access to Cash Collateral and the DIP Facility will ensure that the Debtors have sufficient funds to preserve and

maximize the value of their estates, pursue their restructuring goals in the interim period, as set forth in the Budget, and responsibly administer these chapter 11 cases.

53.     There are three key points to highlight with respect to the DIP Facility.  ***First***, in light of the fact that nearly all of the Debtors' assets, including inventory and intellectual property, are subject to liens asserted by the Prepetition ABL Lenders, the Prepetition Term Loan Lenders, and the Prepetition Vendor Loan Lenders (collectively, the "<u>Prepetition Lenders</u>"), the Debtors concluded that any workable financing likely would require the support of, or be provided by, such parties.  The Prepetition Lenders made it clear that they would not consent to subordinating their liens to a third party.  As a result, any third-party financing proposal would cost the Debtors substantially more than one from the Prepetition Lenders, particularly after accounting for the priming challenges associated with a non-consensual postpetition financing facility.  Accordingly, the DIP Facility is being provided by the Debtors' existing Prepetition ABL Lenders (in such capacity, the "<u>DIP Lenders</u>"), and the Debtors are not facing value-destructive priming issues.

54.     ***Second***, in exchange for providing this critical financing relief, the Debtors are seeking to convert or "roll up" all outstanding prepetition ABL Facility obligations into DIP Facility obligations.  The roll-up was a condition to the DIP Lenders' commitment to provide postpetition financing.  I understand that the "roll-up" of prepetition secured obligations has become standard in distressed retail restructurings.  In this case, I understand that cash collections after entry of the interim order will be used to pay the obligations under the Prepetition ABL Facility, and, upon entry of the final order, the entire Prepetition ABL Facility not paid down will be rolled-up into the DIP Facility.

55.     *Third*, the Debtors believe that the DIP Facility is (i) the product of arms'-length, good-faith negotiation processes, (ii) in light of the facts of this case and the prepetition capital structure, the best presently available postpetition financing option for the Debtors, and (iii) contains reasonably and appropriate financial terms and conditions under the circumstances. The terms of the DIP Facility, including all fees and costs, were the subject of negotiation between the Debtors and the DIP Lenders.  In particular, the fees are an integral component of the overall terms of the DIP Facility, and were required by the DIP Lenders as consideration for the extension of postpetition financing.

**V.      Evidentiary Support for First Day Motions.**

56.     Contemporaneously, the Debtors have filed a number of first day pleadings seeking relief that the Debtors believe is necessary to enable them to efficiently administer their estates with minimal disruption and loss of value during these chapter 11 cases.  The Debtors request that the relief requested in each of the first day motions be granted as critical elements in ensuring the maximization of value of the Debtors' estates.  I believe that the relief requested in the first day motions is necessary to allow the Debtors to operate with minimal disruption during the pendency of these chapter 11 cases.  I have reviewed each of the first day motions discussed below and the facts set forth in each first day motion are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.  A description of the relief requested in and the facts supporting each of the first day motions is set forth in **Exhibit A** attached hereto and incorporated herein by reference.


[*Remainder of Page Intentionally Left Blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated: July 11, 2019                         /s/ *Alvaro E. Bellon*
Wilmington, Delaware                         Name: Alvaro E. Bellon
                                             Title:  Senior Vice President and
                                                     Chief Financial Officer

## EXHIBIT A

**Evidentiary Support for First Day Motions**

<u>**Evidentiary Support for First Day Motions**</u>[1]

I.     **Debtors' Motion Seeking Entry of an Order (I) Directing Joint Administration of Their Related Chapter 11 Cases and (II) Granting Related Relief (the "<u>Joint Administration Motion</u>").**

1.     Pursuant to the Joint Administration Motion, the Debtors request entry of an order (a) directing procedural consolidation and joint administration of their related chapter 11 cases and (b) granting related relief.    Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience and cost savings to the Debtors without harming the substantive rights of any party in interest.

2.     Many of the motions, hearings, and orders in these chapter 11 cases will affect each and every Debtor entity.    For example, virtually all of the relief sought by the Debtors in the First Day Motions is sought on behalf of all of the Debtors.    Joint administration also will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.    Joint administration of these chapter 11 cases, for procedural purposes only, under a single docket, will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding, instead of multiple independent chapter 11 cases.    Accordingly, I respectfully submit that the Joint Administration Motion should be approved.

II.    **Debtors' Motion Seeking Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs and (II) Granting Related Relief (the "<u>SOFA/Schedules Extension Motion</u>").**

3.     Pursuant to the SOFA/Schedules Extension Motion, the Debtors request entry of an order (a) extending the deadline by which the Debtors must file the schedules of assets and

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the applicable First Day Motion.

liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") by 18 days in addition to the extension provided by Local Rule 1007-1(b), for a total of 45-days from the Petition Date, to and including August 26, 2019, without prejudice to the Debtors' ability to request additional extensions for cause shown, and (b) granting related relief. The Debtors estimate that they have far more than 200 creditors on a consolidated basis. The breadth of the Debtors' business operations requires the Debtors to maintain voluminous books and records and complex accounting systems. Given the size, complexity, and geographic diversity of the Company's business operations, and the number of creditors, I submit that the large amount of information that must be assembled to prepare the Schedules and Statements and enormous expenditure of time and effort required to complete the Schedules and Statements would be unnecessarily burdensome to the Debtors during the period of time following the Petition Date.

