## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CHARMING CHARLIE HOLDINGS INC., *et al.*,[1] | ) | Case No. 19-11534 (___) |
| | ) | |
| | ) | (Joint Administration Requested) |
| Debtors. | ) | |
| | ) | |

## DEBTORS' MOTION SEEKING ENTRY OF
## INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO
## OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE
## CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY
## ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION
## TO THE PREPETITION LENDERS, (V) MODIFYING AUTOMATIC STAY,
## (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2]

respectfully submit this motion for the relief set forth herein.  In support of this Motion, the

Debtors submit the *Declaration of Patrick Diercks in Support of Debtors' Motion Seeking Entry*

*of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing,*

*(II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing*

*Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the*

*Prepetition Lenders, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and*

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Charming Charlie Canada LLC (0693); Charming Charlie Holdings Inc. (6139); Charming Charlie International LLC (5887); Charming Charlie LLC (0263); Charming Charlie Manhattan LLC (7408); Charming Charlie USA, Inc. (3973); and Poseidon Partners CMS, Inc. (3302).  The location of the Debtors' headquarters is:  6001 Savoy Drive, Ste. 600 Houston, Texas 77036.

[2]   A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Alvaro Bellon, Chief Financial Officer of Charming Charlie Holdings Inc., in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on July 11, 2019 (the "Petition Date").  Capitalized terms used, but not otherwise defined in this motion shall have the meanings ascribed to them in the First Day Declaration or Interim Order (as defined herein), as applicable.

*(VII) Granting Related Relief* (the "<u>Diercks Declaration</u>"), filed contemporaneously herewith and the First Day Declaration.  In further support of this motion, the Debtors respectfully state the following:

<u>**Preliminary Statement**</u>

1.      The Debtors have an immediate need to access incremental liquidity in the form of postpetition financing to preserve the value of the Debtors' estates and maximize recoveries for stakeholders.  Accordingly, the Debtors seek approval of a $13 million senior secured asset-based loan provided by the Prepetition ABL Lenders.  Because the DIP Facility is being provided by the Prepetition ABL Lenders, the Debtors are avoiding a potentially value-destructive priming fight with a third party lender.

2.      If approved, the Debtors will use the proceeds of the DIP Facility to, among other things:  (a) fund the administration of the Debtors' chapter 11 cases; (b) fund the Debtors' store closing sales; and (c) repay amounts outstanding under the Debtors' Prepetition ABL Facility. Obtaining an immediate injection of cash is critical to the Debtors' ability to fund the store closing sales.  Without the liquidity provided by the DIP Facility and access to the Prepetition Credit Parties' Cash Collateral, the Debtors will be unable to effectuate the store closing sales, preventing the Debtors from maximizing the value of their estate for all stakeholders.

3.      For these reasons, and for the reasons set forth below and in the Diercks Declaration and the First Day Declaration, the Debtors firmly believe that incurrence of the DIP Facility will maximize value for the Debtors' stakeholders and is in the exercise of the Debtors' sound business judgment.  Accordingly, the Debtors respectfully request that the Court approve the entry of the Interim Order and the Final Order.

## Relief Requested

4.      The Debtors seek entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim Order"), and a final order (the "Final Order,") and, together with the Interim Order, the "DIP Orders"):[3]

a.      authorizing the Debtors to obtain senior secured, superpriority postpetition financing (the "DIP Facility," consisting of a senior secured superpriority revolving credit facility in an aggregate principal amount of $13,000,000) pursuant to the terms and conditions of that certain *Debtor-In-Possession Credit Agreement* (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time, the "DIP Agreement"), by and among the Debtors, White Oak Commercial Finance, LLC and Second Avenue Capital Partners, LLC, each as a Co-Collateral Agent (collectively, in such capacity, the "DIP Agents") and as a lender under the DIP Facility (collectively, in such capacity, the "DIP Lenders"), substantially in the form of **Exhibit B**, attached hereto;[4]

b.      authorizing the Debtors to execute and deliver the DIP Agreement and any other agreements, instruments, pledge agreements, guarantees, control agreements  and other Loan Documents (as defined in the DIP Agreement) and documents related thereto (including, without limitation, any security agreements, intellectual property security agreements, control agreements, or notes) (as amended, restated, supplemented, waived, and/or modified from time to time, and collectively, with the DIP Agreement, the "DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

c.      granting to the DIP Agents, for the benefit of themselves and the applicable DIP Lenders and other "Secured Parties" (as defined in the DIP Agreement) on account of the DIP Facility and all obligations owing thereunder and under, or secured by, the DIP Documents (collectively, and including all "Obligations" as described in the DIP Agreement, the "DIP Obligations") allowed superpriority administrative expense claim status in the Cases and any Successor Cases (as defined herein), which superpriority administrative expense claims shall be subject to the priorities as set forth herein;

---

[3]     The Debtors will file the form of Final Order prior to the Final Hearing (as defined herein).

[4]     Following entry of the Interim Order, and prior to entry of the Final Order, amounts outstanding under the Prepetition ABL Facility (as defined herein) will be paid down through collections received by the Debtors. Upon entry of the Final Order, any remaining unpaid Prepetition ABL Obligations (as defined herein) and all accrued and unpaid interest thereon and fees and expenses shall "roll up" and become obligations under the DIP Facility and shall constitute DIP Obligations (as defined herein).

d. granting to each of the DIP Agents, for their benefit and the benefit of the DIP Lenders and each other applicable Secured Party (as defined in the DIP Agreement) under the applicable DIP Documents, automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral"), which liens shall be subject to the priorities set forth herein;

e. authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become earned, due and payable, including, letter of credit fees (including issuance and other related charges), commitment fees, success fees, audit fees, appraisal fees, valuation fees, liquidator fees, structuring fees, administrative agent's fees, unused facility fees, and the reasonable and documented fees and disbursements of the DIP Agents' attorneys, advisors, accountants, and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

f. authorizing the Debtors to use the Prepetition Collateral (as defined herein), including the Cash Collateral of the Prepetition Credit Parties under the Prepetition Documents (each as defined herein), and providing adequate protection to the Prepetition Credit Parties as set forth herein for any diminution in value of their respective interests in the Prepetition Collateral, including Cash Collateral, resulting from the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition Collateral, including Cash Collateral, and the priming of their respective interests in the Prepetition Collateral, including Cash Collateral, including by the Carve Out (collectively, and solely to the extent of such diminution in value, "Diminution in Value");

g. vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim Order;

h. scheduling a final hearing (the "Final Hearing") within thirty (30) days of the Petition Date to consider the relief requested in the DIP Motion on a final basis and approving the form of notice with respect to the Final Hearing; and

i. granting related relief.

**Jurisdiction and Venue**

5. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended*

*Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.    The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014, and Local Rules 2002-1(b) and 4001-2.

### Concise Statements Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2[5]

8.    The below chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | Charming Charlie LLC<br>Charming Charlie USA, Inc.<br><br>*See* DIP Agreement, Art. 1, Preamble. |
| **Guarantor**<br>Bankruptcy Rule 4001(c)(1)(B) | Charming Charlie Holdings Inc.<br>Charming Charlie Manhattan LLC<br>Poseidon Partners CMS, Inc.<br>Charming Charlie International LLC |

---

[5]    The summaries contained in this motion are qualified in their entirety by the provisions of the documents referenced, including the DIP Agreement and the Interim DIP Order. To the extent anything in this motion is inconsistent with such documents, the terms of the applicable documents shall control. Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim DIP Order, as applicable.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | Charming Charlie Canada LLC<br><br>*See* DIP Agreement, Art. 1, Preamble. |
| **DIP Financing Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Second Avenue Capital Partners, LLC ("Second Avenue"), as a Co-Collateral Agent and a Lender, and White Oak Commercial Finance, LLC ("White Oak") as Administrative Agent, a Co-Collateral agent, and a Lender.<br><br>*See* DIP Agreement Preamble. |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | The earliest of: (a) July [12], 2020; (b) if the Final Financing Order is not entered within thirty-five (35) calendar days after the Petition Date, immediately thereafter, (c) the effective date of a Chapter 11 plan of reorganization, (d) the closing of a sale of all or substantially all of the assets of the Loan Parties pursuant to Section 363 of the Bankruptcy Code and (e) the date upon which all or substantially all of the Loan Parties' working capital assets have been sold or otherwise disposed of, such that the Borrowing Base is equal to or less than [twenty percent (20%)] of the Revolving Credit Commitments (as in effect on the Closing Date).<br><br>*See* DIP Agreement § Art. 1. |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | Commitments.  Aggregate Revolving Commitments of $13,000,000.<br><br>*See* DIP Agreement § Art. 1. |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | Conditions of Initial Revolving Credit Borrowing.<br><br>• The Agent's receipt of the following in form and substance satisfactory to the Co-Collateral Agents:<br><br>  o fully executed counterparts of this Agreement;<br><br>  o a Note executed by each Borrower in favor of each Lender requesting a Note;<br><br>  o such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Agent may require evidencing (A) the authority of such party to enter into this Agreement and the other Loan Documents to which such party is a party or is to become a party, and (B) the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such party is a party or is to become a party;<br><br>  o copies of each Loan Party's Organization Documents and such other documents and certifications as the Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing, in good standing and qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to so qualify in such jurisdiction could not reasonably be expected to have a Material Adverse Effect;<br><br>  o a certificate signed by a Responsible Officer of the Borrowers certifying (A) that the conditions specified in Sections 4.02(a) and 4.02(b) have been satisfied, (B) that, except with respect to the filing of the Chapter 11 Case and those matters resulting from the Events and Circumstances, there has been no event or circumstance since January 5, 2019 that has had or could be reasonably expected to have, either individually or in the aggregate, a |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | Material Adverse Effect, and (C) either that (1) no consents, licenses or approvals are required in connection with the execution, delivery and performance by each Loan Party and the validity against each Loan Party of the Loan Documents to which it is a party, or (2) subject to the entry by the Bankruptcy Court of the Interim Financing Order (as same may be amended, supplemented or otherwise modified by the Final Financing Order), that all such consents, licenses and approvals have been obtained and are in full force and effect;<br><br>○ evidence that all insurance required to be maintained pursuant to the Loan Documents and all endorsements in favor of the Agent required under the Loan Documents have been obtained and are in effect;<br><br>○ the Co-Agents shall have received evidence that the Loan Parties shall have delivered all notices, and taken any additional steps, required under the Worker Adjustment and Retraining Notification Act (the WARN Act);<br><br>○ the Security Agreement;<br><br>○ Uniform Commercial Code financing statements, required by Law or reasonably requested by the Agent to be filed, registered or recorded to create or perfect the first priority Liens (subject to Permitted Liens) intended to be created under the Loan Agreements and the Financing Orders and all such documents and instruments shall have been so filed, registered or recorded to the satisfaction of the Agent; and<br><br>○ such other assurances, certificates, documents or consents as the Co-Collateral Agents reasonably may require.<br><br>• After giving effect to (i) the first funding of the Revolving Loans and the transactions contemplated by this Agreement and (ii) any charges to the Loan Account made in connection with the establishment of the credit facility contemplated hereby, including, without limitation, payment of all closing costs and professional fees payable by the Loan Parties, Availability shall be not less than $[_____], calculated on a pro forma basis for non-affiliate trade payables, book overdrafts and tax obligations being within normal and customary payment terms.<br><br>• The Agent shall have received a Borrowing Base Certificate dated the Closing Date, relating to the week most recently ended prior to the Closing Date, and executed by a Responsible Officer of the Borrowers.<br><br>• The Loan Parties shall have entered into the Consulting Agreement, and the Permitted Sale contemplated by such Consulting Agreement shall have commenced.<br><br>• The Co-Collateral Agents shall have received and be satisfied with each Borrower's Approved Budget and such other information (financial or otherwise) reasonably requested by the Agent.<br><br>• The Co-Collateral Agents shall be satisfied that each Loan Party maintains and is in compliance with a policy for the treatment, handling, and storage of customer information and personally identifiable information in accordance with applicable Laws, and shall have received a true, accurate, and complete copy of the current version of such policy.<br><br>• There shall not be pending any litigation or other proceeding, the result of which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect or prevent or restrain the consummation of the |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
|  | Loan Agreements, and which is not stayed by the filing of the Chapter 11 Case. |

