## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CHARMING CHARLIE HOLDINGS INC., *et al.*,[1] | ) | Case No. 19-11534 (CSS) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

### NOTICE OF SUCCESSFUL BIDDER AND PURCHASE AGREEMENT

**PLEASE TAKE NOTICE** that, on August 13, 2019, the above-captioned debtors and debtors-in-possession (the "Debtors"), filed the *Debtors' Motion for Entry of an Order, Pursuant to Sections 105 and 363 of the Bankruptcy Code, (I) Authorizing the Sale of Certain Intellectual Property Free and Clear of Liens, Claims, Encumbrances, and Other Interests and (II) Granting Related Relief* [Docket No. 245] (the "Motion")[2] with the United States Bankruptcy Court for the District of Delaware.  The Motion contemplates the Debtors conducting an auction (the "Auction") to determine the highest or otherwise best bid for the Debtors' Intellectual Property assets.

**PLEASE TAKE FURTHER NOTICE** that the Debtors conducted the Auction on September 11, 2019, at Cooley LLP, 55 Hudson Yards, New York, NY 10001.

**PLEASE TAKE FURTHER NOTICE** that, at the Auction, the Debtors, in consultation with the Consultation Parties, determined that the Successful Bidder is CJS Group, LP with a Successful Bid of $1,125,000.

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Charming Charlie Canada LLC (0693); Charming Charlie Holdings Inc. (6139); Charming Charlie International LLC (5887); Charming Charlie LLC (0263); Charming Charlie Manhattan LLC (7408); Charming Charlie USA, Inc. (3973); and Poseidon Partners CMS, Inc. (3302).  The location of the Debtors' headquarters is:  6001 Savoy Drive, Ste. 600, Houston, Texas 77036.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings provided to them in the Motion.

**PLEASE TAKE FURTHER NOTICE** that a copy of the form Purchase Agreement for the Successful Bid is attached hereto as **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that the hearing on the Motion is scheduled for **September 16, 2019, at 11:00 a.m. (prevailing Eastern Time)**, before the Honorable Christopher S. Sontchi, Chief United States Bankruptcy Judge for the District of Delaware, 824 Market Street, Courtroom #6, 5th floor, Wilmington, Delaware 19801.

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion and all relevant documents may be viewed free of charge on Prime Clerk LLP's website for these chapter 11 cases (https://cases.primeclerk.com/charmingcharlie/Home-DocketInfo) or for a fee at the Court's website (http://www.deb.uscourts.gov/).

*[Remainder of Page Intentionally Left Blank]*

Dated:  September 11, 2019        */s/ Michael W. Yurkewicz*

Wilmington, Delaware              Domenic E. Pacitti (DE Bar No. 3989)

Michael W. Yurkewicz (DE Bar No. 4165)

Sally E. Veghte (DE Bar No. 4762)

KLEHR HARRISON HARVEY BRANZBURG LLP

919 N. Market Street, Suite 1000

Wilmington, Delaware 19801

Telephone:  (302) 426-1189

Facsimile:  (302) 426-9193

- and -

Matthew M. Murphy (admitted *pro hac vice*)

Nathan S. Gimpel (admitted *pro hac vice*)

Matthew Smart (admitted *pro hac vice*)

PAUL HASTINGS LLP

71 South Wacker Drive, Suite 4500

Chicago, Illinois 60606

Telephone:  (312) 499-6000

Facsimile:  (312) 499-6100

*Co-Counsel to the Debtors and Debtors in Possession*

## **Exhibit A**

**Purchase Agreement**

*Confidential*

**INTELLECTUAL PROPERTY**

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**CJS GROUP, LP**

**AND**

**CHARMING CHARLIE LLC**

**Dated as of September 11, 2019**

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS............................................................................................ 2
    Section 1.1    Definitions................................................................................. 2
    Section 1.2    Other Definitions and Interpretive Matters............................. 6

ARTICLE II PURCHASE AND SALE........................................................................... 8
    Section 2.1    Purchase and Sale of the Acquired Assets............................... 8
    Section 2.2    Excluded Assets ........................................................................ 8
    Section 2.3    Assumed Liabilities .................................................................. 8
    Section 2.4    Excluded Liabilities .................................................................. 8
    Section 2.5    Further Assurances ................................................................... 8

ARTICLE III PURCHASE PRICE.................................................................................. 9
    Section 3.1    Purchase Price .......................................................................... 9
    Section 3.2    Minimum Deposit ..................................................................... 9
    Section 3.3    Closing Date Payments ............................................................ 9
    Section 3.4    Discharge of Assumed Liabilities After Closing..................... 9
    Section 3.5    Allocation of Purchase Price. ................................................... 9

ARTICLE IV CLOSING ...............................................................................................10
    Section 4.1    Closing Date..............................................................................10
    Section 4.2    Buyer's Deliveries ...................................................................10
    Section 4.3    Seller's Deliveries ...................................................................11

ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLER ..............11
    Section 5.1    Organization and Good Standing..............................................11
    Section 5.2    Authority; Validity; Consents .................................................11
    Section 5.3    Title to Acquired Assets...........................................................12
    Section 5.4    Taxes ........................................................................................12
    Section 5.5    Legal Proceedings....................................................................12
    Section 5.6    Brokers or Finders ..................................................................12
    Section 5.7    Intellectual Property.................................................................12
    Section 5.8    No Other Representations or Warranties; No Survival............13

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF BUYER...............13
    Section 6.1    Organization and Good Standing..............................................13
    Section 6.2    Authority; Validity; Consents .................................................13

LEGAL_US_E # 144135441.2

# TABLE OF CONTENTS

**Page**

Section 6.3    No Conflict................................................................13

Section 6.4    Availability of Funds; Solvency .................................14

Section 6.5    Litigation..................................................................14

Section 6.6    Brokers or Finders ....................................................14

Section 6.7    Condition of Acquired Assets; Representations....................14

ARTICLE VII ACTIONS PRIOR TO THE CLOSING DATE.................................15

Section 7.1    Operations Prior to the Closing Date ...................................15

Section 7.2    Bankruptcy Court Filings and Approval.................................15

ARTICLE VIII ADDITIONAL AGREEMENTS ...................................16

Section 8.1    Taxes.........................................................................16

Section 8.2    Payments Received ....................................................16

Section 8.3    Confidentiality...........................................................17

Section 8.4    Preservation of Books and Records .................................17

ARTICLE IX CONDITIONS PRECEDENT TO THE OBLIGATION OF BUYER TO CLOSE.................................................................17

Section 9.1    Accuracy of Representations .................................17

Section 9.2    Seller's Performance....................................................17

Section 9.3    No Order ....................................................................17

Section 9.4    Governmental Authorizations.................................18

Section 9.5    Seller's Deliveries.......................................................18

Section 9.6    Sale Order in Effect ....................................................18

ARTICLE X CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLER TO CLOSE.................................................................18

Section 10.1    Accuracy of Representations .................................18

Section 10.2    Buyer's Performance..................................................18

Section 10.3    No Order ...................................................................18

Section 10.4    Governmental Authorizations.................................18

Section 10.5    Buyer's Deliveries.....................................................19

Section 10.6    Sale Order in Effect ..................................................19

ARTICLE XI TERMINATION .................................................19

Section 11.1    Termination Events.....................................................19

# TABLE OF CONTENTS

**Page**

Section 11.2    Effect of Termination .............................................................21

ARTICLE XII GENERAL PROVISIONS............................................................21

Section 12.1    Notices.............................................................................21

Section 12.2    Amendment; Waiver............................................................22

Section 12.3    Entire Agreement...............................................................22

Section 12.4    No Presumption as to Drafting .............................................23

Section 12.5    Assignment ......................................................................23

Section 12.6    Severability ......................................................................23

Section 12.7    Governing Law; Consent to Jurisdiction and Venue; Jury Trial
Waiver. ..........................................................................23