4.      I believe that the relief requested in the SOFA/Schedules Extension Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the SOFA/Schedules Extension Motion should be approved.

**III.     Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to (A) File A Consolidated List of Creditors in Lieu of Submitting A Separate Mailing Matrix for Each Debtor, (B) Redact Certain Personal Identification Information for Employees, and (C) File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors and (II) Granting Related Relief (the "Creditor Matrix Motion").**

5.      Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order: (a) authorizing the Debtors to (i) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, (ii) redact certain personal identification information for the

Debtors' employees, and (iii) file a consolidated list of the Debtors' thirty largest unsecured creditors; and (b) granting related relief.

6.      Although I understand that a list of creditors usually is filed on a debtor-by-debtor basis, in a complex chapter 11 bankruptcy case involving more than one debtor, the debtors may file a consolidated creditor matrix "in the interest of justice."  Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and result in duplicate mailings.[2]

7.      Additionally, I believe that it is appropriate to authorize the Debtors to redact from the Creditor Matrix address information of the Debtors' current and former employees because such information could be used to perpetrate identity theft or locate survivors of domestic violence or stalking.  This risk is not merely speculative.  During the Debtors' prior chapter 11 cases, for example, the abusive former partner of one of the Debtors' employees used the publicly accessible creditor and employee information filed in the cases to track the employee to her new address not publicly available until then, forcing the employee to change addresses again.  The Debtors propose to provide an unredacted version of the Creditor Matrix to the Office of the United States Trustee for the District of Delaware, any official committee of unsecured creditors appointed in these chapter 11 cases, and the Court.  Further, the Debtors' noticing and claims agent will have an unredacted version and will serve each employee at their actual address, as needed.

8.      Accordingly, I respectfully submit that the Court should approve the Creditor Matrix Motion.

---

[2]    The Debtors submit that if any of these chapter 11 cases converts to a case under chapter 7 of the Bankruptcy Code, the applicable Debtor will file its own creditor mailing matrix.

IV.    **Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief (the "Cash Management Motion").**

9.    Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders:  (a) authorizing the Debtors to (i) continue to operate their Cash Management System; (ii) honor certain prepetition obligations related thereto; (iii) maintain existing Business Forms in the ordinary course of business; and (iv) continue to perform Intercompany Transactions consistent with historical practice; (b) granting administrative expense status to postpetition Intercompany Balances; and (c) granting related relief.

10.    The Debtors' Cash Management System is similar to the centralized cash-management systems used by other comparably sized companies to manage cash flow.  The Debtors use their Cash Management System in the ordinary course to transfer and distribute funds and to facilitate cash monitoring, forecasting, and reporting.  The Debtors' treasury department maintains daily oversight over the Cash Management System and implements cash-management controls for entering, processing, and releasing funds.  Additionally, the Debtors' corporate accounting, treasury, and internal audit departments regularly reconcile the Debtors' books and records to ensure that all transfers are accounted for properly.

11.    The Debtors' Cash Management System facilitates the timely and efficient collection, management, and disbursement of funds.  Because of the nature of the Debtors' business and the disruption that would result if the Debtors were forced to close their existing Bank Accounts, I believe that it is critical that the existing Cash Management System remain in place.  I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to

continue to operate their business in chapter 11.    Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

**V.    Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing, but Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief (the "Wages Motion").**

12.    Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to (i) pay prepetition wages, salaries, commissions, other compensation, and reimbursable employee expenses and (ii) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto, in an aggregate amount not to exceed $3,949,000 pursuant to the Interim Order and $4,024,000 pursuant to the Final Order; and (b) granting related relief.

13.    The Debtors employ approximately 3,342 Employees, including approximately 856 full-time employees and approximately 2,486 part-time employees.   In addition to the Employees, the Debtors periodically retain specialized individuals as independent contractors, and also temporary workers, generally sourced from various staffing agencies, to fulfill certain duties on a short- and long-term basis.   At this time, the Debtors retain approximately 14 Temporary Staff.

14.    The Employees and Temporary Staff perform a variety of functions critical to the preservation of value and the administration of the Debtors' estates.   In many instances, the Employees and Temporary Staff include personnel who are intimately familiar with the Debtors' businesses, processes, and systems, and who the Debtors cannot easily replace.   Without the continued, uninterrupted services of the Employees and the Temporary Staff, the ability of the Debtors to maximize creditor recoveries through the store-closing sales and the general administration of the Debtors' estates will be materially impaired.