- The consummation of the transactions contemplated hereby shall not violate any applicable Law or any Organization Document.

- All fees and expenses required to be paid to the Agent by the Loan Parties on or before the Closing Date shall have been paid in full, and all fees and expenses required to be paid to the Lenders by the Loan Parties on or before the Closing Date shall have been paid in full.

- The Borrowers shall have paid all  reasonable and documented out-of-pocket fees, charges and disbursements of counsel to the Agent to the extent invoiced prior to or on the Closing Date, plus such additional amounts of such fees, charges and disbursements as shall constitute the Agent's reasonable estimate of such fees, charges and disbursements incurred or to be incurred by the Agent through the Closing Date (provided that such estimate shall not thereafter preclude a final settling of accounts between the Borrowers and the Agent).

- The Agent and the Lenders shall have completed satisfactory background checks of the Loan Parties' owners, shareholders and management and shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act.

- (i) The Bankruptcy Court shall have entered the Interim Financing Order, the Cash Management Order and the Wage Order, (ii) none of such orders shall have been stayed, vacated or reversed (in whole or in part), (iii) the Cash Management Order shall not have been amended or modified other than with the consent of the Co-Agents in their Permitted Discretion, and (iv) the Interim Financing Order and the Wage Order shall not have been amended or modified other than with the consent of the Co-Agents in their Permitted Discretion the Co-Agents.

- the Co-Agents' and each Lender's respective investment committees shall have approved this Agreement and the transactions contemplated hereby.

- the Loan Parties shall have filed the following motions with the Bankruptcy Court, all of which shall be in form and substance acceptable to the Co-Agents a motion under Section 363 of the Bankruptcy Code to approve the assumption of the Consulting Agreement (the "Consulting Motion").

Conditions Precedent to All Revolving Credit Borrowings.

- The representations and warranties made by a Loan Party contained in Article V of the DIP Agreement or in any other Loan Document or which are contained in any document furnished at any time under or connection herewith or therewith shall be true and correct in all material respects (except in the case of any such representation or warranty that is qualified as to materiality or as to the occurrence of (or the absence of the occurrence of) a Material Adverse Effect, which shall be true and correct in all respects) on and as of the date of such Revolving Credit Borrowing, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date;

- No Default or Event of Default shall exist, or would result from such proposed Revolving Credit Borrowing or from the application of the proceeds thereof;