Section 12.8    Counterparts .....................................................................24

Section 12.9    Parties in Interest; No Third Party Beneficiaries.....................25

Section 12.10   Non-Recourse ...................................................................25

Section 12.11   Schedules; Materiality........................................................25

Section 12.12   Specific Performance .........................................................25

Section 12.13   No Survival.......................................................................25

Section 12.14   Publicity...........................................................................26

LEGAL_US_E # 144135441.2

## SCHEDULES

Schedule 1.1(a)        Permitted Encumbrances
Schedule 2.1(a)        Intellectual Property
Schedule 2.1(b)        Documents
Schedule 5.3           Title to Acquired Assets
Schedule 5.5           Legal Proceedings
Schedule 5.6           Brokers and Finders

## EXHIBITS

Exhibit A        Form of Sale Order

## INTELLECTUAL PROPERTY ASSET PURCHASE AGREEMENT

THIS INTELLECTUAL PROPERTY ASSET PURCHASE AGREEMENT (this "Agreement") is made as of September 11, 2019 (the "Effective Date"), by and between CJS Group, LP, a limited partnership ("Buyer"), and CHARMING CHARLIE LLC, a Delaware limited liability company ("Seller").  Capitalized terms used herein and not otherwise defined herein have the meaning set forth in Article I.

## RECITALS

WHEREAS, Seller is a specialty retailer focused on colorful fashion jewelry, handbags, apparel, gifts and beauty products;

WHEREAS, on July 11, 2019, Seller filed a voluntary petition for relief (the "Filing") commencing a case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, Buyer has delivered to Hilco IP Services, LLC d/b/a Hilco Streambank (the "Hilco") an amount in cash (such amount, as it may be adjusted pursuant hereto, the "Minimum Deposit") in immediately available funds pursuant to the terms of a Bid Submission Form for Intellectual Property Assets of Charming Charlie Holdings Inc., et al, dated September 4th, 2019;

WHEREAS, Seller believes, following consultation with Seller's financial advisors and retained consultants, and consideration of available alternatives, that, in light of the current circumstances, a sale of certain of Seller's intellectual property assets as provided herein is necessary to preserve and maximize value, and is in the best interest of Seller, Seller's creditors, and stakeholders;

WHEREAS, Seller desires to sell to Buyer all of the Acquired Assets (defined below) and transfer to Buyer the Assumed Liabilities (defined below), and Buyer desires to purchase from Seller all of the Acquired Assets and assume all of the Assumed Liabilities, in each case on the terms and subject to the conditions  hereinafter set forth;

WHEREAS, the execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order under, *inter alia*, Sections 363 and 365 of the Bankruptcy Code; and

WHEREAS, the Parties desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Court enters the Sale Order.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged and intending to be legally bound hereby, the Parties agree as follows:

# ARTICLE I

## DEFINITIONS

Section 1.1    Definitions.  For purposes of this Agreement, the following terms have the meaning specified or referenced below.

"Acquired Assets" shall have the meaning set forth in Section 2.1.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such other Person.  For purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms " controlling" and " controlled" have correlative meanings.

"Agreement" shall have the meaning set forth in the Preamble.

"Allocation Schedule" shall have the meaning set forth in Section 3.5(a).

"Alternative Transaction" means a transaction or series of related transactions (whether by asset sale, equity purchase, merger or otherwise) pursuant to which Seller enters into an agreement to sell all of the Acquired Assets or any group of assets that includes all or any material portion of the Acquired Assets to a Third Party, at the highest or best offer.

"Assumed Liabilities" shall have the meaning set forth in Section 2.3.

"Available Assets" shall mean the assets in the schedule annexed to the Sale Motion.

"Auction" shall mean the auction of the Acquired Assets.

"Avoidance Actions" means any and all claims for relief of Seller under chapter 5 of the Bankruptcy Code, or state fraudulent conveyance, fraudulent transfer or other similar state laws.

"Bankruptcy Case" means, collectively, the bankruptcy cases commenced by Seller under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court in the Filing.

"Bankruptcy Code" means Title 11 of the United States Code, Section 101 et seq.

"Bankruptcy Court" shall have the meaning set forth in the Recitals.

"Business Day" means any day of the year, other than a Saturday or Sunday, on which national banking institutions in New York, New York are open to the public for conducting business and are not required or authorized by Law to close.

"Buyer" shall have the meaning set forth in the Preamble.

"Buyer Termination Notice" shall have the meaning set forth in Section 11.1(c)(i).

2

"Cash Consideration"  means an aggregate amount in cash equal to $1,125,000.00.

"Claims" means all claims, causes of action, rights of recovery and rights of set-off of Seller, in each case, of whatever kind or description against any Third Party.

"Closing"  shall have the meaning set forth in Section 4.1.

"Closing Date" shall have the meaning set forth in Section 4.1.

"Closing Date Cash Payment" shall have the meaning set forth in Section 3.3.

"Closing Legal Impediment"  shall have the meaning set forth in Section 9.3.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, agreement, undertaking, license, sublicense, sales order, purchase order or other commitment, whether written or oral (including commitments to enter into any of such), that is binding on any Person or any part of its property under applicable Law.

"Copyrights" means: (a) works of authorship whether or not copyrightable; and (b) any other copyrights and works, together with all common law rights, and any applications and registrations therefor.

"Documents" means all books, records, files, invoices, inventory records, product specifications, customer lists and other customer-related information, cost and pricing information, supplier lists, business plans, personnel records, catalogs, customer literature, quality control records and manuals and credit records of customers relating to any Intellectual Property, including all data and other information stored on hard drives (including those located on remote servers, whether operated by Seller or by Third Party providers), discs, tapes or other media, in each case, solely to the extent owned by Seller and specific to those customers set forth on Schedule 2.1(b).

"Effective Date" shall have the meaning set forth in the Preamble.

"Encumbrance" means any charge, lien, claim, mortgage, lease, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use or possession, right of first offer or first refusal, easement, servitude, restrictive covenant, encroachment, encumbrance, or other similar restriction of any kind.

"Escrow Agreement" shall have the meaning set forth in the Recitals.

"Excluded Assets" shall have the meaning set forth in Section 2.2.

"Excluded Liabilities"  shall have the meaning set forth in Section 2.3.

"Filing"  shall have the meaning set forth in the Recitals.

"Governmental Authority" means any United States federal, state, municipal or local or any foreign government, governmental agency or authority, or regulatory or administrative

authority, or any court, tribunal or judicial body having jurisdiction, including the Bankruptcy Court.

"Governmental Authorization" means any approval, consent, license, permit, waiver or other authorization issued granted or otherwise made available by or under the authority of any Governmental Authority.

"Hilco" shall have the meaning set forth in the Recitals.

"Intellectual Property" means, collectively, all Copyrights, Patents, Trademarks and Online Properties set forth on Schedule 2.1(a). For the avoidance of doubt, any Copyrights, Patents, Trademarks or Online Properties that are not set forth on Schedule 2.1(a) are not and shall not be deemed to be Intellectual Property.

"Knowledge" means, with respect to any matter in question, in the case of Seller, the actual knowledge of Al Bellon, with respect to such matter.

"Law" means any foreign or domestic law, statute, code, ordinance, rule, regulation, order, judgment, writ, stipulation, award, injunction or decree by any Governmental Authority.

"Liability" means any debt, loss, claim, damage, demand, fine, judgment, penalty, liability or obligation (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due).

"Material Adverse Effect" means any effect, change, condition, circumstance, development or event that, individually or in the aggregate with all other effects, changes, conditions, circumstances, developments and events has had, or would reasonably be expected to have, a material adverse effect on the Intellectual Property or any other Acquired Assets, taken as a whole, excluding any effect, change, condition, circumstance, development or event that results from or arises out of: (i) the execution and delivery of this Agreement or the announcement thereof or the pendency or consummation of the transactions contemplated hereby; (ii) geopolitical conditions or any outbreak or escalation of hostilities or acts of terrorism or war or any effect, change or event that is otherwise generally applicable to the industries and markets in which Seller operate; (iii) changes in (or proposals to change) Laws or accounting regulations or principles; (iv) the Bankruptcy Case, including, without limitation, the Auction and any announced liquidation of Seller or any of Seller's respective assets; or (v) any action expressly contemplated by this Agreement or taken at the written request of Buyer.