15.    Additionally, many of the Employees and Temporary Staff rely on their compensation and benefits to pay their daily living expenses.  Thus, the Employees and Temporary Staff will be exposed to significant financial constraints if the Debtors are not permitted to continue paying the Employees' and Temporary Staff's compensation and providing the Employees with health and other benefits.  Without the continued, uninterrupted services of their Employees and Temporary Staff, the Debtors' efforts to maximize the value realized through their store-closing sales will be threatened.  Consequently, I believe that the relief requested herein is necessary and appropriate under the facts and circumstances of these chapter 11 cases.

16.    To minimize the personal hardship the Employees could suffer if prepetition Employee-related obligations are not paid when due or as expected and to maintain stability in the Debtors' workforce during the administration of the Debtors' chapter 11 cases, the Debtors are seeking authority to pay and honor certain prepetition claims relating to the Employee Compensation and Benefits, including, among other things, wages, salaries, commissions, and other compensation, payroll services, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, and taxes), reimbursable expenses, health insurance, retirement health and related benefits, workers' compensation benefits, life insurance, short- and long-term disability coverage, non-insider severance, certain director compensation, and certain other benefits that the Debtors have historically provided in the ordinary course.

17.    Historically, the Debtors have maintained a number of incentive programs to drive performance among their non-insider Employees, including store and manager-level bonus programs.  The programs varied year-to-year depending on the Debtors' needs, but were typically tied to productivity or sales revenue.  More specifically, Employees working in the distribution

center could earn a bonus based on their productivity, while Employees working in the stores could

earn a bonus based on their store's monthly revenue.  Prior to the Petition Date, the Debtors also

enacted a program for store managers at a store location that was being wound down.  Under that

program, store managers received a bonus based on whether they remained at the store through

closings.  I understand that "insiders" (as the term is defined in section 101(31) of the Bankruptcy

Code) of the Debtors are excluded from the relief requested in the Wages Motion with respect to

any bonus programs or severance payments.  As of the Petition Date, the Debtors have ceased all

Non-Insider Employee Incentive Programs.

18.     The Debtors have historically maintained a discretionary severance program in the

ordinary course of business for the benefit of certain non-insider Employees.  Under the program,

Employees were paid, upon termination of their employment with the Debtors, an amount based

on their years of service to the Debtors.  As of the Petition Date, the Debtors have discontinued

the Severance Program.

19.     I believe that payment of the Employee Compensation and Benefits is warranted.

The majority of the Employees rely exclusively on the Employee Compensation and Benefits to

satisfy their daily living expenses.  Consequently, Employees will be exposed to significant

financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee

Compensation and Benefits.  Additionally, continuing ordinary course benefits will help maintain

Employee morale and minimize the adverse effect of the commencement of these chapter 11 cases

on the Debtors' ongoing business operations the Employees provide the Debtors with services

necessary to conduct the Debtors' business, and the Debtors believe that absent the payment of the

Employee Compensation and Benefits, the Debtors may experience turnover and instability at this

critical time in these chapter 11 cases.

20.    Without these payments, the Debtors may experience turnover and instability at this critical time in these chapter 11 cases.  I believe that without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships these Employees may face.  Such Employees may then elect to seek alternative employment opportunities.  Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—efforts that might not be successful given the overhang of these chapter 11 cases.  Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario.  The Debtors therefore believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their business in these chapter 11 cases.

21.    Therefore, I believe that the relief requested in the Wages Motion inures to the benefit of all parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Wages Motion.

**VI.    Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Shippers, Import Claimants, and 503(b)(9) Claimants, and (II) Granting Related Relief (the "Shippers, Import Claimants, and 503(b)(9) Claimants Motion").**

22.    Pursuant to the Shippers, Import Claimants, and 503(b)(9) Claimants Motion, the Debtors seek entry of interim and final orders: (a) authorizing, but not directing, the Debtors to pay Shipper Charges, Import Charges, and 503(b)(9) Claims; and (b) granting related relief.

23.    *Shippers.*  The Debtors pay various freight forwarders, common carriers, and custom brokers (collectively, the "Shippers") to transport the merchandise and other goods, under FOB or DDP arrangements.  The merchandise flow from the Debtors' vendors (including foreign

vendors) to the Houston Distribution Center and, ultimately, to stock the Debtors' domestic stores. While the Shippers are typically not entitled to liens on the merchandise they are transporting, the Shippers do hold possessory interests in the merchandise and, from time to time, decline to deliver merchandise until the Debtors pay outstanding balances on previous services.

24.     The Debtors seek authority to pay only those amounts that they determine are necessary or appropriate to (a) obtain release of critical or valuable goods being held by the Shippers, (b) maintain a reliable, efficient, and smooth distribution system, and (c) induce the Shippers to continue to carry goods and make timely delivery.  The Debtors intend to pay prepetition Shipper Charges only where they believe, in their business judgment, that the benefits to their estates from making such payments will exceed the costs that their estates would incur by bringing an action to compel the turnover of such goods and the delay associated with such actions. For these reasons, I believe that payment of the Shipper Charges is necessary to preserve and enhance the value of the Debtors' business for the benefit of all parties in interest.