- The Agent shall have received a Loan Notice in accordance with the

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | requirements hereof; |
| | • The Agent shall have received a Borrowing Base Certificate showing the Borrowing Base as of the close of business as of one (1) day prior to the date of such requested funding, to be certified as true and correct in all material respects by a Responsible Officer of the Borrowers and accompanied by all applicable system generated documentation supporting the information contained within the Borrowing Base Certificate, including, but not limited to, perpetual inventory reporting inclusive of inventory mix by category and/or department and, where applicable, accounts receivable detail documentation, screen shots of the Loan Parties' bank accounts requested by the Agent as of the date of such Borrowing Base Certificate, accounts receivable agings, perpetual inventory report, flash sales report (including sales comparison by store), inventory receipts by vendor, calculation of Availability reflecting all sales, collections and debit and credit adjustments, the most recent reports (which reports shall be as of one (1) day prior to the date of such requested funding) of Eligible Credit Card Receivables and Eligible Inventory prepared by the Borrowers, and any additional documentation reasonably requested by the Agent; provided that the Borrower shall not be required to update any ineligible Inventory or Credit Card Receivables in conjunction with such delivery; |
| | • No event or circumstance which could reasonably be expected to result in a Material Adverse Effect shall have occurred or would result from the Revolving Credit Borrowing, expect for matters arising from the Events and Circumstances; |
| | • No Overadvance shall result from such Revolving Credit Borrowing; |
| | • Neither the Interim Financing Order nor the Final Financing Order, as applicable, shall have been (i) stayed, vacated or reversed (in whole or in part), or (ii) amended or modified other than with the consent of the Co-Agents in their Permitted Discretion; and |
| | • Each Credit Extension shall be for purposes and in amounts consistent with the Approved Budget (subject to the Permitted Variance). |
| | *See* DIP Agreement §§ 4.01, 4.02 |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | Rates and Payment of Interest. |
| | • Revolving Loan shall bear interest on the outstanding principal amount thereof at a rate per annum equal to LIBO Rate plus the Applicable Margin. "Applicable Margin" means eight and one half of one percent (8.5%). |
| | • If any other Event of Default exists, then the Agent may, and upon the request of the Required Lenders shall, notify the Borrowers that all outstanding Obligations shall thereafter bear interest at the Default Rate (in lieu of the Revolving Interest Rate) to the fullest extent permitted by applicable Laws. "Default Rate" means an interest rate equal to (a) the Revolving Interest Rate or (b) Prime Rate (including any Applicable Margin) otherwise applicable to such portion of the Obligations, in each case, plus two percent (2.0%) per annum. |
| | *See* DIP Agreement §§ 1.01, 2.08 |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Use of DIP Financing Facility and Cash Collateral Bankruptcy Rule** 4001(b)(l)(B)(ii)<br><br>Local Rule 4001-2(a)(ii) | <u>Use of Proceeds</u>.  Use the proceeds of the Revolving Credit Borrowings, to the extent permitted under applicable Law, the Approved Budget (subject to the Permitted Variance), and the Loan Documents, (a) on the Closing Date, for the payment of transaction expenses in connection with this Agreement and to make the Carve-Out Advance, and (b) after the Closing Date, (i) subject to entry of the Final Order, to finance the payoff of the Pre-Petition Obligations in accordance with <u>Section 2.05</u>, (ii) to finance general corporate purposes of the Loan Parties and the acquisition of working capital assets of the Borrowers, including capital expenditures and the purchase of inventory and equipment, in each case in accordance with the Approved Budget or as otherwise approved by the Lenders, and (iii) to fund the Professional Fee Escrow Account and to pay other fees, expenses, and costs incurred in connection with the Chapter 11 Case, as well as the payment of any adequate protection payments approved in the Financing Orders as approved by the Bankruptcy Court and the Agents.<br><br>*See* DIP Agreement §6.11 |
| **Adequate Protection** Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | <u>Prepetition Revolving Loan Adequate Protection Liens</u>. Subject to and subordinate to the Carve Out as set forth in this Interim Order, pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Revolving Loan Secured Parties in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Debtors grant to the Prepetition Revolving Loan Agents, for the benefit of themselves and the Prepetition Revolving Loan Secured Parties, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens on all DIP Collateral (the "<u>Prepetition Revolving Loan Adequate Protection Liens</u>").<br><br><u>Prepetition Term Loan Adequate Protection Liens</u>.  Subject to and subordinate to the Carve Out as set forth in this Interim Order and to the Prepetition Revolving Loan Adequate Protection Liens, pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Term Loan Secured Parties in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Debtors grant to the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Secured Parties, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens on all DIP Collateral (the "<u>Prepetition Term Loan Adequate Protection Liens</u>").<br><br><u>Prepetition Vendor Program Loan Adequate Protection Liens</u>.  Subject to and subordinate to the Carve Out as set forth in this Interim Order and to the Prepetition Revolving Loan Adequate Protection Liens, pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Vendor Program Loan Secured Parties in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Debtors grant to the Prepetition Vendor Program Loan Agent, for the benefit of itself and the Prepetition Vendor Program Loan Secured Parties, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens on all DIP Collateral (the "<u>Prepetition Vendor Program Loan Adequate Protection Liens</u>," and together with the Prepetition Revolving Loan Adequate Protection Liens and the Prepetition Term Loan Adequate Protection Liens, the "<u>Adequate Protection Liens</u>").<br><br><u>Adequate Protection Superpriority Claims</u>.<br><br>    (a) *Prepetition Revolving Loan Superpriority Claim.*  Subject and subordinate to the Carve Out as set forth in this Interim Order and the DIP Superpriority Claim, as further adequate protection of the interests of the Prepetition Revolving Loan Secured Parties in the Prepetition Collateral against any Diminution |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
|  | in Value of such interests in the Prepetition Collateral, the Prepetition Revolving Loan Agents, on behalf of themselves and the Prepetition Revolving Loan Secured Parties, are granted as and to the extent provided by section 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in the Cases and any Successor Cases (the "Prepetition Revolving Loan Superpriority Claim").<br><br>(b) *Prepetition Term Loan Superpriority Claim*.  Subject and subordinate to the Carve Out as set forth in this Interim Order, the DIP Superpriority Claim and the Prepetition Revolving Loan Superpriority Claim, as further adequate protection of the interests of the Prepetition Term Loan Secured Parties in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Term Loan Agent, on behalf of itself and the Prepetition Term Loan Secured Parties, is granted as and to the extent provided by section 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in the Cases and any Successor Cases (the "Prepetition Term Loan Superpriority Claim").<br><br>(c) *Prepetition Vendor Program Loan Superpriority Claim*.  Subject and subordinate to the Carve Out as set forth in this Interim Order, the DIP Superpriority Claim and the Prepetition Revolving Loan Superpriority Claim, as further adequate protection of the interests of the Prepetition Vendor Program Loan Secured Parties in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Vendor Program Loan Agent, on behalf of itself and the Prepetition Vendor Program Loan Secured Parties, is granted as and to the extent provided by section 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in the Cases and any Successor Cases (the "Prepetition Vendor Program Loan Superpriority Claim," and together with the Prepetition Revolving Loan Superpriority Claim and the Prepetition Term Loan Superpriority Claim, the "Adequate Protection Superpriority Claims").<br><br>Adequate Protection Payments and Protections for Prepetition Revolving Loan Secured Parties.  As further adequate protection (the "Prepetition Revolving Loan Adequate Protection Payments"), the Debtors are authorized to provide adequate protection to the Prepetition Revolving Loan Secured Parties in the form of payment in cash (and as to fees and expenses, without the need for the filing of a formal fee application) of (i) interest (including at the default rate) and principal due under the Prepetition Revolving Loan Documents, subject to the rights preserved in paragraph 43 of the Interim Order, (ii) the reasonable and documented fees, out-of-pocket expenses, and disbursements (including the reasonable and documented fees, out-of-pocket expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition Revolving Loan Agents, including the reasonable and documented out-of-pocket expenses and disbursements incurred by (I) Choate, Hall & Stewart LLP, as counsel to the Prepetition Revolving Loan Agents and (II) Richards, Layton & Finger, P.A., as co-counsel to the Prepetition Revolving Loan Agents, arising prior, on, or subsequent to the Petition Date.<br><br>Adequate Protection Payments and Protections for Prepetition Term Loan Secured Parties and the Prepetition Vendor Program Loan Secured Parties.  Subject to the Carve Out as set forth in this Interim Order, as further adequate protection (the "Prepetition Subordinated Creditor Adequate Protection Payments," and together with the Prepetition Revolving Loan Adequate Protection Payments, the "Adequate Protection Payments"), the Debtors are authorized to provide adequate protection to the Prepetition Term Loan Secured Parties and the Prepetition Vendor Program Loan Secured Parties in the form of payment in cash (and as to fees and expenses, without the need for the filing of a formal fee application) of the reasonable and documented |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | fees, out-of-pocket expenses, and disbursements (including the reasonable and documented fees, out-of-pocket expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition Term Loan Agent and the Prepetition Vendor Program Loan Agent, including the reasonable and documented fees, out-of-pocket expenses, and disbursements incurred by (I) Covington & Burling, as counsel to the Prepetition Term Loan Agent and the Prepetition Vendor Program Loan Agent, (II) [TBD], as co-counsel to the Prepetition Term Loan Agent and the Prepetition Vendor Program Loan Agent arising prior, on, or subsequent to the Petition Date (III) Winston & Strawn LLP, as counsel to the lenders pursuant to the Prepetition Term Loan Credit Agreement and Prepetition Vendor Program Credit Agreement and (IV) Young Conaway Stargatt & Taylor, LLP, as co-counsel to the lenders pursuant to the Prepetition Term Loan Credit Agreement and Prepetition Vendor Program Credit Agreement; *provided*, *however*, that the Debtors shall not make any Prepetition Subordinated Creditor Adequate Protection Payments prior to the indefeasible payment in full, in cash of all DIP Obligations and all Prepetition Revolving Loan Obligations and the termination of all commitments to lend or otherwise provide any other financing under the DIP Facility or the Prepetition Revolving Loan Facility.  *See* Interim Order ¶¶ 12, 14, 16, 17. |
| **Repayment Features** Local Rule 4001-2(a)(i)(E) | Repayment of Revolving Loans  The Borrowers shall repay to the Lenders on the Termination Date the aggregate principal amount of Revolving Loans outstanding on such date, along with accrued but unpaid interest and all other Obligations outstanding with respect to the Revolving Loans.  *See* DIP Agreement §2.07  Repayment of Indebtedness  Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in cash any Indebtedness (other than (i) Indebtedness incurred hereunder, (ii) Indebtedness under the Pre-Petition Credit Agreement in accordance with the terms and conditions herein, (iii) with respect to the Pre-Petition Term Debt Obligations and the Pre-Petition Vendor Credit Financing Obligations, in accordance with the Intercreditor Agreement, (iv) any adequate protection payments expressly provided for in the Financing Orders, and (v) as set forth in the Approved Budget or otherwise expressly permitted under this Agreement) or make any payment in violation of any subordination terms of any Subordinated Indebtedness.  *See* DIP Agreement §7.07  Prepayment; Pre-Petition Obligations  • (a) The Borrowers may, upon irrevocable notice (which notice may be conditioned upon the occurrence of any event) from the Borrowers to the Agent, at any time or from time to time, voluntarily prepay Revolving Loans permanently reduce the Aggregate Revolving Commitments in whole or in part; provided that (i) such notice must be received by the Agent not later than 11:00 a.m. three (3) Business Days prior to any date of prepayment of Revolving Loans; and (ii) any prepayment of Committed Revolving Loans and concurrent permanent reduction of the Aggregate Revolving Commitments shall be in a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof, or, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment. The Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Applicable Percentage of such prepayment. If such |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | notice is given by the Borrowers, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Any prepayment of Committed Revolving Loans and permanent reduction of the Aggregate Revolving Commitments shall be accompanied by all accrued interest on the amount prepaid.  Each such prepayment and permanent reduction shall be applied to the Committed Revolving Loans and Revolving Commitments of the Lenders in accordance with their respective Applicable Percentages, in all cases, and in accordance with clause (g) below. |
| | • (c) If for any reason the Total Revolver Outstandings at any time exceed the Maximum Revolving Loan Amount as then in effect, the Borrowers shall immediately prepay the Pre-Petition Obligations and Revolving Loans in an aggregate amount equal to such excess (which prepayment will not reduce the Aggregate Revolving Commitments), and in accordance with clause (g) below. |
| | • (d) The Borrowers shall prepay the Pre-Petition Obligations and Revolving Loans with proceeds and collections received by the Loan Parties to the extent so required under the provisions of Section 6.13 of the DIP Agreement (which prepayment will not reduce the Aggregate Revolving Commitments), and in accordance with clause (g) below. |
| | • (g) Prepayments made pursuant to clauses (a), (c) and (d) above shall be applied, first, to the outstanding Pre-Petition Obligations in accordance with the Pre-Petition Credit Agreement, second, ratably to the outstanding Revolving Loans, and third, the amount remaining, if any, after the prepayment in full of all Pre-Petition Obligations as required above and Revolving Loans outstanding at such time may be retained by the Borrowers for use in the ordinary course of its business or as otherwise not prohibited by the terms and conditions of the Loan Documents. |
| | • (h) No later than one (1) Business Day after the Final Order Entry Date, the Borrowers shall pay in full with the proceeds of Committed Revolving Loans hereunder, the total outstanding amount of the Pre-Petition Obligations, together with additional amounts due under Section 2.09 of the Pre-Petition Credit Agreement. |
| | *See* DIP Agreement §2.05 |
| **Fees** <br> Bankruptcy Rule 4001(c)(1)(B) <br><br> Local Rule 4001-2(a)(ii) | Closing Fee.  On the Closing Date, the Borrowers shall pay to the Agent, for the ratable benefit of Lenders holding the Revolving Commitments based on their Applicable Percentages, a closing fee of $260,000, which shall be non-refundable and fully earned on the Closing Date. |