"Minimum Deposit" shall have the meaning set forth in the Recitals.

"Next Highest Bidder" means the Person submitting a bid at the Auction that is the highest bid immediately before submission of the bid submitted by the Successful Bidder.

"Online Properties" means any domain names, uniform resource locators and social media accounts.

"Order" means any award, writ, injunction, judgment, order or decree entered, issued, made or rendered by any Governmental Authority.

4

"Outside Date" shall have the meaning set forth in Section 11.1(b)(ii).

"Party" or "Parties" means, individually or collectively, Buyer and Seller.

"Patents" means (a) any patent, (b) any patent applications, (c) any continuation, continuation-in-part and divisional patent applications based on any of the foregoing, and (d) any patents issuing from any of the items reference in the foregoing clauses (a)–(c).

"Permitted Encumbrances" means (a) Encumbrances that do not materially impair the value of or interfere with the use of the assets to which they relate, (b) non-exclusive outbound licenses of Intellectual Property, and (c) Encumbrances set forth on Schedule 1.1(a).

"Person" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization or other entity or Governmental Authority.

"Pre-Closing Covenants" shall have the meaning set forth in Section 12.13.

"Proceeding" means any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority, other than an Avoidance Action.

"Purchase Price" has the meaning set forth in Section 3.1.

"Qualified Bid" shall have the meaning set forth in the Sale Procedures.

"Representative" means, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement.

"Sale Motion" shall mean the motion filed by the Seller seeking approval of the sale of the Available Assets.

"Sale Order" means an Order of the Bankruptcy Court approving this Agreement and the transactions contemplated hereby, which Order shall be substantially in the form attached hereto as Exhibit A, with such changes as are not adverse to Buyer or as the Parties may mutually agree.

"Sale Procedures" shall mean those sale procedures for the Auction as set forth in the Sale Motion.

"Seller" shall have the meaning set forth in the Preamble.

"Seller Termination Notice" shall have the meaning set forth in Section 11.1(d)(i).

"Subsidiary" means any entity with respect to which a specified Person (or a Subsidiary thereof) has the power, through the ownership of securities or otherwise, to elect a majority of the directors or similar managing body.

"Successful Bidder" means the Person submitting the bid determined to be the highest or best offer at the Auction.

"Tax" or "Taxes" means any federal, state, provincial, local, municipal, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental (including taxes under Section 59A of the Code),natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar tax, duty, levy or other governmental charge or assessment or deficiency thereof (including all interest and penalties thereon and additions thereto), in each case imposed by any Governmental Authority.

"Tax Return" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed with or required to be filed with any Governmental Authority in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"Third Party" means a Person who or which is neither a Party nor an Affiliate of a Party.

"Trademarks" means all trade names, logos, slogans, designs, common law trademarks and service marks, trademark and service mark registrations and applications therefor, and all goodwill appurtenant to any or all of the foregoing.

"Transaction Documents" means this Agreement, the Escrow Agreement, and any other agreements, instruments or documents entered into pursuant to this Agreement.

"Transfer Taxes" shall have the meaning set forth in Section 8.1(a).

Section 1.2    Other Definitions and Interpretive Matters.

(a)    Unless otherwise indicated to the contrary in this Agreement by the context or use thereof:

(i)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

(ii)    Any reference in this Agreement to $ means U.S. dollars.

6

(iii)    Unless the context otherwise requires, all capitalized terms used in the Exhibits and Schedules shall have the respective meanings assigned in this Agreement.  No reference to or disclosure of any item or other matter in the Exhibits and Schedules shall be construed as an admission or indication that such item or other matter is material or that such item or other matter is required to be referred to or disclosed in the Exhibits and Schedules.  No disclosure in the Exhibits and Schedules relating to any possible breach or violation of any Contract or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.  Any information, item or other disclosure set forth in any Schedule shall be deemed to have been set forth in all other applicable Schedules if the relevance of such disclosure to such other Schedule is reasonably apparent from the facts specified in such disclosure.  All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

(iv)    Any reference in this Agreement to gender includes all genders, and words importing the singular number also include the plural and vice versa.

(v)    The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement.  All references in this Agreement to any "Section," "Article," "Schedule," or "Exhibit" are to the corresponding Section, Article, Schedule, or Exhibit of or to this Agreement unless otherwise specified.

(vi)    Words such as "herein," "hereof" and "hereunder" refer to this Agreement as whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

(vii)    The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)    <u>No Strict Construction</u>.  Buyer, on the one hand, and Seller, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Seller, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.  Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

# ARTICLE II

# PURCHASE AND SALE

Section 2.1    <u>Purchase and Sale of the Acquired Assets</u>.  On the terms and subject to the conditions set forth in this Agreement, on the Closing Date, in consideration of payment of the Purchase Price and assumption of the Assumed Liabilities by Buyer, Seller shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, and Buyer shall purchase, assume and accept from Seller, all right, title and interest of Seller in, to, or under the following (collectively,  the "<u>Acquired Assets</u>"):

   (a)  the Intellectual Property;

   (b)  the Documents;

   (c)  all goodwill associated with the Intellectual Property;

   (d)  all Claims of Seller (other than warranty claims and Avoidance Actions) to the extent arising out of, or relating to, the Intellectual Property or the Documents; and

   (e)  all transferrable rights of Seller under non-disclosure or confidentiality, non-compete,  or  non-solicitation  Contracts  relating  to  the  Intellectual  Property  or  the Documents.

Section 2.2    <u>Excluded Assets</u>.  Notwithstanding anything herein to the contrary, the Buyer shall not acquire any right, title or interest in or to any assets, properties, rights, interests, or claims of any kind or description of Seller or its Affiliates other than the Acquired Assets (collectively, the "<u>Excluded Assets</u>").

Section 2.3    <u>Assumed Liabilities</u>.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, contemporaneously with the sale, assignment and transfer of the Acquired Assets to Buyer, Buyer shall assume and agree to pay, perform and discharge, as and when due (in accordance with the respective terms and subject to the respective conditions thereof) all Liabilities arising from the ownership of the Acquired Assets and the use thereof by Buyer from and after the Closing (collectively,  the "<u>Assumed Liabilities</u>").

Section 2.4    <u>Excluded Liabilities</u>.   Buyer  shall  not  assume  or  be  obliged  to  pay, perform or otherwise discharge, and Seller shall be solely and exclusively liable with respect to, any Liability of Seller that is not an Assumed Liability (such Liabilities, collectively, the "<u>Excluded Liabilities</u>").

Section 2.5    <u>Further Assurances</u>.  Following the Closing, Seller, on the one hand, and Buyer, on the other hand, shall use their respective commercially reasonable efforts to take, or cause to be taken, all appropriate action, do or cause to be done all things reasonably necessary under applicable Law, and execute and deliver such instruments and documents and to take such other actions, as may be required to consummate the transactions contemplated by this Agreement at or after the Closing; <u>provided</u> that nothing in this <u>Section 2.5</u> shall prohibit Seller from ceasing operations or winding up Seller's affairs following the Closing.  In furtherance and

8

not in limitation of the foregoing, in the event that any of the Acquired Assets shall not have been conveyed at Closing, Seller shall use commercially reasonable efforts to convey such Acquired Assets to Buyer as promptly as practicable after the Closing.

## ARTICLE III

## PURCHASE PRICE

Section 3.1    Purchase Price.  In consideration for the purchase, sale, assignment and conveyance of the Acquired Assets, Buyer shall pay to Seller cash in the amount of the Cash Consideration  (the "Purchase Price") and assume the Assumed Liabilities.