25.     ***Import Claimants.***  In the ordinary course of their businesses, the Debtors import inventory and related materials (collectively, the "Imported Goods") from certain Foreign Vendors.  Timely receipt of the Imported Goods is critical to the Debtors' ability to keep their stores well stocked.  Any disruption or delay in receiving goods currently in transit would adversely affect the Debtors' business operations and affect the Debtors' ability to efficiently administer the Store Closing Sales.

26.     In connection with the import of goods, the Debtors may be required to pay various charges (the "Import Charges"), including customs duties, detention and demurrage fees, tariffs and excise taxes, and other similar obligations.  Although the Debtors are in the process of winding down their businesses and are, therefore, not ordering any new inventory, the Debtors currently

have goods currently in transit from certain Foreign Vendors.  Absent such payment, I believe that parties to whom the Debtors owe Import Charges (the "Import Claimants") may interfere with the Debtors receipt of the Imported Goods, preventing the Debtors from selling the merchandise in the Store Closing Sales, to the detriment of all other stakeholders.  The net value of such sales is worth far more to the Debtors than the amount of incurred but unpaid Import Charges the Debtors are seeking authority to pay.  For the foregoing reasons, I believe that payment of the Import Charges is necessary to preserve and enhance the value of the Debtors' business for the benefit of all parties in interest.

27.     ***503(b)(9) Claimants.***  The Debtors may have received certain goods or materials from various vendors  within the 20 days before the Petition Date (the "503(b)(9) Claimants").  I understand that the value of such goods or materials would be accorded administrative priority (the "503(b)(9) Claims").  I believe that the payment of the 503(b)(9) Claims is necessary to preserve and enhance the value of the Debtors' business for the benefit of all parties in interest.

28.     The Debtors require a steady stream of goods and services to ensure they have inventory.  The Debtors are currently in the process of closing their stores and liquidating their inventory for the benefit of their creditors.  Without the supplies and services described in this motion, the Debtors could experience a significant disruption, which could significantly impair the value of the Debtors' businesses.  Moreover, failure to timely receive goods currently in transit will prevent the Debtors from maximizing the value of their estates for all their stakeholders through the Store Closing Sales.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Shippers, Import Claimants, and 503(b)(9) Claimants Motion.

**VII.    Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, (III) Approving the Implementation of Customer Store Bonus Program and Payments to Non-Insiders Thereunder, and (IV) Granting Related Relief (the "Store Closing Motion").**

29.    Pursuant to the Store Closing Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to assume the Consulting Agreement, (b) authorizing the Debtors to conduct store-closing sales at approximately 261 stores in accordance with the terms of the Store Closing Procedures, (c)  approving the proposed dispute resolution procedures described herein to resolve any disputes with governmental units regarding certain applicable nonbankruptcy laws that regulate liquidation and similar-themed sales, and (d) approving the implementation of a bonus program and authorizing payments thereunder to certain non-insider employees.

30.    Following extensive analysis, the Debtors and their advisors have made the difficult decision to seek authority to close and wind down or conduct other similar themed sales ("Store Closings") for all of the Debtors' brick-and-mortar store locations.  The decision has been made after the implementation of numerous cost-reduction measures and the closure of approximately 100 underperforming stores (for which the Debtors obtained approval in the prior chapter 11 cases).  These efforts simply were not sufficient to stabilize the Debtors' businesses and ensure long-term profitability.  As the Court is aware, the Debtors have also faced significant headwinds given the continued decline of the brick-and-mortar retail industry.  The Debtors also faced a number of additional challenges.

31.    After arm's-length and extensive negotiations the Debtors chose to engage the Consultant.  Based on an evaluation of the circumstances, and the Consultant's experience in conducting store closings on an expedited timeline, the Debtors' management, in consultation with the Debtors' advisors, determined that the Consultant provided the best and most competitive proposal.  Pursuant to the Consulting Agreement, the Debtors commenced the Sales on July 8,

2019, and expect such Sales and Store Closings to be completed and the properties vacated by August 31, 2019.  The Debtors estimate that the proceeds from the Sales will be approximately $30 million.

32.     I believe that , the Store Closings are a critical component of the Debtors' ability to maximize value for all stakeholders, and assumption of the Consulting Agreement will allow the Debtors to continue to conduct the Sales and Store Closings in an efficient, controlled manner that will maximize value for the Debtors' estates.  It will permit the Debtors to continue the Sales and the Store Closings in a timely manner as contemplated by this Motion and will establish fair and uniform store closing procedures.

33.     I believe that the Stores are a burden to these estates, and the Store Closure Assets should be liquidated for the benefit of the Debtors' estates and their creditors.  The Debtors determined that entering into the Consulting Agreement, after engaging in extensive negotiations with the Consultant, will provide the greatest return to the Debtors' estates for the Store Closure Assets.  I believe that the terms set forth in the Consulting Agreement comprise the best for the conduct of the Store Closings and Sales.