| | Unused Line Fee.  If the average daily unpaid balance of the sum of Total Revolver Outstandings (the "Usage Amount") for any month does not equal the Aggregate Revolving Commitments, then the Borrowers shall pay to the Agent, for the ratable benefit of Lenders holding the Revolving Commitments based on their Applicable Percentages, an unused line fee at a rate equal to one half of one percent (0.50%) per annum on the amount by which the Aggregate Revolving Commitments exceeds such Usage Amount (the "Facility Fee").  Such Facility Fee shall be payable to the Agent in arrears on the first day of each month with respect to the previous month. |
| | Administration Fee.  The Borrowers shall pay to the Agent, for the ratable benefit of Lenders holding the Revolving Commitments based on their Applicable Percentages, an administrative fee equal to $10,000 per month, payable in advance (i) on the Closing Date for the month of July, and (ii) on the first day of each month thereafter through the Termination Date (the "Administrative Fee").  The Administrative Fee |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | shall be deemed earned in full on the date when each such payment is due and payable hereunder and shall not be subject to rebate or proration upon termination of this Agreement for any reason. |
| | Progress Fee.  The Borrowers shall pay to the Agent, for the ratable benefit of Lenders holding the Revolving Commitments based on their Applicable Percentages, a progress equal to $260,000, which shall be due and payable on the earlier of (i) August 10, 2019 and (ii) the Termination Date (the "Progress Fee").  The Progress Fee shall be deemed earned in full on the date when same is due and payable hereunder and shall not be subject to rebate or proration upon termination of this Agreement for any reason. |
| | *See* DIP Agreement § 2.09. |
| **Budget**<br>Bankruptcy Rule 4001 (c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | Approved Budget.  The thirteen (13) week budget prepared by the Borrowers and furnished to the Co-Collateral Agents on the Effective Date, as the same may or shall, as applicable, be updated, modified and/or supplemented thereafter from time to time as provided in Section 6.01(e), which the Borrowers shall use their best efforts to prepare on a book basis (not incorporating any check "float") and shall include a weekly cash budget, including information on a cumulative basis by category (except with respect to professional fees and expenses, which shall be on a line item basis) as to (w) projected cash receipts and gross margins, (x) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees and expenses), capital expenditures, asset sales and fees and expenses of the Administrative Agent, Co-Collateral Agents and the Lenders (including counsel therefor) and any other fees and expenses relating to the Loan Documents), (y) projected inventory levels and inventory receipts, and (z) a calculation of the Borrowing Base, Total Revolver Outstandings, Pre-Petition Obligations and Availability, which budget and any update thereof shall be acceptable to the Co-Collateral Agents in their Permitted Discretion. |
| | The Approved Budget may be updated, modified or supplemented (with the written consent of the Co-Collateral Agents and/or at the reasonable request of the Co-Collateral Agents) from time to time, and each such updated, modified or supplemented budget shall be approved by, and in form and substance reasonably satisfactory to, the Co-Collateral Agents and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed an Approved Budget; provided, that during the tenth (10th) week of the initial Approved Budget (and the tenth (10th) week of each successive Approved Budget thereafter), the Borrowers shall submit a budget for the next successive thirteen week period to the Co-Collateral Agents, which budget shall be in form and substance reasonably acceptable to the Co-Collateral Agents, and approved by the Co-Collateral Agents at least ten (10) Business Days prior to the expiration of such Approved Budget; provided further that if an updated, modified or supplemented budget is delivered by the Borrowers to the Co-Collateral Agents in accordance with the requirements contained herein and the Co-Collateral Agents do not respond (either by accepting or rejecting the budget) within five (5) Business Days, then such updated, modified or supplemented budget shall be deemed to be the Approved Budget.  Each Approved Budget delivered to the Co-Collateral Agents shall be accompanied by such supporting documentation as requested by the Co-Collateral Agents. |
| | *See* DIP Agreement §§ 1.01; 6.01. |
| **Variance Covenant**<br>Bankruptcy Rule 4001(c)(l)(B) | Budget Compliance and Variance.  On or before Wednesday of each week, the Borrowers shall deliver to the Co-Collateral Agents an Approved Budget Variance Report; and on each Approved Budget and each Approved Budget Variance Report |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| Local Rule 4001-2(a)(ii) | shall each be prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair in light of the conditions existing at the time of delivery of such forecasts, and represented, at the time of such delivery, the Loan Parties' good faith estimate of its future financial performance.<br><br>_Approved Budget Variance Report._  A weekly report in form and substance acceptable to the Co-Collateral Agents in their Permitted Discretion provided by the Borrowers to the Co-Collateral Agents in accordance with Section 6.01(e): (i) showing on a cumulative and weekly basis by category (or line item, as applicable) actual receipts for both inventory and revenues, actual gross margins, actual disbursement amounts, cash on hand, calculation of the Borrowing Base, Total Revolver Outstandings, Pre-Petition Obligations and Availability as of Saturday of each week on a cumulative and weekly basis, noting therein all variances, on a cumulative or line item basis, as applicable, from amounts set forth for such period in the Approved Budget, and shall include explanations for all material variances, and (ii) certified by a Responsible Officer of the Borrowers.<br><br>_See_ DIP Agreement §§ 1.01; 6.01. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B) Local Rule 4001-2(a)(ii) | Events of Default.  Any of the following shall constitute an Event of Default:<br><br>• Non-Payment.  Any Borrower or any other Loan Party fails to pay when and as required to be paid herein, (i) any amount of principal of any Revolving Loan, or (ii) within three (3) Business Days of the date when and as required to be paid herein, provided that such grace period shall only apply if Agent shall have failed to charge Borrowers' account for such amounts due, (x) any interest on any Revolving Loan or (y) any fee due hereunder, or (iii) any other amount payable hereunder or under any other Loan Document or the Financing Orders; or<br><br>• Specific Covenants.  (i) Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of Section 6.01, 6.02 (excluding clause (m) of Section 6.02), 6.03 (excluding clauses (h) and (j) of Section 6.03), 6.05, 6.07, 6.10, 6.11, 6.12, 6.13, 6.14, 6.20 - 6.25 and 6.28 – 6.30 or Article VII of the DIP Agreement; or (ii) any Guarantor fails to perform or observe any payment or other material term, covenant or agreement contained in Article XI of the DIP Agreement or any other Facility Guaranty; or (iii) any of the Loan Parties breaches any negative covenant under any Security Document; or<br><br>• Other Defaults.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for twenty (20) days; or<br><br>• Representations and Warranties.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith (including, without limitation, any Borrowing Base Certificate) shall be incorrect or misleading in any material respect when made or deemed made; or<br><br>• Cross-Default.  (A) Any Loan Party or any Subsidiary thereof fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Post-Petition or unstayed Material Indebtedness (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement), or (B) Any Loan Party or any Subsidiary thereof fails to |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | observe or perform any other agreement or condition relating to any such Post-Petition or unstayed Material Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Post-Petition or unstayed Material Indebtedness or the beneficiary or beneficiaries of any Guarantee thereof (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded.<br><br>• _Maturity Date_.        The Maturity Date occurs (other than pursuant to clause (a) of such definition).<br><br>• _Judgments_.  There is entered against any Loan Party or any Subsidiary thereof (i) one or more judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding $1,000,000 (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or (ii) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, is not in effect; or<br><br>• _ERISA_.  An ERISA Event or any other event or condition specified in <u>Section 6.22</u> or hereof shall occur or exist with respect to any Plan and, as a result of such event or condition, together with all other such events or conditions, any Loan Party or any ERISA Affiliate shall incur, or in the opinion of Agent be reasonably likely to incur, a liability to a Plan or the PBGC (or both) which, in the reasonable judgment of Agent, would have a Material Adverse Effect; or the occurrence of any ERISA Event, or any Loan Party's failure to report an ERISA Event in accordance with <u>Section 6.22</u> hereof; or<br><br>• _Invalidity of Loan Documents_.    (i)   Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder, satisfaction in full of all of the Obligations and the Pre-Petition Obligations or any action or inaction by the Agent or other Credit Parties, ceases to be in full force and effect; or any Loan Party or Permitted Holder or any of their respective Subsidiaries contests in any manner the validity or enforceability of any material provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created under any Security Document; or (ii) any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Loan Party or any other Person not to be, a valid and perfected Lien on any Collateral with an aggregate value of more than $100,000, with the priority required by the applicable Security Document; or |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | • <u>Change of Collateral</u>. There occurs any Change of Control; or<br><br>• <u>Loss of Collateral</u>. There occurs any uninsured loss to any material portion of the Collateral; or<br><br>• <u>Breach of Consulting Agreement</u>. The Loan Parties breach any of the material terms or conditions of the Consulting Agreement or cease conducting the Permitted Sale contemplated thereunder in accordance therewith or file a motion with the Bankruptcy Court to reject, or otherwise seek authority not to perform under, the Consulting Agreement, in all cases, without the prior written consent of the Co-Agents; or<br><br>• <u>Indictment</u>. The indictment of any legal proceeding against any Loan Party or any Subsidiary thereof, under any federal or state criminal statute, which indictment is not vacated within 60 days; or<br><br>• <u>Guaranty</u>. The termination or attempted termination of any Facility Guaranty except as expressly permitted hereunder or under any other Loan Document; or<br><br>• <u>Subordination</u>. (i) The subordination provisions of any Subordination Agreement or other documents evidencing or governing any Subordinated Indebtedness (the "<u>Subordination Provisions</u>") shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Subordinated Indebtedness; or (ii) any Borrower or any other Loan Party shall, directly or indirectly, disavow or contest in any manner (A) the effectiveness, validity or enforceability of any of the Subordination Provisions, (B) that the Subordination Provisions exist for the benefit of the Credit Parties, or (C) that all payments of principal of or premium and interest on the applicable Subordinated Indebtedness, or realized from the liquidation of any property of any Loan Party, shall be subject to any of the Subordination Provisions.<br><br>• <u>Chapter 11 Case</u>. The occurrence of any of the following in the Chapter 11 Case:<br><br>    o  any Loan Party, without the Agent's prior written consent, files a motion with the Bankruptcy Court seeking the authority to liquidate all or substantially all of any Loan Party's assets or capital stock unless the transactions that are the subject of the motion will result in payment in full in cash of the Pre-Petition Obligations and the Obligations on the closing of such sale;<br><br>    o  other than in connection with the payment in full or refinancing of the Pre-Petition Obligations and the Obligations, the bringing or supporting of a motion, taking of any action or the filing of any plan or disclosure statement attendant thereto by or on behalf of any Loan Party in the Chapter 11 Case: (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral; (C) except as provided in the Interim Financing Order or Final Financing Order, as the case may be, to use cash collateral under Section 363(c) of the Bankruptcy Code without the prior written consent of the Agent; (D) that seeks to prohibit Agent or Lenders from credit bidding on any or all of the Loan Parties' assets during the pendency of the Chapter 11 Case; or (E) any other action or actions adverse to the interest of the Agent or the Lenders in their capacities as such or their rights and remedies hereunder or its interest in the Collateral; |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | ○ (A) other than in connection with the payment in full or refinancing of the Pre-Petition Obligations and the Obligations on the effective date of such plan, the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by any Loan Party or any other Person to which the Agent does not consent or otherwise agree to treatment of the respective claims of the Agent and the Lenders, (B) the entry of any order terminating the Loan Parties' exclusive right to file a plan of reorganization without the consent of the Agent, or (C) the expiration of the Loan Parties' exclusive right to file a plan of reorganization without the consent of the Agent;<br><br>○ the entry of an order in the Chapter 11 Case confirming a plan that (A) is not acceptable to the Agent in its Permitted Discretion (it being agreed that a plan that satisfies the Obligations and the Pre-Petition Obligations (if any) in full in cash on the effective date thereof is acceptable to the Agent) or (B) does not contain a provision for termination of the Commitments and repayment in full in cash of all of the Pre-Petition Obligations and the Obligations under this Agreement on or before the effective date of such plan or plans;<br><br>○ the entry of an order reversing, amending, supplementing, staying, vacating or otherwise modifying the Loan Documents, the Pre-Petition Credit Agreement or the Interim Financing Order, the Final Financing Order, the order approving the Consulting Motion or the Cash Management Order without the written consent of the Agent or the filing of a motion for reconsideration with respect to the Interim Financing Order or the Final Financing Order or the Interim Financing Order, the Final Financing Order, order approving the Consulting Motion or the Cash Management Order are otherwise not in full force and effect, in each case, without the consent of the Agent;<br><br>○ the Final Financing Order is not entered prior to the expiration of the Interim Financing Order, and in any event within thirty-five (35) days after the Petition Date;<br><br>○ except as set forth in any motions which have been delivered to and are acceptable to the Agent and as contemplated by the Approved Budget (subject to the Permitted Variance), the payment of, or application for authority to pay, any Pre-Petition Indebtedness or Pre-Petition claim without the Agent's prior written consent;<br><br>○ the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Agent, any other Credit Party or any of the Collateral;<br><br>○ the filing of a motion by a Loan Party or any of their respective Affiliates for, or the entry of an order directing, the appointment of an interim or permanent trustee in the Chapter 11 Case or the appointment of a receiver or an examiner in the Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Loan Parties; or, the sale without the Agent's consent, of all or substantially all of the Loan Parties' assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Case, or otherwise that does not provide for payment in full in cash of the Pre-Petition Obligations and the Obligations and termination of the Commitments on the effective date of such plan or the closing of such |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | sale; |