Section 3.2    Minimum Deposit.  Buyer has delivered to Hilco the Minimum Deposit in immediately available funds pursuant to the Escrow Agreement.  The Minimum Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of Seller or Buyer.  The Minimum Deposit shall be retained by Seller at the Closing (and deducted from the Purchase Price due and payable at the Closing), or if this Agreement is terminated, treated in the manner set forth in Section 11.2.

Section 3.3    Closing Date Payments.  At the Closing, (a) Buyer shall pay to Seller cash by wire transfer of immediately available funds in an amount equal to the Cash Consideration minus the Minimum Deposit (the "Closing Date Cash Payment") and (b) Buyer and Seller shall direct Hilco to indefeasibly transfer the Minimum Deposit to an account designated by Seller.

Section 3.4    Discharge of Assumed Liabilities After Closing.  Following the Closing, Buyer shall pay, perform and satisfy, or cause to be paid, performed and satisfied, the Assumed Liabilities from time to time as and when such Assumed Liabilities become due and payable or are required to be performed or satisfied in accordance with their respective terms.

Section 3.5    Allocation of Purchase Price.

(a)    No later than ten (10) days following the Closing Date, Buyer shall deliver to Seller an allocation schedule(s) allocating the Purchase Price (as may be adjusted pursuant to the terms of this Agreement) among the Acquired Assets of Seller, including the Assumed Liabilities to the extent such Liabilities are required to be treated as part of the purchase price for Tax purposes in accordance with Section 1060 of the Code (the "Allocation Schedule").  Such Allocation Schedule shall become final, binding and conclusive upon Seller and Buyer on the 30th day following Seller's receipt of such statement, unless prior to such 30th day Seller delivers to Buyer a written notice disputing such Allocation Schedule that sets forth what Seller believes represent the proper allocation of the Purchase Price and Assumed Liabilities among the Acquired Assets.  If Seller delivers such a dispute notice, then Buyer and Seller shall seek in good faith to agree upon the proper allocation under Section 1060 of the Code during the ten-day period beginning on the date Buyer receives such dispute notice.  If such an agreement cannot be reached during such ten-day period, then, within ten (10) days thereafter, Buyer, on the one hand, and Seller, on the other hand, shall jointly engage and submit the unresolved dispute to a nationally recognized independent registered public accounting firm appointed by mutual agreement of Buyer and Seller, or, if they are unable to agree, selected by the Bankruptcy Court.

9

Buyer and Seller shall use their respective reasonable best efforts to cause such firm to issue such firm's written determination regarding the proper allocation under Section 1060, as applicable, to the terms of this Agreement within fifteen (15) days after such dispute is submitted to the firm. During the foregoing review period, each Party shall use their respective commercially reasonable efforts to furnish to such firm such work papers and other documents and information as such firm may reasonably request. The determination of such firm shall be final, binding and conclusive upon Buyer and Seller absent manifest error. The Allocation Schedule shall be revised in accordance with Section 1060 of the Code to appropriately take into account any additional payments made under this Agreement following the foregoing determination.

(b)    In administering any Proceeding, the Bankruptcy Court shall not be required to apply the Allocation Schedule(s) in determining the manner in which the Purchase Price should be allocated as between Seller and Seller's estates. Buyer and Seller will each file all Tax Returns (including IRS Forms 8594) consistent with the Allocation Schedule(s) established in accordance with this Section 3.5. Seller, on the one hand, and Buyer, on the other hand, each agree to provide the other promptly with any other information required to complete IRS Forms 8594. Neither Buyer nor Seller shall take any Tax position inconsistent with such Allocation Schedule, and neither Buyer nor Seller shall agree to any proposed adjustment based upon or arising out of Allocation Schedule by any Governmental Authority without first giving the other Party prior written notice; provided, however, that nothing contained herein shall prevent Buyer or Seller from settling any proposed deficiency or adjustment by any Governmental Authority based upon or arising out of the Allocation Schedule, and neither Buyer nor Seller shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Authority based upon or arising out of such Allocation Schedule.

## ARTICLE IV

## CLOSING

Section 4.1    Closing Date.  On the terms and subject to the conditions set forth in this Agreement, the closing of the sale of the Acquired Assets and the assumption of the Assumed Liabilities contemplated hereby (the "Closing") shall take place at the offices of Paul Hastings LLP, 200 Park Avenue, New York, New York 10166, no later than the first (1st) Business Day following the date on which the conditions set forth in Article IX and Article X have been satisfied or (if permissible) waived (other than the conditions that by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions), or at such other place or time as Buyer and Seller may mutually agree upon in writing. The date and time at which the Closing actually occurs is referred to herein as the "Closing Date."

Section 4.2    Buyer's Deliveries.  At the Closing, Buyer shall deliver to Seller each of the following:

(a)    the Closing Date Cash Payment in accordance with clause (a) of Section 3.3;

(b)      each other Transaction Document not previously executed to which Buyer is a party, duly executed by Buyer;

(c)      the certificates of Buyer to be received by Seller pursuant to <u>Sections 10.1</u> and <u>10.2</u>; and

(d)      such assignments and other good and sufficient instruments of assumption and transfer, each in form reasonably satisfactory to Seller, as Seller may reasonably request to transfer and assign the Acquired Assets and Assumed Liabilities to Buyer.

Section 4.3      <u>Seller's Deliveries</u>.    At the Closing, Seller shall deliver to Buyer each of the following:

(a)      each other Transaction Document to which Seller is a party, duly executed by Seller;

(b)      a copy of the Sale Order entered by the Bankruptcy Court;

(c)      the certificates of Seller to be received by Buyer pursuant to <u>Sections 9.1</u> and <u>9.2</u>; and

(d)      such bills of sale, deeds, endorsements, assignments (including requisite assignments of Patents, Copyrights, Trademarks and Online Properties to the extent constituting Intellectual Property), UCC terminations and other filings and other good and sufficient instruments, each in form reasonably satisfactory to Buyer, which are necessary to vest in Buyer all the right, title and interest of Seller in, to or under any or all of the Acquired Assets free and clear of Encumbrances other than Permitted Encumbrances.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the Schedules, Seller hereby represents and warrants to Buyer that the following statements contained in this <u>Article V</u> are true and correct:

Section 5.1      <u>Organization and Good Standing</u>.    Seller is an entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of Seller's organization. Subject to the limitations imposed on Seller as a result of the Filing, Seller has the requisite limited liability company power and authority to own or lease and to operate and use Seller's properties.

Section 5.2      <u>Authority; Validity; Consents</u>.    Seller has, subject to requisite Bankruptcy Court approval, as applicable, the requisite limited liability company power and authority necessary to enter into and perform Seller's obligations under this Agreement and the other Transaction Documents to which Seller is a party and to consummate the transactions contemplated hereby and thereby. This Agreement has been duly and validly executed and delivered by Seller and each other Transaction Document required to be executed and delivered by Seller at the Closing will be duly and validly executed and delivered by Seller at the Closing.

11

Subject to requisite Bankruptcy Court approval, as applicable, this Agreement and the other Transaction Documents constitute, with respect to Seller, the legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Subject to, and after giving effect to, requisite Bankruptcy Court approval (including, without limitation, the Sale Order), as applicable, and except (a) for entry of the Sale Order and (b) for notices, filings and consents required in connection with the Bankruptcy Case, Seller is not required to give any notice to, make any filing with or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a party or the consummation or performance of any of the transactions contemplated hereby and thereby, except for such notices, filings and consents, the failure of which to provide, make or obtain, would not, individually or in the aggregate, have a Material Adverse Effect.