34.     I believe that the Consultant has extensive expertise in conducting liquidation sales and can oversee and assist in the management and implementation of the Store Closings and Sales in an efficient and cost effective manner.  Assumption of the Consulting Agreement will enable the Debtors to utilize the skills and resources of the Consultant to effectively and efficiently conduct the Store Closing Sales for the benefit of all stakeholders.  Given the number of stores and the particular issues in administering the Store Closing Sales, it is not certain the Debtors could retain a liquidator able to conduct the process as efficiently and effectively as the Consultant.  If the Consulting Agreement is not approved of, operative and effective on an interim basis, the Store

Closings and Sales would lose the benefit of the Consultant's oversight and might be delayed or suspended entirely, leading to loss of additional liquidity and increased administrative expenses. Moreover, it is imperative that the Consulting Agreement is approved on an interim basis so that the Debtors and Consultant can immediately begin to advertise the Sales as "Store Closing", "Everything Must Go", "Everything on Sale" "Going out of Business" or similarly themed sale. I believe that based on the Consultant's experience, the ability to advertise using this language will generate more proceeds for the Debtors and their estates.

35.     The success of the Store Closings depends on store-level employees continuing their ordinary course duties under the supervision of the Consultant and Debtors. Store employees are necessary to, among other things, service customers, administer in-store sales, and manage cash receipts and bank deposits. Replacing such employees would be unfeasible under the contemplated timeframe for the Store Closings. Through the employees' ongoing commitment and performance, the Debtors can ensure that they maximize estate value through their store-closing sales. I believe that the Store Bonus Program is a necessary component of the Store Closings.

36.     Therefore, I respectfully submit that the Court should approve the Store Closing Motion.

**VIII.   Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief (the "<u>Customer Programs Motion</u>").**

37.     Pursuant to the Customer Programs Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to maintain and administer their customer-related programs as described in this motion (collectively, the "<u>Customer Programs</u>") and honor certain prepetition obligations related thereto, and (b) granting related relief.

38.     The Debtors have historically provided certain incentives, coupons, discounts, and accommodations to their customers to attract and maintain positive customer relationships.  The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors' business and the value of their brand.  I believe that attracting customers and maintaining these relationships form a critical component of successful store-closing sales and maximizing the value of the Debtors' estates for the benefit of all stakeholders.

39.     ***The Refund and Exchange Program.***  The primary Customer Program that the Debtors seek to honor is their refund and exchange program (the "Refund and Exchange Program"), for goods purchased prior to the store-closing sales.  The Debtors have historically allowed their customers to return or exchange purchased merchandise within 30 days of purchase so long as it is returned in saleable condition, with tags attached, and accompanied by the original receipt or packing slip, as applicable.  Under the Refund and Exchange Program, the Debtors have refunded customers the full purchase price of a returned item in the manner in which they purchased it.  If a customer returned merchandise past the applicable 30-day period or without a receipt or packing slip, that customer would have instead received (a) store credit for items purchased in-store or (b) a Charming Charlie gift card for items purchased online, each equal in value to the selling price of the item at the time of return.  The Debtors do not intend to extend the Refund and Exchange Program to any merchandise sold in accordance with their store-closing sales.

40.     I believe that maintaining the Refund and Exchange Program for the customers who purchased goods prepetition is critical to the Debtors' maintaining goodwill of their customers, many of whom will likely purchase items during the store-closing sales.

41.    ***The "Charm Club" Loyalty Program.***    The Debtors have historically offered discounts, special promotions, free gifts, birthday vouchers, and other benefits pursuant to their "Charm Club" loyalty program (the "Charm Club").  However, as of the Petition Date, the Debtors have discontinued the Charm Club and are no longer honoring reward points or any other benefits accrued thereunder.

42.    ***The Gift Card Program.***    The Debtors maintain a program (the "Gift Card Program") under which their customers can purchase physical, pre-paid, non-expiring gift cards in various denominations, historically less than $500 (collectively, the "Gift Cards").  The Debtors historically sold the Gift Cards, which could be redeemed for merchandise in-store or on the Debtors' eCommerce platform, to their customers in the Debtors' brick-and-mortar retail stores or online.  In addition, various third parties have also sold Gift Cards through other retailers such as Walgreens.  As of the Petition Date, the Debtors have suspended the issuance of new Gift Cards and notified the third-party vendors to cease selling the Gift Cards through other retailers and to any pull unsold Gift Cards from the shelves.

43.    ***The Sales Promotions and Coupons.***    The Debtors occasionally conduct sales promotions both online and at selected stores (the "Sales Promotions").  The Sales Promotions consist of clearance discounts, seasonal discounts, and other promotions.  The Debtors also issue coupons for discounts on future purchases (the "Coupons"), which customers can present at the time of purchase of goods at the Debtors' retail stores or online on the Debtors' website.  I do not believe that there are any currently outstanding Sales Promotions or Coupons beyond those offered in connection with the Store Closing Sales.