| | ○ the dismissal of the Chapter 11 Case, or the conversion of the Chapter 11 Case from Chapter 11 to Chapter 7 of the Bankruptcy Code, or any Loan Party files a motion or other pleading seeking the dismissal of the Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise; |
| | ○ the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (1) to allow any creditor to execute upon or enforce a Lien on any Collateral having a value of $50,000 (or $100,000 in the aggregate) or more, or (2) with respect to any Lien or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority; |
| | ○ the commencement of a suit or action against the Agent, any Lender or any other Credit Party (both under this Agreement and as such terms are defined in the Pre-Petition Credit Agreement) by or on behalf of any Loan Party, its bankruptcy estates, any of their Affiliates, any statutory committee, the Pre-Petition Term Debt Agent (or lenders thereunder) or any the Pre-Petition Vendor Payment Financing Agent Subordinated Agent (or lenders thereunder); |
| | ○ the entry of an order in the Chapter 11 Case avoiding or permitting recovery of any portion of the payments made on account of the Indebtedness owing under this Agreement or the other Loan Documents or the Pre-Petition Credit Agreement; |
| | ○ the failure of any Loan Party to perform any of its obligations under the Interim Financing Order, the Final Financing Order or the Cash Management Order or any of its material obligations under the any other order of the Bankruptcy Court; |
| | ○ the failure of the Bankruptcy Court to, within sixty (60) days after the Petition Date (or such later date to which the Agent may otherwise agree), grant an order extending the time period of the Loan Parties to assume or reject unexpired leases of real property to a date that is 210 days from the Petition Date; or |
| | ○ the entry of an order in the Chapter 11 Case granting any other super-priority administrative claim or Lien equal or superior to that granted to the Agent, the Lenders and Pre-Petition Agent except as set forth in the Financing Orders. |
| | *See* DIP Agreement § 8.01. |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | <u>Indemnification of Agent</u>.  Without limiting the obligations of the Loan Parties hereunder, the Lenders hereby agree to indemnify the Administrative Agent, each Co-Collateral Agent and any of their Related Parties, as the case may be, ratably according to their Applicable Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Administrative Agent, any Co-Collateral Agent and any of their Related Parties in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted to be taken by the Administrative Agent, any Co-Collateral Agent and any of their Related Parties in connection therewith; <u>provided</u>, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's, any Co- |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
|  | Collateral Agent's or their Related Parties' gross negligence or willful misconduct as determined by a final and nonappealable judgment of a court of competent jurisdiction. |
|  | *See* DIP Agreement § 9.14. |
|  | Indemnification by the Loan Parties.  The Loan Parties shall indemnify the Agent (and any sub-agent thereof), each other Credit Party, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs, and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Agent (and any sub-agents thereof) and their Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Revolving Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to any Loan Party or any of its Subsidiaries, (iv) any claims of, or amounts paid by any Credit Party to, a Blocked Account Bank or other Person which has entered into a control agreement with any Credit Party hereunder, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower or any other Loan Party or any of the Loan Parties' directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee, (y) result from a claim brought by any Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if such Borrower or Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction, or (z) any dispute between and among Indemnitees. |
|  | *See* DIP Agreement § 10.04(b). |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(i) | The Prepetition Revolving Loan Lenders under the Prepetition Revolving Loan Credit Agreement, the Prepetition Term Loan Lenders under the Prepetition Term Loan Credit Agreement, and the Prepetition Vendor Program Lenders under the Prepetition Vendor Program Facility.<br><br>*See* Interim Order Preamble; ¶ F. |
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(f) | *See* Interim Order ¶ 40. |
| **Liens and Priorities** | DIP Liens.  Subject and subordinate to the Carve Out as set forth in this Interim |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| Bankruptcy Rule 4001(c)(l)(B)(i)<br><br>Local Rule 4001-2(a)(i)(D) and (G), 4001-2(a)(ii) | Order, in order to secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agents, for the benefit of themselves and the DIP Lenders, are hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (collectively, the "<u>DIP Liens</u>") all personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of the Debtors (the "<u>DIP Collateral</u>"), including without limitation: (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including all of the issued and outstanding capital stock of each of its subsidiaries), hedge agreements, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) all proceeds of leased real property; (c) actions brought under section 549 of the Bankruptcy Code to recover any post-petition transfer of DIP Collateral and all proceeds of any such action; (d) subject to entry of a Final Order, the proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code (other than actions brought pursuant to section 549 of the Bankruptcy Code) or applicable state law equivalents; (e) subject to entry of a Final Order, the Debtors' rights under section 506(c) and 550 of the Bankruptcy Code and the proceeds thereof; (f) all Prepetition Collateral; and (g) all DIP Collateral that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date.  Notwithstanding the foregoing, DIP Collateral shall not include the Debtors' real property leases (but shall include all proceeds of such leases).  The Prepetition Revolving Loan Liens shall be deemed continuing liens for the benefit of the Prepetition Revolving Loan Secured Parties, the DIP Agents, and the DIP Lenders to secure the DIP Obligations, and any liens, claims, or interests subordinate to the Prepetition Revolving Loan Liens as of the Petition Date shall likewise be deemed subordinate to the DIP Liens.<br><br><u>DIP Lien Priority</u>.  The DIP Liens securing the DIP Obligations are valid, automatically perfected, non-avoidable, senior in priority, and superior to any security, mortgage, collateral interest, lien, or claim to any of the DIP Collateral, except that the DIP Liens shall be subject and subordinate to the Carve Out as set forth in this Interim Order and shall otherwise be junior only to Prepetition Revolving Loan Permitted Prior Liens.  Other than as set forth herein (including the Carve Out) or in the DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in the Cases or any Successor Cases, upon the conversion of the Cases to cases under Chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of the Cases or Successor Cases.  The DIP Liens shall not be subject to section 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Lien. Notwithstanding any provisions of this Interim Order, or any final orders pertaining to the sale of the Debtors' assets, or any agreements validated by any such orders, any senior liens currently held by the Local Texas Tax Authorities shall neither be |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | primed by, nor subordinated to, any liens granted thereby. |
| | *See* Interim Order ¶¶ 5, 6. |
| **506(c) Waiver**<br>Bankruptcy Rule 4001(c)(l)(B)(x)<br><br>Local Rule 4001-2(a)(i)(C) | Section 506(c) Claims.  Subject to entry of a Final Order, no costs or expenses of administration which have been or may be incurred in the Cases at any time shall be charged against the DIP Agents, the DIP Lenders or any of the Prepetition Revolving Loan Secured Parties, or any of their respective claims, or any DIP Collateral or the Prepetition Collateral securing the DIP Obligations or the Prepetition Revolving Loan Obligations, pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Agents, the DIP Lenders, and the Prepetition Revolving Loan Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders.<br><br>*See* Interim Order ¶ 45. |
| **Section 552(b)**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(i)(h) | Section 552(b).  Subject to entry of a Final Order, the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties, with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral.<br><br>*See* Interim Order ¶ 47. |
| **Stipulations to Prepetition Liens and Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(iii)<br><br>Local Rule 4001-2(a)(i)(B)<br><br>**Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens**<br>Bankruptcy Rule 4001(c)(1)(B)(vii) | Debtors' Stipulations.  After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties-in-interest as set forth in paragraph 43 of the Interim Order, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree to certain stipulations regarding the validity and extent of the Prepetition Revolving Loan Lenders', Prepetition Term Loan Lenders', and Prepetition Vendor Program Lenders' claims and liens.<br><br>*See* Interim Order ¶ F. |
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(i)(B) | Effect of Stipulations on Third Parties.<br><br>*Generally.*  The admissions, stipulations, agreements, releases, and waivers set forth in this Interim Order (collectively, the "Prepetition Lien and Claim Matters") are and shall be binding on the Debtors, any subsequent trustee, responsible person, examiner with expanded powers, any other estate representative, and all creditors and parties in interest and all of their successors in interest and assigns, including a Committee (if appointed), unless a party in interest with requisite standing (other than the Debtors, as to which any Challenge (as defined herein) is irrevocably waived and relinquished) (i) has timely filed the appropriate pleadings, and timely and properly commenced  an adversary proceeding or contested matter (in each case subject to the limitations set forth herein) challenging the Prepetition Lien and Claim Matters (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "Challenge") by no later than the earlier of (a) 60 days from the date of formation of a Committee, or (b) 75 days following the entry of the Interim Order if no Committee is appointed (the "Challenge Deadline"), as such applicable date may be extended in writing from time to time in the sole discretion of the Prepetition Revolving Loan Agents (with respect to the Prepetition Revolving |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
|  | Loan Documents), the Prepetition Term Loan Agent (with respect to the Prepetition Term Loan Documents), and the Prepetition Vendor Program Loan Agent (with respect to the Prepetition Vendor Program Loan Documents), or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline; *provided* that if a chapter 11 trustee is appointed or the Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Deadline, the chapter 11 or chapter 7 trustee, as applicable, shall have until the later of (1) the Challenge Deadline or (2) the tenth (10th) day after the appointment of the chapter 11 trustee or the conversion of the Cases to cases under chapter 7, as applicable, to commence a Challenge, subject to any further extension by order of the Court, and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding and any such judgment has become a final judgment that is not subject to any further review or appeal. <br><br> *See* Interim Order ¶ 43. |
| **Waiver/Modification of the Automatic Stay** <br> Bankruptcy Rule 4001(c)(1)(B)(iv) | <u>Modification of Automatic Stay</u>.   The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including to:  (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, DIP Superpriority Claims, and Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such acts as the DIP Agents, the Prepetition Revolving Loan Agents, the Prepetition Term Loan Agent, and the Prepetition Vendor Program Loan Agent each may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Agents, DIP Lenders, and Prepetition Secured Parties under the DIP Documents, the DIP Facility, and this Interim Order, as applicable; and (d) authorize the Debtors to pay, and the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of the Interim Order. <br><br> <u>Rights and Remedies Upon Event of Default</u>.  The automatic is hereby modified so that seven (7) business days after the date a Termination Declaration is delivered (the "<u>Remedies Notice Period</u>"):  (a) the DIP Agents shall be entitled to exercise all rights and remedies, in accordance with the DIP Documents and this Interim Order, to satisfy the DIP Obligations, DIP Superpriority Claim, and DIP Liens, subject to the Carve Out; and (b) the Prepetition Revolving Loan Agents shall be entitled to exercise all rights and remedies to satisfy the relevant Prepetition Secured Obligations, Adequate Prepetition Superpriority Claims, and Prepetition Adequate Protection Liens, subject to the Carve Out.  During the Remedies Notice Period, the Debtors and/or any Committee (if appointed) shall be entitled to seek an emergency hearing within the Remedies Notice Period.  Unless the Court orders otherwise, the automatic stay, as to the DIP Agents, DIP Lenders, and the Prepetition Secured Parties, shall automatically be terminated at the end of the Remedies Notice Period without further notice or order.  Upon expiration of the Remedies Notice Period, the DIP Agents shall be permitted to exercise all remedies set forth herein, in the DIP Documents, the Prepetition Documents, and as otherwise available at law without further order of or application or motion to the Court consistent with the Intercreditor Agreement, as applicable, and paragraph 30 of the Interim Order. <br><br> *See* Interim Order ¶¶ 22, 34. |
| **Liens on Avoidance Actions** <br> Local Rule 4001-2(a)(i)(D) | *See* Interim Order ¶ 5. |
| **Milestones** | <u>Bankruptcy Related Affirmative Covenants</u>.  The Borrowers shall complete, or shall |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | cause to be completed, the following actions as and when required below, which motions and orders shall, in all cases, be upon terms and conditions acceptable to the Co-Agents in their Permitted Discretion, provided that such deadlines below are subject to the Bankruptcy Court's availability, and if the Bankruptcy Court cannot accommodate the deadlines set forth below, the Borrowers and Co-Agents shall work together in good faith to amend the deadlines accordingly:<br><br>        (a)     no later than three (3) days after the Petition Date, the Bankruptcy Court shall have entered an interim order approving the Consulting Motion.<br><br>        (b)     no later than three (3) days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Interim Financing Order;<br><br>        (c)     no later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered final order approving the CRO Motion;<br><br>        (d)     no later than thirty-thirty (35) days after the Petition Date, the Bankruptcy Court shall have entered a final order approving the Consulting Motion; and<br><br>        (e)     no later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered the Final Financing Order.<br><br>Lease Extensions.  No later than thirty (30) days after the Petition Date, the Loan Parties shall have filed a motion seeking an order ("Lease Extension Order") of the Bankruptcy Court extending the time period of the Loan Parties to assume or reject leases to not less than 210 days from the Petition Date, and on or before forty-five (45) days after the Petition Date, the Bankruptcy Court shall have entered the Lease Extension Order.<br><br>*See* DIP Agreement §§ 6.28; 6.29 |