Section 5.3    Title to Acquired Assets.    Immediately prior to Closing, Seller will have and, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 4.3, and subject to the terms of the Sale Order, Seller will thereby transfer to Buyer, title to or, a valid contractual interest in, all of the Acquired Assets free and clear of all Encumbrances, except (i) as set forth on Schedule 5.3 and (ii) for Permitted Encumbrances; provided, that, the foregoing representation and warranty is not and shall not be deemed to be a representation or warranty of any kind regarding the infringement, misappropriation, or other violation of any intellectual property rights of any third party.

Section 5.4    Taxes.    There are no Encumbrances for Taxes on any of the Acquired Assets other than Permitted Encumbrances.

Section 5.5    Legal Proceedings.    As of the date hereof, except for the Bankruptcy Case and as set forth on Schedule 5.5, there is no Proceeding or Order pending, outstanding or, to Seller's Knowledge, threatened against Seller that (a) seeks to restrain or prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or (b) would have, individually or in the aggregate, a Material Adverse Effect.

Section 5.6    Brokers or Finders.    Except as set forth on Schedule 5.6 hereof, Seller has not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment owed in connection with this Agreement, the other Transaction Documents to which it is a party or the transactions contemplated hereby or thereby, in all cases for which Buyer is or will become liable following the Closing.

Section 5.7    Intellectual Property.

(a)    The issued Patents, registered Trademarks and registered Copyrights included in the Acquired Assets are subsisting and, to Seller's Knowledge, valid and enforceable. Seller owns and possesses, free and clear of all Encumbrances (other than Permitted Encumbrances), all right, title, and interest in and to, or, in the case of Online Properties, a valid contractual interest in, the Intellectual Property included in the Acquired Assets, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

12

(b)    To Seller's Knowledge, no third party is infringing or misappropriating any Intellectual Property included in the Acquired Assets in a material manner.

Section 5.8    No Other Representations or Warranties; No Survival.    Buyer acknowledges, on behalf of itself and its Affiliates, that, except for the representations and warranties contained in this Article V, none of Seller, Seller's Affiliates or any other Person on behalf of Seller or Seller's Affiliates makes any express or implied representation or warranty with respect to Seller, the Acquired Assets, the Assume Liabilities or with respect to any information provided by or on behalf of Seller or its Affiliates to Buyer.    Without limiting the generality of the foregoing, Seller expressly disclaims any representations or warranties regarding accuracy, sufficiency, fitness for a particular purpose, merchantability, and non-infringement of third party rights.    The representations and warranties of Seller will expire upon the earlier of the Closing Date or the termination of this Agreement.

# ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller that the following statements contained in this Article VI are true and correct:

Section 6.1    Organization and Good Standing.    Buyer is a limited partnership, duly organized, validly existing and in good standing under the laws of the jurisdiction of Buyer's organization.    Buyer has the requisite power and authority to own or lease and to operate and use Buyer's properties and to carry on Buyer's business as now conducted.

Section 6.2    Authority; Validity; Consents.    Buyer has the requisite power and authority necessary to enter into and perform Buyer's obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby.    The execution, delivery and performance of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated herein have been duly and validly authorized by all requisite corporate actions in respect thereof.    This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a party will be duly and validly executed and delivered by Buyer at the Closing.    This Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity.    Subject to requisite Bankruptcy Court approval, as applicable, Buyer is not and will not be required to give any notice to or obtain any consent from any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a party or the consummation or performance of any of the transactions contemplated hereby or thereby.

Section 6.3    No Conflict.    When the consents and other actions described in Section 6.2 have been obtained and taken, the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and

13

therein will not result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Buyer under (a) any agreement, indenture, or other instrument to which it is bound, (b) the certificate of incorporation of Buyer, (c) any Order or (d) any Law.

Section 6.4    Availability of Funds; Solvency.    Buyer has and will have at the Closing sufficient cash in immediately available funds to pay the Purchase Price and any other costs, fees and expenses required to be paid by it under this Agreement and the other Transaction Documents.    As of the Closing and immediately after consummating the transactions contemplated by this Agreement and the other transactions contemplated by the Transaction Documents, Buyer will not, assuming that the representations and warranties made by Seller in Article V of this Agreement are accurate in all material respects, (i) be insolvent (either because Buyer's financial condition is such that the sum of Buyer's debts is greater than the fair value of Buyer's assets or because the present fair value of Buyer's assets will be less than the amount required to pay Buyer's probable Liability on Buyer's debts as they become absolute and matured), (ii) have unreasonably small capital with which to engage in Buyer's business, or (iii) have incurred or plan to incur debts beyond Buyer's ability to repay such debts as they become absolute and matured.

Section 6.5    Litigation.    There are no Proceedings pending or, to the knowledge of Buyer, threatened, that would affect in any material respect Buyer's ability to perform Buyer's obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

Section 6.6    Brokers or Finders.    Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated by this Agreement for which Seller is or will become liable, and Buyer shall hold harmless and indemnify Seller from any claims with respect to any such fees or commissions.

Section 6.7    Condition of Acquired Assets; Representations.    Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly made by Seller in Article V (subject to the disclosures set forth on the Schedules), and Buyer acknowledges and agrees that, except for the representations and warranties contained in Article V, the Acquired Assets are being transferred on a "where is" and, as to condition, "as is" basis.    Buyer acknowledges that it has conducted to Buyer's satisfaction Buyer's own independent investigation of Seller's business (including the Acquired Assets and Assumed Liabilities) and, in making the determination to proceed with the transactions contemplated by this Agreement, Buyer has relied on the results of Buyer's own independent investigation.    In connection with Buyer's investigation, Buyer has received or may receive from Seller certain projections, forward-looking statements and other forecasts and certain business plan information.    Buyer acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Buyer is familiar with such uncertainties, that Buyer is taking full responsibility for making Buyer's own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to Buyer (including the reasonableness of the assumptions underlying such estimates, projections,

14

forecasts or plans), and that Buyer shall have no claim against anyone with respect thereto. Accordingly, Buyer acknowledges that Seller makes no representation or warranty with respect to such estimates, projections, forecasts or plans (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans).

## ARTICLE VII

## ACTIONS PRIOR TO THE CLOSING DATE

Section 7.1    Operations Prior to the Closing Date.  Seller covenants and agrees that, except (i) as expressly contemplated by this Agreement, (ii) with the prior written consent of Buyer (which consent, other than with respect to Section 7.1(b)(ii), shall not be unreasonably withheld or delayed), (iii) as required by the Bankruptcy Court or (iv) as otherwise required by Law, after the Effective Date and prior to the Closing Date:

(a)    Seller shall use commercially reasonable efforts, taking into account Seller's status as debtors-in-possession in the Bankruptcy Case, to maintain and preserve the Acquired Assets in their present condition in all material respects and, without limiting the generality of the foregoing,

(b)    Seller shall not:

(i)    sell, lease (as lessor), transfer or otherwise dispose of, or mortgage or pledge, or voluntarily impose or suffer to be imposed any Encumbrance (other than Assumed Liabilities and Permitted Encumbrances) on, any Acquired Asset; or

(ii)    cancel or compromise any material claim or waive or release any material right, in each case, that is a claim or right related to an Acquired Asset; or enter into any agreement or commitment to take any action prohibited by this Section 7.1.

Section 7.2    Bankruptcy Court Filings and Approval.

(a)    Seller shall use Seller's commercially reasonable efforts to obtain entry of the Sale Order and such other relief from the Bankruptcy Court as may be necessary or appropriate in connection with this Agreement and the consummation of the transactions contemplated by this Agreement.  Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and, consistent with Section 2.5, a finding by the Bankruptcy Court of adequate assurance of future performance by Buyer.

(b)    Seller and Buyer acknowledge that this Agreement and the sale of the Acquired Assets are subject to Bankruptcy Court approval.  Seller and Buyer acknowledge that to obtain such approval, Seller must demonstrate that they have taken reasonable steps to obtain the highest or otherwise best offer possible for the Acquired Assets and Buyer hereby agrees to provide all appropriate assurances thereof necessary in order to obtain the foregoing approvals.