44.    ***The Credit Card and Other Payment Processors.***    In addition to cash, the Debtors' retail stores accept the following methods of payment from customers:  (i) Visa, MasterCard,

Discover, and American Express credit cards; and (ii) traveler's checks (collectively, the "Non-Cash Payments"). The Debtors incur certain fees and expenses associated with accepting Non-Cash Payments. I believe that the Debtors' continued acceptance of Non-Cash Payments is essential to the operation of business because the majority of the Debtors' sales—indeed, the majority of all retail sales—are made using these methods of payment. Requiring all purchases to be made in cash would have a severe negative effect on the Debtors' ongoing operations and the store-closing sales, the cost of which would be borne by their estates.

45.    I believe that continuing to administer the Customer Programs as described in the motion without interruption during the pendency of the chapter 11 cases will help preserve the Debtors' valuable customer relationships and goodwill, which will inure to the benefit of all of the Debtors' creditors and stakeholders. Thus, if the Debtors are unable to continue their Customer Programs postpetition or to pay amounts or other value due and owing to their customers under the various Customer Programs, the Debtors risk alienating certain customer constituencies, suffering corresponding losses in customer loyalty and goodwill that will harm the Debtors' prospects for store-closing sales that maximize value.

46.    I believe that the substantial benefit conferred on the Debtors' estates by the Customer Programs warrants the authority to honor the Customer Programs. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Customer Programs Motion.

**IX.    Debtors' Motion Seeking Entry of Interim and Final Orders (I) Determining Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Services, (III) Establishing Procedures for Determining Adequate Assurance of Payment, (IV) Authorizing Fee Payments to Engie for Services Performed, (V) Requiring Utility Providers to Return Deposits for Utility Services No Longer in Use, and (VI) Granting Related Relief (the "<u>Utilities Motion</u>").**

47.    Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders: (a) determining adequate assurance of payment for future utility services; (b) prohibiting utility providers from altering, refusing, or discontinuing services; (c) establishing procedures for determining adequate assurance of payment; (d) authorizing fee payments to Engie for services performed; (e) requiring utility providers to return deposits for utility services no longer in use; and (f) granting related relief.

48.    In connection with the operation of their businesses and management of their properties, the Debtors historically obtain water, sewer service, electricity, waste disposal, natural gas, and other similar services (collectively, the "<u>Utility Services</u>") from a number of utility providers or their brokers (collectively, the "<u>Utility Providers</u>").  The relief requested herein applies to all Utility Providers.

49.    To manage the Debtors' payments owed to most of their Utility Providers, Charming Charlie LLC entered into a that certain Service Agreement with Engie.  Pursuant to the Service Agreement, the Debtors pay Engie on a weekly basis for the amounts invoiced for the Utility Services managed by Engie, plus a monthly fee of approximately $8,500, in each case, in the ordinary course of business.

50.    Pursuant to the leases for several of the Debtors' stores, certain Utility Services are billed directly to the Debtors' landlords and passed through to the Debtors as part of the Debtors' lease payments in accordance with the applicable lease agreements.  The relief requested herein is

with respect to all Utility Providers supplying Utility Services to the Debtors, including those that indirectly supply services through the applicable landlords.

51.     On average, the Debtors pay approximately $500,000 each month for Utility Services, calculated as a historical average payment for the twelve-month period ending July 1, 2019, including services paid under the Services Agreement and excluding Utility Services billed directly to the Debtors' landlords.  The Debtors estimate that their cost for Utility Services during the next 30 days (not including any deposits to be paid or fees payable to Engie) will be approximately $500,000.

52.     To provide additional assurance of payment, the Debtors propose to deposit into a segregated account $205,625.00 (the "Adequate Assurance Deposit"), which represents an amount equal to approximately two weeks of Utility Services the Utility Providers provide the Debtors, calculated based on the Debtors' average utility expenses over the last twelve months ending July 1, 2019, excluding Utility Services billed directly to the Debtors' landlords and the average monthly fee paid to Engie.  The Debtors are conducting store-closing sales for their stores ("Closing Stores"), which are expected to close on or before August 31, 2019.  Closing Stores account for nearly all of the average monthly Utility Service costs.  On a rolling basis, as stores are closed and their corresponding utilities accounts are settled, in accordance with the Adequate Assurance Procedures described below, the Adequate Assurance Deposit will be reduced by the two-week cost of Utility Services provided to the applicable Closing Stores, calculated based on the aforementioned historical average, to align with the go-forward average monthly cost of Utility Services.

53.     The Adequate Assurance Deposit will be held in a segregated account (the "Adequate Assurance Account") at Wells Fargo Bank, N.A. ("Wells Fargo") for the benefit

of the Utility Providers and for the duration of these chapter 11 cases and may be applied to any postpetition payment defaults owed to the Utility Providers by the Debtors. The Adequate Assurance Deposit will be held by the Debtors; no liens will encumber the Adequate Assurance Deposit or the Adequate Assurance Account.