## Background[6]

### I.    The Debtors' Prepetition Capital Structure.

9.    As of the Petition Date, the Debtors' capital structure consists of outstanding funded-debt obligations in the aggregate amount of approximately $81.8 million, including the Prepetition ABL Facility, the Prepetition Term Loan Facility, and the Prepetition Vendor

---

[6]    A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the First Day Declaration.

Facility.[7]  The following table summarizes the Debtors' outstanding funded-debt obligations as of the Petition Date:

| Funded Debt | Maturity | Interest Rates | Total Amount Outstanding |
|---|---|---|---|
| Prepetition ABL Facility | February 2022 | Libor + 6.5% | $9.5 million |
| | | Prime Rate + 5.5% | |
| Prepetition Term Loan Facility | April 2023 | Term A Loans: Libor + 10.00% | $62.3 million |
| | | Term B Loans: | |
| | | Libor + 1.00% + PIK interest of 9.00% | |
| | | Term A Loans: Base Rate + 9.00% | |
| | | Term B Loans: Base Rate + 0.00% + PIK interest of 9.00% | |
| Prepetition Vendor Facility | May 2020 | 20.0% | $10.0 million |
| TOTAL | | | $81.8 million |

### A.    The Prepetition ABL Revolving Credit Facility.

10.    Charming Charlie LLC and Charming Charlie USA, Inc. ("CC USA") are parties to that certain Credit Agreement, dated as of February 28, 2019, (as amended, the "Prepetition ABL Facility") by and among Charming Charlie Holdings Inc. ("Holdings"), as holdings, Charming Charlie LLC and CC USA, as borrowers, the guarantors party thereto,[8] Second Avenue Capital, LLC ("Second Avenue"), as co-collateral agent and lender, and White Oak Commercial Finance, LLC ("White Oak" and together with Second Avenue, the "Prepetition

---

[7]    Charming Charlie LLC is also a party to certain lease agreements (collectively, the "Capital Leases") whereby it leases company vehicles and office equipment, including printers (collectively, the "Leased Assets") utilized in the ordinary course of business.  Under the Capital Leases, Charming Charlie LLC is indebted in the aggregate amount of approximately $95,000.  The Capital Leases mature in 2020, and are secured by a first-priority lien on the Leased Assets.

[8]    The guarantors under the Prepetition ABL Facility are Holdings, Poseidon Partners CMS, Inc. ("Poseidon"), Charming Charlie Manhattan LLC ("CC Manhattan"), Charming Charlie International LLC, ("CC International"), and Charming Charlie Canada LLC ("CC Canada").

ABL Lenders") as co-collateral agent, lender, and administrative agent (White Oak and together with Second Avenue, the "Prepetition ABL Agents").  The Prepetition ABL Facility provides for a $35.0 million senior secured revolving credit facility (subject to a borrowing base composed primarily of inventory and credit card receivables) with a maturity date of February 28, 2022.

11.     The Prepetition ABL Facility provides for loans bearing interest at 3-month LIBOR *plus* an applicable margin of 6.5%. Interest is paid monthly in arrears.  Obligations under the Prepetition ABL Facility are secured by a first priority lien on all of the assets of the borrowers and the guarantors.  Each Debtor has guaranteed all obligations under the Prepetition ABL Facility.

12.     Additionally, the Debtors have entered into deposit account control agreements in favor of the Prepetition ABL Agents with respect to their bank accounts.  Thus, substantially all of the Debtors' cash is subject to a perfected first priority security interest in favor of the Prepetition ABL Agents.   Under the Prepetition ABL Facility, the Debtors must remit substantially all cash receipts on a daily basis to a non-Debtor account maintained by the Prepetition ABL Agents (the "Agent Account").   Accordingly, each day, any excess cash is swept to the Agent Account and applied to prepay loans in accordance with the Prepetition ABL Facility.  As of the Petition Date, there is approximately $9.5 million of outstanding principal and approximately $4.0 million of availability under the Prepetition ABL Facility.

**B.     The Prepetition Term Loan Facility.**

13.     Charming Charlie LLC is party to that certain Amended and Restated Term Loan and Guarantee Agreement, dated as of April 28, 2018 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "Prepetition Term Loan Facility"), among Holdings, Charming Charlie LLC,

as borrower, certain of the Debtors as guarantor parties thereto,[9] the lenders from time to time parties thereto, and Wilmington Trust, National Association, as administrative agent (in such capacity, the "Prepetition Term Loan Agent").  The Term Loan Facility provides for a loan in an original principal amount of $55 million, with a maturity date of April 24, 2023.  CC USA, in addition to certain Debtors, has guaranteed all obligations under the Term Loan Facility. Obligations under the Term Loan Facility are secured by a second priority lien on all assets of the Debtors.

14.     The Term Loan Facility provides for Tranche A Term Loans and Tranche B Term Loans.  Tranche A Term Loans that are LIBOR loans bear interest (per annum) at LIBOR (with a 1.00% floor) *plus* a 10.00% margin.  Tranche B Term Loans that are LIBOR loans bear interest (per annum) at LIBOR (with a 1.00% floor) *plus* a 1.00% margin *plus* PIK interest of 9.00%. Tranche A Term Loans that are Base Rate loans bear interest (per annum) at the Base Rate (equal to the higher of (a) the applicable prime lending rate, (b) 0.50% above the overnight federal funds rate, or (c) 1.00% above LIBOR, subject to a 2.00% floor) plus a 9.00% margin. Tranche B Term Loans that are Base Rate loans bear interest (per annum) at the Base Rate (equal to the higher of (a) the applicable prime lending rate, (b) 0.50% above the overnight federal funds rate, or (c) 1.00% above LIBOR, subject to a 2.00% floor) *plus* a 0.00% margin *plus* PIK interest of 9.00%.

15.     As of the Petition Date, approximately $60.7 million in aggregate principal amount remained outstanding under the Term Loan Facility, and approximately $1.6 million in PIK Interest accrued to balance, for a total outstanding balance of approximately $62.3 million.

---

[9]     The guarantors under the Term Loan Facility are Holdings, Poseidon, CC Manhattan, CC International, CC Canada, and CC USA.

C.      **The Vendor Credit Agreement.**

16.      Charming Charlie LLC is party to that certain Vendor Payment Financing Credit and Guarantee Agreement, dated as of April 24, 2018 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "Prepetition Vendor Facility"), among Holdings, Charming Charlie LLC, as borrower, certain of the Debtors as guarantor parties thereto,[10] the lenders from time to time parties thereto, and Wilmington Trust, National Association, as administrative agent (in such capacity, the "Prepetition Vendor Program Loan Agent").   The Prepetition Vendor Facility provides for a term loan in an original principal amount up to $10 million, with a maturity date of May 15, 2020.   Each of the Debtors have guaranteed all obligations under the Prepetition Vendor Facility.   Obligations under the Prepetition Vendor Facility are secured by a second priority lien on all assets of the Debtors.

17.      The Prepetition Vendor Facility bears interest at a rate of 20.0% percent per annum.   As of the Petition Date, approximately $10.0 million in aggregate principal amount remained outstanding under the Vendor Facility.

D.      **The Intercreditor Agreement.**

18.      The relative lien priorities between (i) the Prepetition ABL Facility and (ii) the Prepetition Vendor Facility and the Prepetition Term Loan Facility are set forth in that certain Subordination and Intercreditor Agreement, dated as of February 28, 2019, (as amended, the "Intercreditor Agreement"), by and among the ABL Agent and Wilmington Trust, National Association, in its capacities as Prepetition Vendor Program Loan Agent and Prepetition Term Loan Agent.   In addition to lien priorities, the Intercreditor Agreement governs the respective

---

[10]   The guarantors under the Prepetition Term Loan Facility are Holdings, Poseidon, CC Manhattan, CC International, CC Canada, and CC USA.

rights, interests, obligations, and positions of (a)(i) the Prepetition ABL Agents and (ii) the Prepetition Vendor Program Loan Agent and the Prepetition Term Loan Agent and (b)(i) the Prepetition ABL Lenders and (ii) the Vendor Facility Lenders and the Term Lenders.  The DIP Facility preserves the priority scheme set forth in the Intercreditor Agreement.

## II.    The Need to Use Cash Collateral and For Access to Financing.

19.    The Debtors require immediate access to liquidity to ensure that they are able to continue operating during these chapter 11 cases and preserve the value of their estates for the benefit of all parties in interest.  As of the Petition Date, the Debtors' total cash balance is approximately $6,000, which is insufficient to operate their enterprise and continue paying their debts as they come due.  Without prompt postpetition financing and access to cash collateral, the Debtors will be unable to pay wages for their employees, preserve and maximize the value of their estates, and administer these chapter 11 cases, causing immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders.  *See* Diercks Declaration ¶ 12; First Day Declaration ¶¶ 50, 52.

20.    The Debtors, in consultation with their proposed restructuring advisor, Clear Thinking Group LLC, reviewed and analyzed the Debtors' projected cash needs and prepared a 13 week projection (as updated from time to time in accordance with the terms of the DIP Agreement, the "Budget")[11] outlining the Debtors' postpetition cash needs in the initial 13 weeks of these cases.  The Debtors believe that the Budget and their projections provide an accurate reflection of their funding requirements over the identified period, will allow them to meet their obligations—including the administrative expenses of the chapter 11 cases—and are reasonable and appropriate under the circumstances.