(c)     Seller shall give all notices required to be given by applicable Law, to all Persons entitled thereto, of all motions (including the motions seeking entry of the Sale Order), orders, hearings and other proceedings relating to this Agreement and the transactions contemplated hereby and thereby and such additional notice as ordered by the Bankruptcy Court or as Buyer may reasonably request.

(d)     After entry of the Sale Order, Seller shall not take any action that is intended to, or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order.

## ARTICLE VIII

## ADDITIONAL AGREEMENTS

Section 8.1     <u>Taxes</u>.

(a)     Any sales, use, property transfer or gains, documentary, stamp, registration, recording or similar Tax (including, for certainty, goods and services tax, harmonized sales tax and land transfer tax) payable in connection with the sale or transfer of the Acquired Assets ("<u>Transfer Taxes</u>") shall be borne by Buyer and, to the extent Seller is required by applicable Law to pay Transfer Taxes, such Transfer Taxes shall be paid by Buyer to Seller at Closing. Seller and Buyer shall use reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Acquired Assets from any such Transfer Taxes. Seller shall prepare and file all necessary Tax Returns or other documents with respect to all such Transfer Taxes; <u>provided, however</u>, that in the event any such Tax Return requires execution by Buyer, Seller shall prepare and deliver to Buyer a copy of such Tax Return at least three (3) Business Days before the due date thereof, and Buyer shall promptly execute such Tax Return and deliver it to Seller, which shall cause it to be filed.

(b)     Buyer and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Acquired Assets (including access to the Documents) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority and the prosecution or defense of any claims, suit or proceeding relating to any Tax; <u>provided</u>, <u>however</u>, that (other than as required pursuant to this <u>Section 8.1(b)</u>) neither Buyer nor Seller shall be required to disclose the contents of its income tax returns to any Person. Any expenses incurred in furnishing such information or assistance pursuant to this <u>Section 8.1(b)</u> shall be borne by the Party requesting it.

(c)     Notwithstanding any other provisions in this Agreement, Buyer and Seller hereby waive compliance with all "bulk sales," "bulk transfer" and similar laws that may be applicable with respect to the sale and transfer of any or all of the Acquired Assets to Buyer.

Section 8.2     <u>Payments Received</u>.     Seller, on the one hand, and Buyer, on the other hand, each agree that, after the Closing, each will hold and will promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements (using each of their best efforts not to convert such checks into cash) or other

16

property that they may receive on or after the Closing which properly belongs to the other and will account to the other for all such receipts.

Section 8.3    Confidentiality.    The terms of any confidentiality agreement to which Buyer (or an Affiliate of Buyer) is party in respect of Seller (or any Affiliate of Seller) shall continue in full force and effect until the Closing, at which time Buyer's obligations under any such confidentiality agreement shall terminate only insofar as they pertain to the Acquired Assets, and shall otherwise remain in full force and effect in accordance with the terms thereof.

Section 8.4    Preservation of Books and Records.    For a period of seven (7) years after the Closing Date, Buyer shall preserve and retain all business records and other accounting, legal, auditing, and other books and records of the Seller included in the Acquired Assets (including any documents relating to any governmental or non-governmental claims, Proceedings, or investigations with respect to the Acquired Assets) relating to the ownership of the Acquired Assets prior to the Closing Date.

## ARTICLE IX

## CONDITIONS PRECEDENT TO THE OBLIGATION OF BUYER TO CLOSE

Buyer's obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction or waiver by Buyer (to the extent waivable), at or prior to the Closing, of each of the following conditions:

Section 9.1    Accuracy of Representations.    The representations and warranties of Seller contained in Article V shall be true and correct as of the date hereof and as of the Closing Date as though made on and as of the Closing Date (except that those representations and warranties which address matters only as of a particular date need only be true and correct as of such date); provided, however, that the condition in this Section 9.1 shall be deemed to be satisfied so long as any failure of such representations and warranties to be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" set forth therein), individually or in the aggregate, (a) has not had and would not reasonably be expected to have a Material Adverse Effect or (b) was not the result of changes or developments contemplated by the terms of this Agreement, resulting from any transaction consented to by Buyer, or resulting from the transactions contemplated by this Agreement.  At the Closing, Buyer shall receive a certificate of Seller, signed by a duly authorized officer of Seller, to that effect.

Section 9.2    Seller's Performance.    Seller shall have performed and complied in all material respects with the covenants and agreements that Seller is required to perform or comply with pursuant to this Agreement at or prior to the Closing.  At the Closing, Buyer shall receive a certificate of Seller, signed by a duly authorized officer of Seller, to that effect.

Section 9.3    No Order.    No Governmental Authority shall have enacted, issued, promulgated or entered any Order which is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement (a "Closing Legal Impediment"); provided, however, that prior to asserting this condition Buyer shall have taken all actions required by Section 7.2 to prevent the occurrence or entry of any such

17

Closing Legal Impediment and to remove or appeal as promptly as possible any such Closing Legal Impediment.

Section 9.4    Governmental Authorizations.    Any applicable waiting period under any applicable material antitrust or competition Law shall have expired or been terminated and any other material approval under any applicable antitrust or competition Law shall have been received.

Section 9.5    Seller's Deliveries.    Each of the deliveries required to be made to Buyer pursuant to Section 4.3 shall have been so delivered.

Section 9.6    Sale Order in Effect.    The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not be subject to a stay pending appeal.

## ARTICLE X

## CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLER TO CLOSE

Seller's obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction or waiver by Seller (to the extent waivable), at or prior to the Closing, of each of the following conditions:

Section 10.1    Accuracy of Representations.    The representations and warranties of Buyer contained in Article VI shall be true and correct as of the date hereof and as of the Closing Date as though made on and as of the Closing Date (except that those representations and warranties which address matters only as of a particular date need only be true and correct as of such date); provided, however, that the condition in this Section 10.1 shall be deemed to be satisfied so long as any failure of such representations and warranties to be true and correct (without giving effect to any limitation as to "materiality" or "material adverse effect" set forth therein), individually or in the aggregate, has not had and would not reasonably be expected to prevent or materially impair the ability of Buyer to consummate the transactions contemplated by this Agreement.  At the Closing, Seller shall receive a certificate of Buyer, signed by a duly authorized officer of Buyer, to that effect.

Section 10.2    Buyer's Performance.    Buyer shall have performed and complied in all material respects with the covenants and agreements that Buyer is required to perform or comply with pursuant to this Agreement at or prior to the Closing.  At the Closing, Seller shall receive a certificate of Buyer, signed by a duly authorized officer of Buyer, to that effect.

Section 10.3    No Order.    No Closing Legal Impediment shall be in effect, provided, however, that prior to asserting this condition Seller shall have taken all actions required by Section 7.2 to prevent the occurrence or entry of any such Closing Legal Impediment and to remove or appeal as promptly as possible any such Closing Legal Impediment.

Section 10.4    Governmental Authorizations.    Any applicable waiting period under any material applicable antitrust or competition Law shall have expired or been terminated and any other material approval under any applicable antitrust or competition Law shall have been received.

Section 10.5    Buyer's Deliveries.    Each of the deliveries required to be made to Seller pursuant to Section 4.2 shall have been so delivered.

Section 10.6    Sale Order in Effect.    The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not be subject to a stay pending appeal.