54.    Additionally, the Debtors seek approval of their proposed Adequate Assurance Procedures. These procedures allow Utility Providers to request adequate assurance for unpaid Utility Services and additional adequate assurance when they believe the proposed amount is not sufficient. This ensures that all key stakeholder groups obtain notice of such request before it is honored.

55.    Furthermore, the Debtors request that Utility Providers be prohibited from refusing or disrupting Utility Services, for any duration, including those that are indirectly obtained through nonresidential real property leases with landlords associated with certain retail locations. Landlords must continue to honor their obligations and pay for Utility Services in accordance with such leases until the applicable lease is rejected pursuant to section 365 of the Bankruptcy Code, notwithstanding any current or future nonpayment, deferral, waiver, or other compromise of rent. I believe that Utility Services should be preserved on an uninterrupted basis because it is essential to the Debtors' ongoing operations and a successful reorganization. The Debtors' store closing sales require open and active stores to entice and allow customers to make purchases. Any disruption would adversely impacts the Debtors' ability to maximize value through the Store Closing Sales. Therefore, it is critical that Utility Services continue uninterrupted during these chapter 11 cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Utilities Motion.

**X.      Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief (the "<u>Taxes Motion</u>").**

56.      The Debtors request authority to: (i) negotiate, remit, and pay certain accrued and outstanding prepetition obligations accrued in the ordinary course of business on account of the Taxes and Fees in an aggregate amount not to exceed $2,646,800 on an interim basis and $6,526,000 on a final basis, absent further order of the Court and (ii) continue negotiating and paying the Taxes and Fees accrued in the ordinary course of business on a postpetition basis.

57.      In the ordinary course of business, the Debtors incur and/or collect certain Taxes and Fees and remit such Taxes and Fees to various governmental authorities.  The Debtors must continue to pay the Taxes and Fees to avoid potential costly distractions during these chapter 11 cases.  Specifically, the Debtors' failure to pay the Taxes and Fees could adversely affect the Debtors' estate because the governmental authorities could file liens or seek to lift the automatic stay.

58.      I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

**XI.      Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Their Obligations Under Insurance Policies Entered into Prepetition, (B) Continue to Pay Brokerage Fees, (C) Renew, Supplement, Modify, or Purchase Insurance Coverage, (D) Maintain the Customs Surety Bonds, and (E) Enter Into a Premium Financing Agreement and Pay Premiums Thereunder, and (II) Granting Related Relief (the "<u>Insurance Motion</u>").**

59.      The Debtors request authority to: (i) continue honoring their obligations under prepetition Insurance Policies and satisfy payment of prepetition obligations related thereto, including the payment of related brokerage fees, (ii) renew, supplement, modify, extend, or

purchase insurance coverage in the ordinary course of business on a postpetition basis, (iii) continue their Customs Surety Bonds (as defined below) on an uninterrupted basis, and (iv) enter into a premium financing agreement and pay premiums thereunder.

60.      The Debtors are currently negotiating the terms of a new premium financing agreement (the "Premium Financing Agreement").  The Premium Financing Agreement will cover the premiums for all of the Debtors' current Insurance Policies. I expect that the Premium Financing Agreement will include twelve monthly premium payments in addition to an up-front payment, each on commercially reasonable terms.  I believe that the Premium Financing Agreement will allow the Debtors to effectively manage the costs of their Insurance Policies as they navigate these chapter 11 cases.  Indeed, as the Debtors wind down their businesses, they will continually evaluate their Insurance Policies and cancel any unnecessary coverage.  By the end of these chapter 11 cases, I expect that the Debtors will have minimal obligations under the Insurance Policies and Premium Financing Agreement.

61.      In connection with the Insurance Policies, the Debtors obtain insurance brokerage services from Alliant Insurance Services, Inc. (the "Broker").  The Broker assists the Debtors in obtaining comprehensive insurance coverage for the Debtors' operations by aiding with the procurement and negotiation of the Insurance Policies and enabling the Debtors to obtain those policies on advantageous terms at competitive rates.  I believe that continuation of the services of the Broker is necessary to assure the Debtors' ability to secure Insurance Policies on advantageous terms at competitive rates, facilitate the proper maintenance of the Debtors' Insurance Policies postpetition, and ensure adequate protection of the Debtors' property for any party in interest.

62.      I believe that the ability to maintain the Insurance Policies, to enter into the Premium Financing Agreement, to extend or reduce those Insurance Policies, and to enter into new

insurance policies, as needed in the ordinary course of business, are essential to the preservation of the value of the Debtors' business, operations, and assets.  I understand that, in many cases, insurance coverage such as that provided by the Insurance Policies is required by diverse regulations, laws, and contracts.  Failure to make the payments required by the Debtors' Insurance Policies, including the Financing Agreement, could have a significant negative impact on the Debtors' operations.