---

[11]    A copy of the Budget is attached to the Interim Order as **Exhibit 1**.

21.     The Debtors relied on these forecasts to determine the amount of postpetition financing required to administer these chapter 11 cases.  The DIP Facility is critical to the Debtors' ability to smoothly operate postpetition, including by providing sufficient liquidity to fund the administrative cost of these chapter 11 cases and the store closing sales.  As a result, the Debtors believe that the DIP Facility provides the Debtors sufficient liquidity to stabilize their operations and fund the orderly wind down of their businesses, and is therefore essential to the preservation of their assets during the pendency of these cases.  *See* First Day Declaration ¶ 50, Ex. A.

22.     With virtually no cash on hand, the Debtors require interim approval of the DIP Facility to obtain access to mission-critical financing.  *See* Diercks Declaration ¶ 13; First Day Declaration ¶¶ 50, 52.  Absent the immediate relief requested by this motion, the Debtors face a material risk of substantial, irreparable, and ongoing harm.  Access to Cash Collateral and the DIP Facility will ensure the Debtors have sufficient funds to preserve and maximize the value of their estates, and responsibly administer these chapter 11 cases.

## III.    Alternative Sources of Financing Are Not Readily Available.

23.     The Debtors do not have alternative sources of financing readily available.  The Debtors' Prepetition Lenders assert that substantially all of the Debtors' assets are encumbered under their existing capital structure, which, along with the Debtors' uncertain financial condition and overall weakness in the apparel industry, restricts the availability of, and options for, postpetition financing.  *See* Diercks Declaration ¶ 14; First Day Declaration ¶¶ 51–52.  The Prepetition Lenders also made it clear that they would not consent to "priming" debtor-in-possession financing provided by a third party.  *See* First Day Declaration ¶ 52.  Additionally, as described below, the Debtors' marketing process—which included outreach to numerous parties for a variety of financing solutions—yielded no actionable results on the timeline necessary for

implementation.  *See* Diercks Declaration ¶ 15; First Day Declaration ¶ 52.  Accordingly, the Debtors do not believe third-party debtor-in-possession financing would be reasonably obtainable.  *See* Diercks Declaration ¶¶ 14–15; First Day Declaration ¶ 52.

24.    While negotiating the DIP Facility with the Debtors' existing debtholders, the Debtors, with the assistance of their advisors, began soliciting indications of interest from alternative third-party sources of asset based financing (including specialty lenders and those that routinely provide debtor-in-possession financing), to gauge their interest in providing a revolving credit facility or term loan to the Debtors.  *See* Diercks Declaration ¶ 15; First Day Declaration ¶ 51.  No party provided an proposal that was better both in terms of economics as well as the ability to implement.  *See id.*

25.    Indeed, any proposal by a lender outside the Debtors' prepetition capital structure would cost the Debtors substantially more than the DIP Facility and require priming of the Prepetition Lenders—likely resulting in expensive and distracting litigation at the critical start of these chapter 11 cases.  *See id.*  Additionally, with any third-party proposal, the Debtors would incur the execution risk associated with a new lender transaction, including material timing and due diligence constraints, necessarily involving the payment of additional professional fees. *See id.*  Therefore, it became clear to the Debtors that their existing lenders would provide the best source of postpetition financing.  *See id.*

### **Basis for Relief**

## I.    **The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Documents.**

### A.    **Entry into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.**

26.    The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and continue using

the Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflected] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

27.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

28.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor

and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).  The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility.  For example, in *In re ION Media Networks. Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  *Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization*.  This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

29.     The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment following an arm's-length process and careful evaluation of alternatives.  Specifically, the Debtors and their advisors determined that postpetition financing will create certainty with respect to cash flows necessary for the administration of these chapter 11 cases through the orderly wind down of the Debtors' businesses.  The Debtors negotiated the DIP Agreement and other DIP Documents with the DIP Lenders in good faith, at arm's length, and with the assistance of their respective advisors, and the Debtors believe that they have obtained the best financing available.  *See* Diercks Declaration ¶ 21; First Day

Declaration ¶ 55. Accordingly, the Court should authorize the Debtors' entry into the DIP Documents, as it is a reasonable exercise of the Debtors' business judgment.

**B.      The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

30.      The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Documents pursuant to section 364(c) of the Bankruptcy Code. Specifically, the Debtors propose to provide to the DIP Lenders continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral (as defined in the Interim Order), which includes substantially all of the Debtors' assets. Because the DIP Lenders are also the Prepetition ABL Lenders, the priority scheme of the Debtors' prepetition capital structure will remain largely unchanged. Under the DIP Documents, the DIP Lenders will receive first priority liens, similar to their liens as they existed prior to the Petition Date. More specifically, "[t]he DIP Liens securing the DIP Obligations are valid, automatically perfected, non-avoidable, senior in priority, and superior to any security, mortgage, collateral interest, lien, or claim to any of the DIP Collateral, except that the DIP Liens shall be subject and subordinate to the Carve Out as set forth in this Interim Order and shall otherwise be junior only to Prepetition Revolving Loan Permitted Prior Liens." Interim Order ¶ 6.

31.      The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a

debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

    a.    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

    b.    the credit transaction is necessary to preserve the assets of the estate; and

    c.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

32.    As described above and as set forth in the Diercks Declaration and the First Day Declaration, third-party lenders were unwilling to provide postpetition financing on an unsecured basis or otherwise junior to the Prepetition Lenders.  *See* Diercks Declaration ¶ 15; First Day Declaration ¶ 51.  Therefore, the Debtors, in consultation with their advisors, concluded that any workable financing likely would require the support of, or be provided by, the Debtors' existing lenders.  *See* Diercks Declaration ¶ 14; First Day Declaration ¶ 53.  Absent the DIP Facility, which will provide certainty that the Debtors will have sufficient liquidity to administer these chapter 11 cases, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  *See* Diercks Declaration ¶ 12; First Day Declaration ¶ 50.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Agreement, are fair, reasonable, and adequate, all as more fully set forth below.  *See* Diercks Declaration ¶ 21; First Day Declaration ¶ 55.  For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

33.    In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over

any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." As described above, the Debtors are unable to obtain unsecured credit. Therefore, approving a superpriority claims in favor of the DIP Lenders is reasonable and appropriate.

34.     Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1).  Consent by the secured creditors to priming obviates the need to show adequate protection. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition Lenders have consented or (b) Prepetition Lenders' interests in collateral are adequately protected.

35.     Here, the Prepetition Lenders have consented to the DIP Facility.  Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

**C.     No Comparable Alternative to the DIP Facility Is Reasonably Available.**

36.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code.  *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor,

"it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

37.    As noted above, the Debtors do not believe that alternative sources of financing are reasonably available given the realities imposed by the Debtors' existing capital structure and the Debtors' unsuccessful solicitation of alternative financing proposals.  Substantially all of the Debtors' existing assets, including Cash Collateral, are encumbered.  *See* First Day Declaration ¶ 53.  Moreover, the Debtors have searched for actionable alternative proposals—in this regard, the market has spoken.  There are no other options.  *See* Diercks Declaration ¶ 20; First Day Declaration ¶ 51.  Thus, the Debtors have determined that the DIP Facility provides the best opportunity available to the Debtors under the circumstances to fund these chapter 11 cases.  *See* Diercks Declaration ¶ 20; First Day Declaration ¶ 55.  Therefore, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

**D.    The Proposed Repayment of Prepetition Indebtedness Should Be Approved.**

38.    Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  It is well settled in

the Third Circuit that such transactions should be approved when they are supported by a sound

business purpose.  *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (holding that in

the Third Circuit, a debtor's use of assets outside the ordinary course of business under

section 363(b) should be approved if the debtor can demonstrate a sound business justification

for the proposed transaction).  The business judgment rule shields a debtor's management from

judicial second-guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615¶16 (Bankr. S.D.N.Y.

1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a

presumption of reasonableness attaches to a debtor's management decisions.").

39.    Repayment of prepetition debt (often referred to as a "roll-up") is a common

feature in debtor-in-possession financing arrangements.   Courts in this jurisdiction have

approved similar DIP features on the first day of the case.  *See, e.g.*, *In re MACH Gen, LLC*,

No. 14-10461 (MFW) (Bankr. D. Del. Mar. 5, 2014) (authorizing approximately $200 million

DIP that included roll-up of approximately $144 million prepetition debt pursuant to interim

order); *In re Furniture Brands Int'l, Inc.*, No. 13-12329 (CSS) (Bankr. D. Del. Sept. 11, 2013)

(authorizing approximately $140 million DIP that included roll-up of approximately $91 million

prepetition debt pursuant to interim order); *In re Appleseed's Intermediate Holdings LLC*,

No. 11-10160 (KG) (Bankr. D. Del. Jan. 20, 2011) (authorizing approximately $140 million DIP

that included roll-up of approximately $48.6 million prepetition debt pursuant to interim order);

*In re Dayton Superior Corp.*, No. 09¬11351 (BLS) (Bankr. D. Del. Apr. 21, 2009) (authorizing

approximately $165 million DIP that included roll-up of approximately $110 million prepetition

debt pursuant to interim order).[12]

---

[12]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion.
Copies of these orders are available upon request of the Debtors' proposed counsel.

40.     Moreover, repayment of prepetition debt has been approved in several recent retail cases in this and other jurisdictions. *See In re The Gymboree Corp.*, No. 17-32986 (KLP) (Bankr. E.D. Va. July 11, 2017) (approving use of debtor-in-possession financing to pay down or "roll-up" prepetition debt); *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Oct. 24, 2017) (same); *In re American Apparel, Inc.*, No. 15-12055 (Bankr. D. Del. October 6, 2017) (approving on an interim basis the repayment in full of all outstanding amounts under the prepetition revolving credit agreement); *In re The Gymboree Corp.*, No. 17¬32968 (Bankr. E.D. Va. June 12, 2017) (approving on an interim basis the conversion and "roll-up" of all outstanding prepetition revolving obligations and $70 million of prepetition term loan obligations); *In re rue21, inc.*, No. 17-22045 (Bankr. W.D. Pa. May 18, 2017) (approving on an interim basis the conversion and "roll-up" of all outstanding prepetition revolving obligations and $100 million of prepetition term loans); *In re BCBG Max Azria Holdings, LLC*, No. 17-10466 (Bankr. S.D.N.Y. March 28, 2017) (approving on a final basis the conversion and "roll-up" of $35 million of prepetition term loan obligations); *In re BCBG Max Azria Holdings, LLC*, No. 17-10466 (Bankr. S.D.N.Y. March 2, 2017) (approving the conversion and "roll-up" of all outstanding prepetition revolving obligations on a rolling basis following entry of the interim order); *In re Aeropostale, Inc.*, No. 16-11275 (Bankr. S.D.N.Y. May 6, 2016) (approving on an interim basis the conversion and "roll-up" of all outstanding prepetition revolving obligations).