## ARTICLE XI

## TERMINATION

Section 11.1    Termination Events.    Notwithstanding anything contained in this Agreement to the contrary (other than as provided in the last sentence of this Section 11.1), this Agreement may be terminated at any time prior to the Closing Date:

    (a)    by mutual written consent of Seller and Buyer; or

    (b)    by either Seller or Buyer:

        (i)    if the Bankruptcy Court does not approve this Agreement for any reason or if a Governmental Authority issues a final, non-appealable ruling or Order permanently prohibiting the transactions contemplated hereby, provided, however, that the right to terminate this Agreement pursuant to this Section 11.1(b)(i) shall not be available to any Party whose breach of any of its representations, warranties, covenants or agreements contained herein results in such failure to approve, such ruling or Order;

        (ii)    if the Closing shall not have occurred by the close of business on September 19, 2019 (the "Outside Date"); provided, however, that the right to terminate this Agreement pursuant to this Section 11.1(b)(ii) shall not be available to any Party whose breach of any of such Party's representations, warranties, covenants, or agreements contained herein results in the failure of the Closing to be consummated by such time; provided, further, that if as of the Outside Date, all of the conditions precedent to the Closing other than the conditions set forth in Sections 9.4 and 10.4 (and other than those conditions that by their terms are to be satisfied at the Closing or on the Closing Date) shall have been satisfied as of the Outside Date, then Seller shall be entitled to extend the Outside Date until September 26, 2019, upon written notice to the Buyer, in which case the Outside Date shall be deemed for all purposes to be September 26, 2019;

        (iii)    if (A) the Sale Hearing is not held on or before September 12, 2019; provided, however, if the Sale Hearing is delayed due to the Bankruptcy Court's unavailability, the next Business Day on which the Bankruptcy Court is available, or (B) the Bankruptcy Court has not entered the Sale Order on or before September 13, 2019; provided, however, if approval of the Sale Order is delayed due to the Bankruptcy Court's unavailability, the next Business Day on which the Bankruptcy Court is available;

        (iv)    if the Sale Order is vacated; or

(v)    if Seller enters into a definitive agreement with respect to an Alternative Transaction because Buyer is not the Successful Bidder at the Auction; provided, however, that if Buyer is the Next Highest Bidder, then Buyer may not terminate this Agreement or withdraw its irrevocable offer unless and until such Alternative Transaction has closed; or

(c)    Seller (A) files any stand-alone plan of reorganization or liquidation that does not contemplate, the implementation or consummation of, the transactions provided for in this Agreement or (B) consummates an Alternative Transaction; or by Buyer:

(i)    in the event of any breach by Seller of any of Seller's agreements, covenants, representations or warranties contained herein that would result in the failure of a condition set forth in Article IX to be satisfied, and the failure of Seller to cure such breach by the earlier of (A) the Outside Date and (B) the date that is 15 days after receipt of the Buyer Termination Notice; provided, however, that (1) Buyer is not in breach of any of Buyer's representations, warranties, covenants or agreements contained herein in a manner that would result in the failure of a condition set forth in Article X to be satisfied, (2) Buyer notifies Seller in writing (the "Buyer Termination Notice") of Buyer's intention to exercise Buyer's rights under this Section 11.1(c)(i) as a result of the breach, and (3) Buyer specifies in the Buyer Termination Notice the representation, warranty, covenant or agreement contained herein of which Seller is allegedly in breach;

(ii)    if the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement; or

(iii)    if any conditions to the obligations of Buyer set forth in Article IX shall have become incapable of fulfillment other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement; or

(d)    by Seller:

(i)    except as provided in Section 11.1(d)(iii), in the event of any breach by Buyer of any of Buyer's agreements, covenants, representations or warranties contained herein that would result in the failure of a condition set forth in Article X to be satisfied, and the failure of Buyer to cure such breach by the earlier of (A) the Outside Date and (B) the date that is 15 days after receipt of the Seller Termination Notice; provided, however, that Seller (1) is not itself in material breach of any of Seller's representations, warranties, covenants or agreements contained herein, (2) notify Buyer in writing (the "Seller Termination Notice") of Seller's intention to exercise Seller's rights under this Section 11.1(d)(i) as a result of the breach, and (3) specify in the Seller Termination Notice the representation, warranty, covenant or agreement contained herein of which Buyer is allegedly in breach;

20

(ii)    if Seller consummates a sale, transfer or other disposition of any portion of the Acquired Assets in a transaction or series of transactions with one or more Persons other than Buyer; or

(iii)    if the Sale Order with respect to the transactions contemplated by this Agreement has been entered and is not subject to any stay on enforcement and (A) Seller has provided Buyer with written notice that Seller is prepared to consummate the transactions contemplated by this Agreement, (B) the conditions to Closing in Article IX have been satisfied (or waived by Buyer), other than those conditions that by their nature can only be satisfied at Closing, and (C) the Closing Date does not occur within one (1) Business Day of Seller providing Buyer with such notice.

For the avoidance of doubt, the Parties acknowledge and agree, that in the event that Seller determines, in Seller's reasonable discretion, that the last overbid submitted by Buyer is better than all other Qualified Bids as such Qualified Bids may be amended by an overbid submitted at the Auction, then within two (2) Business Days following the conclusion of the Auction, Sellers and Buyer shall enter into an amendment to this Agreement to reflect Buyer's last overbid; it being acknowledged and agreed that this Agreement shall not be deemed to have terminated by virtue of Buyer's having submitted the winning bid at the Auction.

Section 11.2    Effect of Termination.    If this Agreement is terminated pursuant to Section 11.1(d)(i) or Section 11.1(d)(iii), the Minimum Deposit shall be retained by Seller for Seller's own account as damages specifically; provided that Seller specifically reserves the right to seek additional damages and remedies against Buyer in any respect of any claim against Buyer arising under this Agreement or otherwise.    If this Agreement is terminated pursuant to any provision of Section 11.1 other than either Section 11.1(d)(i) or Section 11.1(d)(iii), Seller shall promptly (but in any event within two (2) Business Days of such termination) instruct Hilco to return the Minimum Deposit to Buyer by wire transfer of immediately available funds, and the return thereof shall constitute the sole and exclusive remedy of Buyer in the event of such a termination hereunder.

## ARTICLE XII

## GENERAL PROVISIONS

Section 12.1    Notices.    Any notice, consent or other communication required or permitted under this Agreement shall be in writing and shall be delivered (a) in person, (b) by a nationally recognized courier for overnight delivery service, or (c) by email or other electronic means, confirmed by telephone or return email (including an automated return receipt), to the persons indicated below.    A notice or communication shall be deemed to have been effectively given (i) if in person, upon personal delivery to the Party to whom the notice is directed, (ii) if by nationally recognized courier, one Business Day after delivery to such courier, and (iii) if by email or other electronic means, when sent and confirmed by telephone or return email. Rejection or other refusal to accept or inability to deliver because of changed address of which no notice has been received shall also constitute receipt.    Any such notice, election, demand, request or response shall be addressed as follows:

21

    (a)     If to Seller, then to:

            Charming Charlie LLC
            6001 Savoy Drive, Suite 600
            Houston, Texas  77036
            Attention:  Al Bellon

            with a copy (which shall not constitute notice) to:

            Paul Hastings LLP
            71 S. Wacker Drive, 45th Floor
            Chicago, Illinois  60606
            Attention:     Matthew M. Murphy; Tyler J. Born; and Nathan S. Gimpel
            Phone:         312-499-6000
            Email:          mattmurphy@paulhastings.com;
                              tylerborn@paulhastings.com;
                              nathangimpel@paulhastings.com

    (b)     If to Buyer, then to:

            CJS Group L.P.
            1330 Post Oak Blvd., Suite 1200
            Houston, Texas  77056
            Attention:     Charles Chanaratsopon
            Phone:         832-216-0088
            Email:          cchanaratsopon07@gmail.com

      Section 12.2   <u>Amendment; Waiver</u>.  No amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by the Party against whom enforcement of the amendment, modification, discharge or waiver is sought and such amendment, modification, discharge or waiver is delivered substantially contemporaneously to each other Party.  Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Party granting such waiver in any other respect or at any other time.  Neither the waiver by any of the Parties of a breach of or a default under any of the provisions of this Agreement, nor the failure by any of the Parties, on one or more occasions, to enforce any of the provisions of this Agreement or to exercise any right or privilege hereunder shall be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder.  No course of dealing between or among the Parties shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights to payment of any Party under or by reason of this Agreement.