63.     Similarly, the Debtors are required by U.S. Customs to provide the Customs Surety Bonds in order to be able to import merchandise into the United States.  Given that the Debtors rely on imported merchandise to replenish their inventory and invigorate their operations, failure to provide, maintain, or timely replace the Customs Surety Bonds will jeopardize the Debtors ability to operate their businesses.

64.     I believe that the relief requested in the Insurance Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

**XII.    Debtors' Application For Entry of an Order (I) Authorizing and Approving the Appointment of Prime Clerk LLC As Claims and Noticing Agent to the Debtors, Effective *Nunc Pro Tunc* to the Petition Date, and (II) Granting Related Relief (the "Prime Clerk Retention Application").**

65.     Pursuant to the Claims and Noticing Agent Application, the Debtors seek entry of an order (a) appointing Prime Clerk LLC ("Prime Clerk") as claims and noticing agent for the Debtors and their chapter 11 cases, effective *nunc pro tunc* to the Petition Date, including assuming full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in these chapter 11 cases, and (b) granting related relief.

66.     Based on my discussions with the Debtors' advisors, I believe that the Debtors' selection of Prime Clerk to act as the Claims and Noticing Agent is appropriate under the circumstances and in the best interest of the estates.  Moreover, it is my understanding that based on all engagement proposals obtained and reviewed that Prime Clerk's rates are competitive and comparable to the rates charged by their competitors for similar services.

67.     The Debtors anticipate that there will be thousands of persons and entities to be noticed in these chapter 11 cases.  In light of the number of parties in interest and the complexity of the Debtors' business, the Debtors submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's office of the administrative burden of, noticing and processing proofs of claim and is in the best interests of both the Debtors' estates and their creditors.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Prime Clerk Retention Application.

**XIII.  Debtors' Omnibus Motion Seeking Entry of an Order (I) Authorizing the Rejection of Certain Executory Contracts, Each Effective *Nunc Pro Tunc* to the Petition Date, and (II) Granting Related Relief (the "<u>Contract Rejection Motion</u>").**

68.     Pursuant to the Contract Rejection Motion the Debtors seek entry of an order authorizing the rejection of certain executory contracts.

69.     Prior to the Petition Date, the Debtors undertook a review of their Contracts to determine whether the Contracts were needed to effectuate an orderly wind down of the Debtors' business.  Ultimately, the Debtors determined in their business judgment that certain Contracts were not needed and should be rejected as of the Petition Date.  I believe that the Contracts subject to the Contract Rejection Motion provide no benefit to the Debtors' estates or these chapter 11 cases.  Absent rejection, the Debtors would be obligated to pay for products or services that the Debtors no longer use or need.  By rejecting the Contracts at the outset of these chapter 11 cases, the Debtors save a considerable amount of unnecessary costs, maximizing the value to the Debtors'

estates for the benefit of all stakeholders.  Additionally, the Debtors have determined in their business judgment that the costs of the Contracts exceed any marginal benefits that could potentially be achieved from assignments or delegation of the of the Contracts. Accordingly, on behalf of the Debtors, I respectfully submit that the Contract Rejection Motion should be approved.

**XIV.  Debtors' Motion Seeking Entry of an Order (I) Authorizing and Approving Procedures to Reject Executory Contracts and Unexpired Leases and (II) Granting Related Relief (the "<u>Rejection Procedures Motion</u>").**

70.    Pursuant to the Rejection Procedures Motion, the Debtors seek entry of an order authorizing and approving procedures for rejecting executory contracts and unexpired leases.

71.    The Debtors are party to approximately 350 Contracts, which include agreements with vendors for the supply of goods and services, other contracts related to the Debtors' businesses, and leases with respect to real and personal property.  I understand that approximately 260 of these Contracts may be considered nonresidential real property leases.  Following extensive analysis and due to a confluence of internal and external factors, the Debtors have made the difficult decision to seek authority to liquidate their stores (the "<u>Stores</u>") through the immediate commencement of store-closing sales.  I believe that the Debtors will seek to reject all or substantially all nonresidential real property lease agreements with respect to the Stores as part of the Store Closings to the extent that such leases cannot be monetized for the benefit of the Debtors' estates.

72.    Absent the relief requested in this motion, I understand that the Debtors would be required to file separate motions to reject the Contracts, resulting in substantial costs to, and administrative burdens on, the Debtors' estates—in addition to burdening the Court's docket.

73.    I believe that the Contract Procedures provide the best and most efficient means of rejecting executory contracts and unexpired leases, and such procedures will allow the Debtors to focus their attention on maximizing the value of the Debtors' estates and avoid unnecessary costs

that would be incurred from filing separate motions to assume or reject leases.    Therefore, I respectfully submit that the Court should grant the Debtors' Rejection Procedures Motion.

[*Remainder of Page Intentionally Left Blank*]

**<u>EXHIBIT B</u>**

**Corporate Structure Chart**