41.     As set forth above, the DIP Agreement provides that the full amount outstanding under the Prepetition ABL Facility will "roll up" into the DIP ABL Facility upon entry of the Final Order.  Prior to entry of the Final Order, amounts outstanding under the Prepetition ABL Facility will be paid down through collections received by the Debtors.

42.     The repayment of the Prepetition ABL Facility is a sound exercise of the Debtors'

business judgment and is a material component of the structure of the DIP Facility and was

required by the DIP Lenders as a condition to their commitment to provide postpetition

financing.  *See* First Day Declaration ¶ 54.  The Debtors were unable to obtain debtor-in-

possession financing on similar terms that did not provide for the repayment of prepetition

amounts on these terms.  *See* Diercks Declaration ¶ 15; First Day Declaration ¶ 51.  Without

continued access to an asset-based lending facility to fund the administration of these chapter 11

cases and the orderly wind down of the Debtors' businesses, the Debtors' businesses would

cease and they would likely be forced to liquidate.  *See* First Day Declaration ¶ 50.  A value

destructive alternative for all stakeholders.  Importantly, the Prepetition ABL Lenders, with

approximately $9.1 million of first lien, first priority claims, are oversecured.  Where, as the

Prepetition ABL Lenders are here, a prepetition secured creditor is oversecured, repaying such

creditor that stands to receive payment in full with postpetition loans will not harm the Debtors'

estates and other creditors.

43.     The simple economic reality is that an orderly wind down of the Debtors'

businesses comes at a price, which in this case the Debtors believe to be reasonable.  *See* Diercks

Declaration ¶ 20; First Day Declaration ¶ 54.  The Prepetition Lenders are unlikely to continue to

lend postpetition without some assurance regarding their prepetition claims.  Absent the

Prepetition Lenders' support, the first month of the Debtors' chapter 11 cases would likely

devolve into a costly priming fight.  In contrast, the roll up of the Prepetition ABL Facility

merely affects the timing, not the amount or certainty, of the Prepetition Lenders' recovery—the

secured claims arising under the Prepetition ABL Facility are required by section 1129 of the

Bankruptcy Code to be satisfied in full before recoveries to junior creditors may be provided,

absent consent of such secured parties (which consent the Debtors do not have here). Importantly, the proposed roll-up is subject to review by a creditors' committee (if appointed) or another party-in-interest with requisite standing if a committee is not appointed.

44.     Given these circumstances, repayment of the Prepetition ABL Facility upon entry of the Interim Order is reasonable, appropriate, and a sound exercise of the Debtors' business judgment.

**II.     The Debtors Should Be Authorized to Use the Cash Collateral.**

45.     Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) permits a debtor in possession to use cash collateral with the consent of the secured party.  Here, the Prepetition Lenders consent to the Debtors' use of the Cash Collateral (as well as the Prepetition Collateral), subject to the terms and limitations set forth in the Interim Order.

46.     Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate

protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding").

47.     As described more fully above, and as set forth in the Interim Order, the Debtors propose to provide the Prepetition Lenders with a variety of adequate protection to protect against the postpetition diminution in value of the Cash Collateral (as well as the Prepetition Collateral) resulting from the use of the Cash Collateral by the Debtors and the imposition of the automatic stay (collectively, the "Adequate Protection Obligations"):

    a.    valid and automatically perfected replacement liens and security interests in and upon the DIP Collateral;

    b.    superpriority administrative claims under section 507(b) of the Bankruptcy Code;

    c.    the payment of the professional fees and expenses of the Prepetition ABL Agents, the Prepetition Term Loan Agent, and the Prepetition Vendor Program Loan Agent; and

    d.    the payment of interest, fees, and principal due under the Prepetition Revolver Documents.

48.     Therefore, the Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect the Prepetition Lenders from any diminution in value to the Cash Collateral and Prepetition Collateral.  In light of the foregoing, the Debtors further submit, and the Prepetition Lenders agree, that the proposed Adequate Protection Obligations to be provided for the benefit of the Prepetition Lenders are appropriate.[13]  Thus, the Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these chapter 11 cases to ensure the

---

[13]   Pursuant to the DIP Orders, the Prepetition Lenders are permitted to seek additional adequate protection in accordance with the terms thereof.

Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

**III.     The Scope of the Care Out is Appropriate.**

49.     The proposed Adequate Protection is subject to the Carve Out. Without the Carve Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these chapter 11 cases would be restricted. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). The Carve Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers. Additionally, the Carve Out protects against administrative insolvency during the course of these chapter 11 cases by ensuring that assets remain for the payment of the Clerk of the Court or U.S. Trustee fees and professional fees of the Debtors.

**IV.     The Debtors Should Be Authorized to Pay the Fees Required by the DIP Agents and the DIP Lenders Under the DIP Documents.**

50.     Under the DIP Loan Documents, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Agents and the DIP Lenders. In particular, the Debtors have agreed to pay aggregate fees in accordance with the DIP Documents consisting of the following: (a) closing fees of approximately $260,000; (b) an unused line fee equal to 0.5% per annum of the undrawn commitments; (c) an administration fee of $10,000 per month; and (d) a progress fee of approximately $260,000.

51.     It is understood and agreed by all parties, including the Debtors, that these fees are an integral component of the overall terms of the DIP Facility, and were required by the

applicable DIP Agents and the DIP Lenders as consideration for the extension of postpetition financing.  *See* First Day Declaration ¶ 54.  Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Documents in connection with entering into those agreements.

**V.      The Debtors Should Be Deemed Good-Faith Lenders Under Section 364(e).**

52.      Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

53.      As explained herein, in the First Day Declaration, the DIP Documents are the result of: (a) the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain vital postpetition financing, and (b) arms'-length, good-faith negotiations between the Debtors and the DIP Agents and DIP Lenders.  The Debtors submit that the terms and conditions of the DIP Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Documents other than as described herein.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**VI.    The Findings of Validity, Perfection, or Amount of Prepetition Liens and Challenge Period Are Appropriate.**

54.    Local Rule 4001-2(a)(i)(B) requires explicit disclosure of provisions that bind the estate or other parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least 75 days from the entry of the order and the creditor's committee, if any, at least 60 days from the date of its formation to investigate such matters. Here, the Interim Order provides any committee appointed in these chapter 11 cases and other parties in interest with sufficient time within which to investigate and/or challenge the Credit Agreement Obligations.

55.    As part of the Interim Order, the Debtors agree and stipulate to the validity and extent of the Prepetition Revolving Loan Lenders', Prepetition Term Loan Lenders', and Prepetition Vendor Program Lenders' claims and liens.  The Interim Order further provides that, subject to certain limitations, the committee (if any) or any other party in interest (except the Debtors), in each case, with requisite standing, may file an adversary proceeding challenging the validity, enforceability, priority, or extent of the Prepetition Lien and Claim Matters by no later than (i) with respect to parties in interest other than the Creditors' Committee, 75 days from the date of entry of the Interim Order and (ii) with respect to the Creditors' Committee, 60 days from the formation of the Committee, to investigate the representations, admissions, stipulations, agreements, releases, and waivers set forth in the Interim Order.

**VII.    The Automatic Stay Should Be Modified on a Limited Basis.**

56.    The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and

documents in order to validate and perfect the liens and security interests granted to them under the Interim Order. The proposed Interim Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant the DIP Liens to the DIP Lenders and to incur all liabilities and obligations set forth in the Interim Order. Finally, the proposed Interim Order provides that, following the occurrence of an Event of Default, the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Agents to exercise all rights and remedies in accordance with the DIP Documents, or applicable law following a seven-day notice period, during which time the Debtors may seek injunctive relief.

57.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases. *See, e.g.*, *In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG) (Bankr. D. Del. Dec. 15, 2015) (terminating automatic stay after event of default); *In re Peak Broad., LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay after occurrence of termination event); *In re TMP Directional Mktg., LLC,* No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (same); *In re Haights Cross Commc'ns, Inc.*, No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010) (same).

## VIII.    Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.

58.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court may conduct a preliminary, expedited hearing

on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

59.    For the reasons noted above, the Debtors have an immediate postpetition need to use Cash Collateral, including advances under the DIP Facility.  The Debtors cannot maintain the value of their estates during the pendency of these chapter 11 cases without access to this liquidity.  *See* Diercks Declaration ¶ 13; First Day Declaration ¶ 50.  The Debtors will use cash to, among other things, fund the administration of these chapter 11 cases and the store closing sales.  *See id.*  The Debtors believe that substantially all of their available cash constitutes the Prepetition Lenders' Cash Collateral.  *See* First Day Declaration ¶¶ 24, 26.  The Debtors will therefore be unable to operate their business or otherwise fund these chapter 11 cases without access to the Cash Collateral, and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest.  In short, the Debtors' ability to administer these chapter 11 cases through the use of Cash Collateral is vital to preserve and maximize the value of the Debtors' estates.

60.    The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive initial funding under the DIP Facility.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

### **Request for Final Hearing**

61.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing within approximately 30 days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

62.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Notice**

63.     The Debtors will provide notice of this motion to: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Agents and the Prepetition ABL Agents; (d) counsel to the Prepetition Term Loan Agent and the Prepetition Vendor Program Loan Agent; (e) the United States Attorney's Office for the District of Delaware; (g) the Internal Revenue Service; (h) the United States Securities and Exchange Commission; (i) the state attorneys general for all states in which the Debtors conduct business; and (j) any party that requests service pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

64.     No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the DIP Orders, granting relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated:  July 11, 2019
        Wilmington, Delaware

/s/ *Domenic E. Pacitti*
Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
Sally E. Veghte (DE Bar No. 4762)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:     (302) 426-1189
Facsimile:     (302) 426-9193

- and -

Matthew Murphy (*pro hac vice* admission pending)
Nathan S. Gimpel (*pro hac vice* admission pending)
Matthew Smart (*pro hac vice* admission pending)
**PAUL HASTINGS LLP**
71 South Wacker Drive, Suite 4500
Chicago, Illinois 60606
Telephone: (312) 499-6000
Facsimile: (312) 499-6100

Todd M. Schwartz (*pro hac vice* admission pending)
**PAUL HASTINGS LLP**
1117 South California Avenue
Palo Alto, California 94304
Telephone: (650) 320-1800
Facsimile: (650) 320-1900

*Proposed Co-Counsel to the Debtors and Debtors in Possession*