      Section 12.3   <u>Entire Agreement</u>.  This Agreement (including the Schedules and the Exhibits) and the other Transaction Documents contain all of the terms, conditions and representations and warranties agreed to by the Parties relating to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings, negotiations, correspondence, undertakings and communications of the Parties or their

22

representatives, oral or written, respecting such subject matter.  The representations, warranties, covenants and agreements contained in this Agreement (including the Schedules and the Exhibits) and the other Transaction Documents are intended, among other things, to allocate the economic cost and the risks inherent in the transactions contemplated hereby and thereby, including risks associated with matters as to which the party making such representations and warranties has no knowledge or only incomplete knowledge, and such representations and warranties may be qualified by disclosures contained in the Schedules.  Consequently, Persons other than the Parties may not rely upon the representations and warranties in this Agreement as characterizations of actual facts or circumstances as of the date of this Agreement or as of any other date.

Section 12.4    No Presumption as to Drafting.  Each of the parties acknowledges that it has been represented by legal counsel in connection with this Agreement and the other Transaction Documents and the transactions contemplated hereby and thereby.  Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement or the Transaction Documents against the drafting party has no application and is expressly waived.

Section 12.5    Assignment.  This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of the other Parties (which consent maybe granted or withheld in the sole discretion of such other Party); provided, however, that Buyer shall be permitted, upon prior notice to Seller, to assign all or part of Buyer's rights or obligations hereunder to an Affiliate, but no such assignment shall relieve Buyer of Buyer's obligations under this Agreement.

Section 12.6    Severability.  The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

Section 12.7    Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and all claims or causes of action (whether in contract, tort or otherwise) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement) shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to Contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.

(b)     Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding; provided, however, that, if the Bankruptcy Case is closed, all Proceedings arising out of or relating to this Agreement shall be heard and determined in a Delaware state court or a federal court sitting in the State of Delaware, and the Parties hereby (a) irrevocably and unconditionally submit to the exclusive jurisdiction of the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Proceeding in the United States District Court for the District of Delaware) with respect to all Proceedings arising out of or relating to this Agreement and the transaction contemplated hereby (whether based on contract, tort or other theory); (b) agree that all claims with respect to any such Proceeding shall be heard and determined in such courts and agrees not to commence any Proceeding relating to this Agreement or the transactions contemplated hereby (whether based on contract, tort or other theory) except in such courts; (c) irrevocably and unconditionally waive any objection to the laying of venue of any Proceeding arising out of this Agreement or the transactions contemplated hereby and irrevocably and unconditionally waives the defense of an inconvenient forum; and (d) agree that a final judgment in any such Proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.  The Parties agree that any violation of this Section 12.7(b) shall constitute a material breach of this Agreement and shall constitute irreparable harm.

(c)     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 12.7.

Section 12.8   Counterparts.   This Agreement may be executed in any number of counterparts (including via facsimile or other electronic transmission in portable document format (pdf)) with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement. This Agreement shall become effective when, and only when, each Party shall have received a counterpart hereof signed by the other Party.  Delivery of an executed counterpart hereof by means of facsimile or electronic transmission in portable document format (pdf) shall have the same effect as delivery of a physically executed counterpart in person.

LEGAL_US_E # 144135441.2

Section 12.9   Parties in Interest; No Third Party Beneficiaries.    Nothing in this Agreement shall confer any rights, benefits, remedies, obligations, liabilities or claims hereunder upon any Person not a Party or a permitted assignee of a Party.

Section 12.10   Non-Recourse.    All claims, obligations, liabilities or causes of action (whether in contract or in tort, in law or in equity or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with or relate in any manner to this Agreement, the negotiation, execution or performance of this Agreement (including any representation or warranty made in connection with or as an inducement to this Agreement) or the transactions contemplated hereby may be made only against (and are those solely of) the Persons that are expressly identified as Parties to this Agreement.  No other Person, including any of their Affiliates, directors, officers, employees, incorporators, members, partners, managers, stockholders, agents, attorneys, or representatives of, or any financial advisors or lenders to, any of the foregoing shall have any liabilities (whether in contract or in tort, in law or in equity, or granted by statute) for any claims, causes of action, obligations or liabilities arising under, out of, in connection with, or related in any manner to, this Agreement or based on, in respect of, or by reason of, this Agreement or its negotiation, execution, performance or breach.

Section 12.11   Schedules; Materiality.    The inclusion of any matter in any Schedule shall be deemed to be an inclusion for all purposes of this Agreement, to the extent that such disclosure is sufficient to identify the Section to which such disclosure is responsive, but inclusion therein shall not be deemed to constitute an admission, or otherwise imply, that any such matter is material or creates a measure for materiality for purposes of this Agreement.  The disclosure of any particular fact or item in any Schedule shall not be deemed an admission as to whether the fact or item is "material" or would constitute a "Material Adverse Effect."

Section 12.12   Specific Performance.    The Parties acknowledge and agree that (a) irreparable injury, for which monetary damages, even if available, would not be an adequate remedy, will occur in the event that any of the provisions of this Agreement are not performed in accordance with the specific terms hereof or are otherwise breached, and (b) the non-breaching Party or Parties shall therefore be entitled, in addition to any other remedies that may be available, to obtain (without the posting of any bond) specific performance of the terms of this Agreement.  If any Proceeding is brought by the non-breaching Party or Parties to enforce this Agreement, the Party in breach shall waive the defense that there is an adequate remedy at law.

Section 12.13   No Survival.    None of the (a) representations  and warranties or (b) covenants which require performance prior to the Closing ("Pre-Closing Covenants"), in each case contained in this Agreement, any Transaction Document or in any certificate or schedule delivered pursuant to hereto or thereto shall survive the Closing.  In furtherance, not limitation, of the foregoing, the Parties, intending to contractually shorten any otherwise applicable statute of limitations, hereby agree that: (i) the representations and warranties herein are intended solely to facilitate disclosure and to give effect to the closing conditions set forth in Article IX and Article X, (ii) the Pre-Closing Covenants are intended solely to serve as the closing conditions set forth in Article IX and Article X and (iii) no claim of any kind based on the failure of any representation or warranty to have been true and correct, or based on the failure of any Pre-Closing Covenant to have been performed or complied with, may be brought at any time after the Closing.   All covenants and agreements contained herein that by their terms are to be

25

performed in whole or in part, or which prohibit actions, subsequent to the Closing shall survive the Closing in accordance with their terms.

Section 12.14 <u>Publicity</u>. Neither Party nor any of their respective representatives may make any press release or other public disclosure regarding the existence of this Agreement or the other Transaction Documents, its or their contents, or the transactions contemplated by this Agreement or the other Transaction Documents without the written consent of the other Party, in any case, as to the form, content, and timing and manner of distribution or publication of such press release or other public disclosure (which consent may not be unreasonably withheld, conditioned, or delayed). Each Party shall hold confidential the terms and provisions of this Agreement and the other Transaction Documents and the terms of the transactions contemplated by this Agreement and the other Transaction Documents. Notwithstanding the foregoing, nothing in this <u>Section 12.14</u> will prevent either Party or its representatives from making any press release or other disclosure required by Law (including in connection with the Bankruptcy Case or Sale Motion) or the rules of any stock exchange, in which case the Party required to make such press release or other disclosure shall use commercially reasonable efforts to allow the other Party reasonable time to review and comment on such release or disclosure in advance of its issuance.

*[Remainder of page intentionally left blank]*

LEGAL_US_E # 144135441.2

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the Effective Date.

**BUYER:**

**CJS GROUP, LP**

By: _____
Name: Charles Chanaratsopon
Title:   Managing Partner

*[Signature Page to Intellectual Property Asset Purchase Agreement]*

**SELLER:**

**CHARMING CHARLIE LLC**

By: _____
Name: Alvaro Bellon
Title:  CFO

**EXHIBIT A**

**<u>Sale Order</u>**